**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | x | |
| In re: | : | Chapter 11 |
| | : | |
| HEXION HOLDINGS LLC, et al., [1] | : | Case No. 19-10684 (  ) |
| | : | |
| Debtors. | : | Joint Administration Requested |
| | x | |

**GEORGE F. KNIGHT'S DECLARATION IN SUPPORT OF THE DEBTORS'**
**CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Hexion Holdings LLC (6842); Hexion LLC (8090); Hexion Inc. (1250); Lawter International Inc. (0818); Hexion CI Holding Company (China) LLC (7441); Hexion Nimbus Inc. (4409); Hexion Nimbus Asset Holdings LLC (4409); Hexion Deer Park LLC (8302); Hexion VAD LLC (6340); Hexion 2 U.S. Finance Corp. (2643); Hexion HSM Holdings LLC (7131); Hexion Investments Inc. (0359); Hexion International Inc. (3048); North American Sugar Industries Incorporated (9735); Cuban-American Mercantile Corporation (9734); The West India Company (2288); NL Coop Holdings LLC (0696); and Hexion Nova Scotia Finance, ULC (N/A). The address of the Debtors' corporate headquarters is 180 East Broad Street, Columbus, Ohio 43215.

PRELIMINARY STATEMENT .................................................................................................3

I.      DESCRIPTION OF THE DEBTORS ..........................................................................5

        A.      The Debtors' Corporate Structure.................................................................5
        B.      History of the Debtors...................................................................................6
        C.      The Debtors' Business Operations.................................................................8
        D.      The Debtors' Prepetition Capital Structure...................................................16

II.     Events Leading to Commencement of Chapter 11 Cases...................................................21

        A.      Maturities and Liquidity ...............................................................................22
        B.      Restructuring Efforts.....................................................................................23

III.    Restructuring Support Agreement ...................................................................................25

IV.     Summary of First Day Pleadings .....................................................................................26

        A.      Motions Related to Case Management ..........................................................27
        B.      Motions Related to Financing of Operations ..................................................299
        C.      Motions to Pay Certain Prepetition Obligations and Maintain Certain
                Business Practices and Programs....................................................................33
        D.      Certain Other Motions ...................................................................................64

I, George F. Knight, declare under penalty of perjury:

1.      I am the Executive Vice President and Chief Financial Officer of Hexion Inc., which, together with the other above-captioned debtors (the "**Debtors**") and their non-debtor affiliates, (the "**Non-Debtor Affiliates**" and together with the Debtors, "**Hexion**"), is the world's leading producer of thermosetting resins, or thermosets, and a leading producer of adhesive and structural resins and coatings.  Thermosets are a critical ingredient in most paints, coatings, glues and other adhesives produced for consumer or industrial uses.

2.      Hexion Inc. is incorporated in New Jersey; most of its co-Debtors are Delaware limited liability companies or Delaware corporations.  The Debtors are headquartered in Columbus, Ohio.  Hexion employs approximately 4,000 employees around the world, including approximately 1,300 in the United States across 27 production facilities.

3.      I have worked for the Debtors, or predecessors of the Debtors, for over 20 years.  Prior to my current post, I served as Senior Vice President of Finance and Treasurer of Hexion Inc. from 2010-2016.  Prior to that, I served in similar capacities at predecessor companies Hexion Specialty Chemicals Inc. (2005-2010) and Borden Chemical (1997-2005).  I have also served in finance posts at Duracell International, Inc., and spent more than 11 years at Deloitte & Touche, leaving as a senior audit manager in 1992.

4.      I am generally familiar with the Debtors' businesses, day-to-day operations, financial matters, operating results, business plans, actual and projected cash flows, and underlying books and records.  Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' management, employees, and advisors, my review of relevant documents, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  If called to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

5.    On the date I am filing this Declaration (the "**Petition Date**"), the 18 Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Chapter 11 Cases**").

6.    I submit this Declaration to describe the Debtors' background, the circumstances that led to these Chapter 11 Cases, and the Debtors' goals in these cases. I also submit this Declaration in support of relief the Debtors have requested in certain of the "first day" applications and motions filed with the Court (collectively, the "**First Day Pleadings**"). All of the relief sought in the First Day Pleadings is necessary to ensure the Debtors' continued operations, minimize potential adverse effects of filing bankruptcy, and ease the administrative burden of operating in chapter 11.

7.    In addition, Debtor Hexion Inc. is the parent company not only to all of the Debtor operating companies but also to all of the Non-Debtor Affiliate operating companies around the world. The operations of these Non-Debtor Affiliates are integrated with the Debtors' operations on every level, and the relief sought in the First Day Pleadings is critical to maintaining the stable global business operations of these Non-Debtor Affiliates.

8.    With the First Day Pleadings, the Debtors seek to, among other things:

- establish administrative procedures to promote a seamless transition into and through these Chapter 11 Cases;

- allow for the continued payment of utility, wage, insurance, and tax obligations;

- ensure the continuation of the Debtors' and the Non-Debtor Affiliates' operations and cash management system without interruption and allow the continuation of funding between certain Debtors and Non-Debtor Affiliates through the maintenance of intercompany loans and other payment mechanisms;

- pay critical vendors and other vendors that have asserted or are capable of asserting liens against the Debtors' property;

2

- as a foundation to all of the relief sought, obtain debtor-in-possession financing and use cash collateral in the operation of the Debtors' businesses.

9.      I am familiar with each of the First Day Pleadings.  In my opinion, the Debtors—and their Non-Debtor Affiliates—would suffer immediate and irreparable harm absent the ability to continue their business operations, which is what the relief requested in the First Day Pleadings accomplishes.  The relief sought in the First Day Pleadings is critical to the Debtors' efforts to transition into chapter 11 efficiently and with minimized disruptions to their business operations, thereby permitting the Debtors to preserve and maximize value for the benefit of all their stakeholders while the Debtors pursue the strategic and financial objectives these Chapter 11 Cases were filed to achieve.

10.      This Declaration is divided into four parts.  **Part I** describes the Debtors' business, organizational structure, and prepetition indebtedness.  **Part II** describes the circumstances leading to the commencement of these chapter 11 cases.  **Part III** describes the anticipated restructuring.  **Part IV** summarizes the First Day Pleadings and explains why the relief requested is appropriate and necessary.

## PRELIMINARY STATEMENT

11.      Hexion is a global leader in the field of thermoset resins.  These resins are key ingredients in a wide variety of industrial and consumer goods, where they are often employed as adhesives, as coatings and sealants, and as intermediates for other chemical applications.  Hexion adhesives help hold together all manner of industrial products, from wind turbine blades to particle board; Hexion coatings prevent corrosion on critical infrastructure, from bridges to buildings; Hexion intermediates help create products consumers rely on every day.

12.      Hexion is a strong operating business with a positive outlook.  Hexion benefits from a global footprint of strategically located operations, a diversified product portfolio, and a substantially integrated manufacturing process that helps avoid disruptions in

3

supply.  Hexion also has an outstanding employee base and a highly-experienced management team. These attributes and others help Hexion deliver quality solutions for its customers—and to do so reliably and efficiently. On a consolidated basis, the Debtors and their Non-Debtor Affiliates generated $3.8 billion in revenue in 2018 and $440 million in segment EBITDA. This represents the best operational performance since 2012, and an improvement of 21% over the prior year.

13.     At the same time, the Debtors face financial difficulties.  Prior to the anticipated restructuring, the Debtors are over nine times levered relative to their 2018 adjusted EBITDA and face annual debt service in excess of $300 million.  In addition, over $2 billion of the Debtors' prepetition funded debt obligations mature in 2020. The resulting liquidity and refinancing pressures have created an unsustainable drag on the Debtors and, by extension, their Non-Debtor Affiliates, requiring a comprehensive solution.

14.     The Debtors explored a variety of options and initiatives, and retained additional legal and financial advisors to provide additional guidance. The Debtors, in consultation with their advisors, ultimately concluded that a chapter 11 process was in the best interests of the Debtors and their creditors and other stakeholders. The Debtors, together with their advisors, engaged in arm's-length negotiations with creditor groups representing holders of a substantial majority of the Debtors' prepetition debt securities.  As a result of those efforts, the Debtors enter these Chapter 11 Cases with a proposed restructuring, memorialized in a detailed restructuring support agreement, that enjoys the support of creditors holding a majority of the debt to be restructured, including majorities within every tier of the capital structure.

15.     The proposed restructuring will restore the Debtors to a sound financial footing and position them for success going forward. The proposed restructuring reduces total funded debt by approximately $2 billion, reducing total leverage by over half, while also providing substantial fresh equity capital from new money equity participation.  Finally, the proposed restructuring effects minimal changes to non-financial obligations and to operations, employees, vendors, and customers.

US-DOCS\106033993.27

16.     To finance their restructuring, the Debtors have also secured commitments for third-party debtor-in-possession financing through two postpetition credit facilities: the DIP Term Loan and the DIP ABL (each as defined below) (the "DIP Facilities").  Borrowings under the DIP Term Loan (which will initially be borrowed by non-Debtor subsidiary Hexion International Holdings B.V. and guaranteed by the Debtors) will be used to repay the prepetition ABL.  The DIP ABL is an asset-based revolving loan facility with a maximum availability of $350 million (subject to borrowing base limitations),  which will be the primary vehicle through which the Debtors finance their operations during, and the costs of, these Chapter 11 Cases.  The financing provided under the DIP Facilities will be essential to the Debtors' efforts to consummate the proposed restructuring described above.

17.     Through these Chapter 11 Cases, the Debtors seek to maintain all of the many benefits of Hexion's history, culture, and market position while effecting a financial restructuring that positions the Debtors and their non-Debtor Affiliates for stability and success. By garnering broad-based support for their proposed restructuring and securing sufficient postpetition financing to pursue it, the Debtors have already taken an important first step toward achieving those goals.

# I.     DESCRIPTION OF THE DEBTORS

## A.     The Debtors' Corporate Structure

18.     Hexion Holdings LLC is the sole member of Hexion LLC, which is the sole owner of Hexion Inc.  Hexion Inc. is the direct or indirect parent of all of the Debtors in these cases as well as the Non-Debtor Affiliates.

19.    A detailed organizational chart is attached hereto as <u>Exhibit A</u>.  The following is a simplified version:[2]



*Integrated Global Thermoset Resins Production and Delivery*

**B.    History of the Debtors**

20.    Hexion was formed in 2005 through the combination of Borden Chemical, Inc., Resolution Performance Products LLC and Resolution Specialty Materials LLC. Together, these legacy companies had been leaders in the specialty chemicals industry for over a hundred years.  This heritage began in 1899 with the formation of Gail Borden Jr. and Company, producers of milk—and also of the milk byproduct casein, which was an ingredient in early plastics and remains an adhesive for wood products.  Borden Chemical separated from the food-focused business in 2001.

21.    This heritage also includes the development of Bakelite, which is to us a thermosetting phenol formaldehyde resin, but is to the world the revolutionary "product of 1,000 uses"—an extraordinarily versatile, strong, and moldable synthetic plastic.  Legacy companies

---

[2] The simplified chart set forth herein does not reflect that a single non-operating foreign subsidiary, Hexion Nova Scotia Finance ULC, which is an issuer of the Debtors' 2L Notes (as defined herein), is also a Debtor.

further developed phenolic resins for the modern age, including for use on Space Shuttle engine nozzles, due to their fire resistance.

22.     Legacy companies are also responsible for development of the first patented epoxy resin.  Epoxy resins, which remain a key Hexion product today, are used for a wide array of coating and adhesive processes as well as for forming plastics and composites. Hexion-legacy epoxy resins helped build the first modern wind turbines.  Legacy companies also helped develop the first waterborne (i.e., water-solvent) epoxy resins, improving versatility and reducing emissions relative to solvent-based resins.

23.     The 2005 combination of these storied companies made Hexion a global leader in these products, a category of essential specialty chemicals known as thermoset resins.

24.     In 2010, Hexion LLC (formerly known as Momentive Specialty Chemicals Holdings LLC), and Momentive Performance Materials Holdings Inc. ("**MPM Holdings**"), the parent company of Momentive Performance Materials Inc. ("**MPM**"), became subsidiaries of a newly formed holding company, Hexion Holdings LLC (formerly known as Momentive Performance Materials Holdings LLC, "**Hexion Holdings**").  We refer to this transaction as the "Momentive Combination."  As a result of the Momentive Combination, Hexion Holdings became the ultimate parent of MPM and Hexion. Hexion Holdings is controlled by investment funds managed by affiliates of Apollo Management Holdings, L.P. (together with Apollo Global Management, LLC and its subsidiaries, "**Apollo**").

25.     During the period between 2010 and 2014, MPM and Hexion maintained a common parent but maintained separate capital structures. Also, a shared services agreement was put in place to allow for MPM and Hexion to utilize a common management team to operate the businesses and to share administrative costs between the two companies.  As a result of the 2014 chapter 11 proceedings of MPM, Hexion and MPM no longer share a common parent.  Hexion has nevertheless maintained certain important contractual relationships with MPM including, until recently, a shared services agreement.

7

26.     In December 2014, the company resumed use of the Hexion name, noting at the time the desire to align itself with the heritage described above.  From its beginnings, through its formation in 2005, and up to today, Hexion has continued to lead the market in its products and in innovation.  Recent key initiatives include environmentally-friendly resins (such as EcoBind, an ultra-low emission resin technology), specialty epoxy resins for the wind energy market, and composites for high-performance automobiles.  The Debtors hope to carry this history forward with the assistance of the bankruptcy process and their supportive creditors, positioning itself to build on its legacy for years to come.

C.      **The Debtors' Business Operations**

27.     The Debtors, together with their Non-Debtor Affiliates, are leaders in the field of thermoset resins.  These resins are created through a variety of chemical processes, and they serve an even broader array of industrial purposes.  Hexion's products are used in thousands of applications and are sold into diverse markets, such as forest products, architectural and industrial paints, packaging, consumer products, composites and automotive coatings.  Hexion serves many industry sectors, including industrial/marine, construction, consumer/durable goods, automotive, wind energy, aviation, electronics, architectural, civil engineering, repair/remodeling and oil and gas field support.  The diversity of Hexion's products limits its dependence on any one market or end-use.  Hexion has a history of product innovation and success in introducing new products to new markets, as evidenced by over 750 granted patents, the majority of which relate to the development of new products and manufacturing processes.  Hexion is constantly looking at new ways to introduce new products in its currently established markets.

a.  **Business Segments**

28.     Hexion divides its business into two operating segments[3] for reporting purposes: the Epoxy, Phenolics and Coatings Resins Division ("**EPCD**") and the Forest Products

---

[3] Hexion reports a third segment, Corporate and Other, which is primarily corporate, general and administrative expenses that are not allocated to the other segments, such as shared service and administrative functions, unallocated foreign exchange gains and losses and legacy company costs not allocated to continuing segments

8

Division ("**FPD**").   As detailed below, the EPCD segment comprises a variety of epoxy and phenolic specialty products, while FPD focuses on formaldehyde and formaldehyde-based resins useful in wood-adhesion applications.

i.   *Epoxy, Phenolics and Coatings Resins Segment Division (EPCD)*

29.    EPCD further divides into the five business units detailed below.

30.    <u>Base Epoxy Resins & Intermediates</u>.  Hexion is one of the world's largest suppliers of base epoxy resins.  Base epoxy resins are used primarily in coatings including "electrocoat" applications for the automotive industry, powder coatings for automotive, oil and gas, general industry and white goods (*e.g.*, appliances), and heat-cured coatings for metal packaging, coiled steel and general industry.

31.    <u>Epoxy Specialty Resins</u>.  Hexion is a leading producer of epoxy specialty resins including infusion resins and bonding pastes for the wind turbine industry, low-emission waterborne coatings to combat corrosion, and blends and resins for lightweight materials and composites critical to the automotive and aircraft industries.

32.    <u>Versatics</u>.  Hexion is a leading producer of versatic acids and derivatives. Versatic acids and derivatives are specialty monomers that provide performance advantages for finished coatings, including superior adhesion, water resistance, appearance and ease of application.   Applications for these specialty monomers include decorative, automotive and protective coatings.

33.    <u>Phenolic Specialty Resins</u>.   Hexion is a leading producer of phenolic specialty resins, which are used in applications that require extreme heat resistance and strength, such as after-market automotive and OEM truck brake pads, filtration, aircraft components and foundry resins.   These products are sold under globally recognized brand names such as BORDEN, BAKELITE, DURITE and CELLOBOND.   Hexion's phenolic specialty resins are also known for their binding qualities and are used widely in the production of mineral wool and glass wool used for commercial and domestic insulation applications.

34.   <u>Oilfield</u>.   Hexion is an innovator in oilfield specialty products, including additives both for drilling and for cementing, and resin-coated proppants.

ii.   *Forest Products Segment Division (FPD)*

35.   FPD further subdivides into the two business units detailed below.

36.   <u>Formaldehyde</u>.   Hexion is a significant producer of formaldehyde, a key raw material used to manufacture thousands of other chemicals and products.

37.   <u>Forest Products Resins / Wood Adhesive</u>.   Hexion is the leading producer of formaldehyde-based resins for the North American forest products industry, and also holds significant positions in Latin America, Australia, New Zealand, and Europe.   Formaldehyde-based resins, also known as forest products resins, are a key adhesive and binding ingredient used in the production of a wide variety of engineered lumber products, including medium-density fiberboard, particleboard, oriented strand board and various types of plywood and laminated veneer lumber.   These products are used in a wide range of applications in the construction, remodeling and furniture industries.

### b.  Production Facilities

38.   The Debtors and the Non-Debtor Affiliates have 47 total active production sites around the world.   Through their worldwide network of strategically located production facilities, the Debtors and their Non-Debtor Affiliates serve more than 3,100 customers in approximately 85 countries.   The following map illustrates Hexion's global operations:

US-DOCS\106033993.27



39.     Most of the Debtors' facilities are used for the production of thermosetting resins, and most of them manufacture more than one type of thermosetting resin, the nature of which varies by site.  These facilities typically use batch technology, and range in size from small sites, with a limited number of reactors, to larger sites, with dozens of reactors.  In addition, the Debtors, and their Non-Debtor Affiliates, have the ability to internally produce key intermediate materials such as formaldehyde, BPA, ECH, and versatic acid.  This backward integration provides cost advantages and facilitates adequacy of supply.  These facilities are usually co-located with downstream resin manufacturing facilities they serve.  As these intermediate materials facilities are often much larger than a typical resins plant, the Debtors, and their Non-Debtor Affiliates generally, capture the benefits of manufacturing efficiency and scale by selling excess production to third parties.

40.     The Debtors own or lease 27 production facilities in the United States. The following chart details the Debtors' facilities:

| Count | Segment | Site | St. | Owned/Leased | Employees[+] |
|---|---|---|---|---|---|
| 1 | FPD & EPCD - PSR | Louisville | KY | Owned | 120 |
| 2 | EPCD – BERI | Deer Park | TX | Owned* | 130 |
| 3 | EPCD – EPS | Argo | IL | Owned* | 40 |
| 4 | FPD | Hope | AR | Owned | 25 |
| 5 | FPD | Springfield | OR | Owned | 50 |
| 6 | FPD | Fayetteville | NC | Owned | 70 |
| 7 | FPD | Diboll | TX | Owned | 40 |
| 8 | FPD | Luling | LA | Owned* | 10 |
| 9 | FPD | Missoula | MT | Leased | 20 |
| 10 | FPD | Sheboygan | WI | Owned | 30 |
| 11 | FPD | Morganton | NC | Leased | 30 |
| 12 | FPD | Alexandria | LA | Owned | 25 |
| 13 | FPD | Geismar | LA | Owned[++] | 50 |
| 14 | FPD | Baytown | TX | Owned* | 10 |
| 15 | EPCD - EPS | Lakeland | FL | Owned | 45 |
| 16 | FPD | Acme | NC | Owned | 30 |
| 17 | FPD | LaGrande (Island City) | OR | Owned | 10 |
| 18 | FPD | Moreau | NY | Owned | 10 |
| 19 | FPD | Columbus | GA | Owned* | 5 |
| 20 | FPD | Portland | OR | Owned | 5 |
| 21 | EPCD - Oilfield | Brady^ | TX | Owned | |
| 22 | EPCD - Oilfield | Shreveport^ | LA | Owned* | |
| 23 | EPCD - Oilfield | Cleburne^ | TX | Owned | |
| 24 | FPD | Virginia^ | MN | Owned | |
| 25 | FPD | Mount Jewett^ | PA | Owned | |
| 26 | FPD | Demopolis^ | AL | Owned | |
| 27 | EPCD - Oilfield | Batesville^ | AR | Owned | |
| | *Machinery and equipment owned; ground lease<br>[+] Approximate; includes manufacturing employees, contractors, and regional/commercial staff<br>[++] G6 Formaldehyde Reactor leased<br>^ Idle | | | | |

### c.  Research and Development

41.    Hexion's research and development activities are geared towards developing and enhancing products, processes and application technologies to maintain Hexion's position as the world's largest producer of thermosetting resins.  Hexion has approximately 360 scientists and technicians worldwide.  Hexion's research and development facilities include a broad range of synthesis, testing and formulating equipment and small-scale versions of customer manufacturing processes for applications development and demonstration.

42.    More recently, efforts have focused on incorporation of green chemistry principles into technology innovations to remain competitive and to address customer demands

US-DOCS\106033993.27

for more environmentally preferred solutions.  Initiatives include developing resin technologies that reduce emissions, maximize efficiency and increase the use of bio-based raw materials. Some examples of meaningful results of this investment in the development of green products include: EPIKOTE / EPIKURE epoxy systems for wind energy applications, which provide superior mechanical and process properties, reducing air emissions when hours of energy are created; EPIKOTE and Bakelite resin systems for automotive applications, which produce lightweight automotive composite components and other automotive parts that allow customers to build cars with better mileage, reducing air emissions without sacrificing performance; EcoBind Resin Technology, an ultra-low-emitting binder resin used to produce engineered wood products; and Epi-Rez Epoxy Waterborne Resins, which provide for lower volatile organic compounds, reducing air emissions.

### d.  Intellectual Property

43.     As of December 31, 2018, Hexion owns, licenses or has rights to over 750 granted patents and over 1,100 registered trademarks, as well as various patent and trademark applications and technology licenses around the world, which are used or held for use in operations.  A majority of these patents relate to developing new products and processes for manufacturing and will expire between 2019 and 2036.  Trademarks are renewed on a regular basis.  The Debtors own or have the rights over the substantial majority of this intellectual property.

### e.  Employees

44.     As of the Petition Date, Hexion had approximately 4,000 employees around the world.  Debtor Hexion Inc. employs approximately 1,300 of these employees, including approximately 275 in Columbus, Ohio, providing executive management, oversight, procurement and other globally shared services.  None of the other Debtors employs any employees.  Approximately 40% of Hexion employees are members of a labor union or are represented by workers' councils that have collective bargaining agreements, including 6% of the Debtors' employees.

13

### f.   Marketing, Customers, and Seasonality

45.     The Debtors' products are sold to industrial users around the world with a special focus on the industries highlighted above in discussion of Hexion's business segments. Those customers include global leaders in the automotive, aircraft, consumer goods, construction, oil and gas, and wind energy industries, as well as other chemical and intermediates companies.  Hexion's products are sold to industrial users worldwide through a combination of a direct sales force that services the larger customers and third-party distributors that more cost-effectively serve Hexion's smaller customers.  Hexion's customer service and support network is made up of key regional customer service centers.  Hexion also has global teams that serve the needs of its global customers for technical support and supply and commercial term requirements.  Where operating and regulatory factors vary from country to country, these functions are managed locally.

46.     Neither the Debtors' overall business nor any of its reporting segments depends on any single customer or a particular group of customers; therefore, the loss of any single customer would not have a material adverse effect on either reporting segment (EPCD or FPD) or the Debtors—or Hexion—as a whole. The Debtors and their Non-Debtor Affiliates' primary customers are manufacturers, and the demand for our products is seasonal in certain businesses, with the highest demand in the summer months and lowest in the winter months.

47.     Demand for the Debtors' and their Non-Debtor Affiliates' products can also be cyclical, as general economic health and industrial and commercial production levels are key drivers for the Debtors' business.

### g.   Management Team

48.     The Debtors' current senior leadership team comprises the following individuals, each of whom has substantial industry experience, and who collectively represent decades of familiarity with Hexion and its predecessor companies:

| Hexion Inc. Senior Management | |
|---|---|
| Craig A. Rogerson | Chairman, President, and Chief Executive Officer |
| George F. Knight | Executive Vice President and Chief Financial Officer |
| Douglas A. Johns | Executive Vice President, General Counsel, and Corporate Secretary |
| John P. Auletto | Executive Vice President – Human Resources |
| Paul Barletta | Executive Vice President - Operations |
| Nathan E. Fisher | Executive Vice President – Procurement |
| Matt Sokol | Executive Vice President and Chief Administrative Officer |

49.      The supervision of the management team and the general course of the Debtors' affairs and business operations is entrusted to the eight-member Board of Managers of Hexion Inc.'s indirect parent, co-Debtor Hexion Holdings LLC.  Each member of the Board has knowledge, experience and expertise relevant to serving as a director, and many of the directors have experience serving on boards of directors of other companies.  Four members are independent of Apollo and are not executives of Hexion Inc.

**h.  Shared Services Agreement**

50.      As noted, the Debtors and MPM were owned by a common parent from 2010 to 2014, until MPM's chapter 11 reorganization.  Historically, the Debtors and MPM have derived efficiencies and cost savings through sharing services provided by a pool of employees utilized by both companies.  These services have included certain aspects of management, administrative support, treasury services, audit and tax functions, financial services, legal affairs, property management, accounting and records keeping, credit management and collections, accounts payable, financial statement preparation, information technology and enterprise resource planning, investor and public relations, environmental, health, and safety, engineering, payroll management, risk management, insurance, human resources, procurement, and export services (collectively, the "**Shared Services**") over the term of the relationship.

15

51.     To govern the relationship between the two sides as to the Shared Services, Debtor Hexion Inc. and non-Debtor Momentive Performance Materials Inc. entered into to that certain Second Amended and Restated Shared Services Agreement, dated as of October 24, 2014 (the "**Shared Services Agreement**").  The Shared Services Agreement established certain criteria upon which the costs of such services were allocated between the Debtors and MPM and required that the steering committee formed under the agreement meet no less than annually to evaluate and determine an equitable allocation percentage.  The allocation percentages for 2018 and 2017 were 57% and 56%, respectively, for the Debtors and 43% and 44%, respectively, for MPM.

52.     The Shared Services Agreement was renewed for one year starting in October 2018 subject to termination by either the Company or MPM, without cause, on not less than 30 days' written notice.  On February 11, 2019, MPM provided notice to the Debtors that they would be terminating the Shared Services Agreement effective March 14, 2019.  The termination triggers a period of up to 14 months during which the parties will work together to facilitate an orderly transition of services provided under the agreement.

### D.     The Debtors' Prepetition Capital Structure

53.     As of the Petition Date, the Debtors had funded debt outstanding of approximately $3.8 billion.  The following table summarizes the Debtors' prepetition indebtedness and capital structure:

| (USD in mm) | Maturity | Outstanding | Rate | Interest Expense |
|---|---|---|---|---|
| ABL* | 5-Dec-21 | $297 | L+2.250%** | $7 |
| 10.375% First Lien Notes | 1-Feb-22 | $560 | 10.375% | $58 |
| 10.000% First Lien Notes | 15-Apr-20 | $315 | 10.000% | $32 |
| 6.625% First Lien Notes | 15-Apr-20 | $1,550 | 6.625% | $103 |
| **Total First Lien Debt** | | **$2,722** | | **$199** |
| 13.750% 1.5 Lien Notes | 1-Feb-22 | $225 | 13.750% | $31 |

| 9.000% Second Lien Notes | 15-Nov-20 | $574 | 9.000% | $52 |
|---|---|---|---|---|
| Lease Obligations | Various | $66 | Various | N/A |
| Foreign Local Debt | Various | $127 | Various | $17 |
| **Total Secured Debt** | | **$3,714** | | **$299** |
| 9.200% Borden Debentures | 15-Mar-21 | $74 | 9.200% | $7 |
| 7.875% Borden Debentures | 15-Feb-23 | $189 | 7.875% | $15 |
| **Total Unsecured Debt** | | **$263** | | **$22** |
| **Total Debt** | | **$3,977** | | **$320** |
| **Total Debt (Excluding Foreign Local Debt)** | | **$3,850** | | |
| Cash & Equivalents | | $76 | | |
| **Total Net Debt** | | **$3,901** | | |
| **Total Net Debt (Excluding Foreign Local Debt)** | | **$3,774** | | |
| * The ABL amount does not include approximately $50 million in letters of credit<br>** Blended | | | | |

54.     The collateral securing the ABL and the various Secured Notes (both as defined below) is substantially the same, and is subject to largely matching exclusions.  Among other exclusions, the collateral for the ABL and the Secured Notes does not include any Principal Property.   "Principal Property" is a term defined in the indenture governing the Borden Debentures (defined below).  With limited exceptions, a Principal Property may not be made collateral for other financing unless the Borden Debentures are granted ratable security in such Principal Property (which has not occurred).

55.     Subject to the enumerated exclusions, including the exclusion of any Principal Property, collateral for the ABL and the Secured Notes includes substantially all of the

Debtors' other personal property.  The following table summarizes the collateral for the secured debt, and the priorities in respect of the same among the secured instruments:[4]

| Priority | Instrument | Collateral |
|---|---|---|
| First Lien | ABL | • Subject to enumerated exclusions, including exclusion of any Principal Property, a first lien on substantially all of the Debtors' other personal property<br>• Priority over the First Lien Notes in respect of the Debtors' inventory and accounts |
|  | First Lien Notes | • Subject to enumerated exclusions, including exclusion of any Principal Property, a first lien on substantially all of the Debtors' other personal property<br>• Priority over the ABL in respect of the Debtors' personal property other than inventory and accounts |
| 1.5 Lien | 1.5 Lien Notes | • Subject to enumerated exclusions, including exclusion of any Principal Property, a lien junior to the ABL and the First Lien Notes on substantially all of the Debtors' other personal property |
| Second Lien | Second Lien Notes | • Subject to enumerated exclusions, including exclusion of any Principal Property, a lien junior to the ABL and the First Lien Notes and the 1.5 Lien Notes on substantially all of the Debtors' other personal property |

### a.  ABL

56.     Hexion Inc. is a borrower under the Amended and Restated Asset-Based Revolving Credit Agreement dated as of December 21, 2016, by and among, *inter alia*, Debtor Hexion Inc., as U.S. Borrower, certain foreign Non-Debtor Affiliates of Hexion Inc. as Foreign Borrowers (together with Hexion Inc., the "**Borrowers**"), and JPMorgan Chase Bank, N.A., as Administrative Agent (among other capacities) (the "**ABL**").

57.     As amended, the ABL has a maturity date of December 5, 2021 subject to certain springing maturities linked to outstanding amounts under various of the Debtors' notes. The ABL bears interest at a floating rate based on, at the Company's option, an adjusted LIBOR rate plus an applicable margin or an alternate base rate plus an applicable margin.  As of the Petition Date, the applicable margin for LIBOR rate loans was 2.25% and for alternate base rate loans was 1.25%

---

[4] I provided the description and table for convenience and illustrative purposes only; these are not a complete description of the collateral, or the exclusions thereto, set forth in the collateral agreements governing the Debtors' secured obligations.

58.     Availability under the ABL is $350 million, subject to a borrowing base for U.S. borrowings based on a specified percentage of U.S. eligible accounts receivable and inventory.  While Foreign Borrowers may generally rely on the global borrowing base, a "U.S. Sublimit" prevents borrowings by Hexion Inc. when such borrowing would cause U.S. borrowings to exceed the U.S. borrowing base—effectively limiting U.S. borrowings to the U.S. borrowing base.[5]  As of the Petition Date, U.S. borrowings under the ABL totaled $93 million, with remaining U.S. availability of $1.7 million.  Foreign Borrowers were borrowers of $203.8 million.

59.     Under the ABL and related collateral documents, the Debtors guarantee all obligations (both domestic and foreign), while the Foreign Borrowers and the foreign guarantors guarantee only foreign obligations.

60.     The ABL is secured by senior liens on most of the inventory and accounts of the Debtors (the **"ABL Priority Collateral"**) and certain inventory, accounts, and other assets of certain of the foreign Non-Debtor Affiliates.  The ABL is further secured by junior liens (junior in priority only to the First-Lien Notes described below) on collateral that generally includes most of the Debtors' personal property other than the ABL Priority Collateral, subject to certain exclusions—including the exclusion of any Principal Property—and permitted liens (the "**Notes Priority Collateral**" and together with the ABL Priority Collateral, the "**Notes Collateral**").  As noted, the liens in respect of the assets of the relevant Non-Debtor Affiliates, as Foreign Borrowers and foreign guarantors, secure only the foreign obligations, while the liens in respect of the assets of the Debtors secure all obligations under the ABL.

### b.  First Lien Notes

61.     In 2017, Hexion Inc. issued $560 million aggregate principal amount of 10.375% First Priority Senior Secured Notes due 2022 (the "**10.375% First Lien Notes**"), the proceeds of which were used to discharge maturing notes indebtedness and for general corporate

---

[5] At such times, subject to availability to Foreign Borrowers, Foreign Borrowers may draw and transfer the funds to Hexion Inc. via intercompany loan.

purposes.  In 2016, Hexion Inc. issued $315 million aggregate principal amount of 10.000% First Priority Senior Secured Notes due 2020 (the "**10.000% First Lien Notes**"), proceeds of which were used to discharge maturing debenture indebtedness and to repay all amounts then outstanding under the then-existing ABL.  In 2012, Hexion Inc. issued $450 aggregate principal amount of First-Priority Senior Secured Notes due 2020 (the "**6.625% First Lien Notes**" and together with the 10.000% First Lien Notes and the 10.375% First Lien Notes, the "**First Lien Notes**").  Hexion Inc. issued an additional $1,100 million aggregate principal amount of 6.625% First Lien Notes in January 2013.  The aggregate outstanding principal amount of First Lien Notes as of the Petition Date is $2,425 million.  There are scheduled interest payments due on April 15 in respect of the 6.625% First Lien Notes and the 10.000% First Lien Notes of $51.3 million and $15.8 million, respectively.

62.     The First Lien Notes are secured by senior liens on the Notes Priority Collateral.  The First Lien Notes are further secured by junior liens (junior in priority only to the ABL described above) on the ABL Priority Collateral.

### c.  1.5 Lien Notes

63.     In 2017, Hexion Inc. issued $225 million aggregate principal amount of 13.750% Senior Secured Notes due 2022 (the "**1.5 Lien Notes**"), proceeds of which were used to discharge maturing notes indebtedness.  The 1.5 Lien Notes are secured by liens on the Notes Collateral that are junior to the liens in such collateral securing the First Lien Notes and the ABL but senior to the liens in such collateral securing the Second Lien Notes (defined below).

### d.  Second Lien Notes

64.     In 2010, Debtors Hexion U.S. Finance Corp. and Hexion Nova Scotia Finance ULC issued $574 million aggregate principal amount of 9.000% Second-Priority Senior Secured Notes due 2020 (the "**Second Lien Notes**" and together with the First Lien Notes and the 1.5 Lien Notes, the "**Secured Notes**"), proceeds of which were used to refinance existing second-lien note indebtedness.  The Second Lien Notes are secured by liens on the Notes

Collateral that are junior to the liens in such collateral securing the First Lien Notes, the ABL, and the 1.5 Lien Notes.

### e.  Borden Debentures

65.      In 1987 and 1991, Hexion Inc. predecessor Borden Inc. issued its 9.200% debentures due 2021 (the "**2021 Debentures**") and 7.875% debentures due 2023 (the "**2023 Debentures**" and together with the 2021 Debentures, the "**Borden Debentures**").

66.      The Borden Debentures are unsecured obligations of Hexion Inc. The Borden debentures indenture contains a negative pledge on the granting of liens on, or taking certain other actions in respect of, any "Principal Property."  A Principal Property is defined therein as any "manufacturing or processing plant or warehouse owned or leased by the Issuer or any Subsidiary of the Issuer and located within the United States of America . . . other than any such plant or warehouse or portion thereof which the Board of Directors reasonably determines not to be a Principal Property after due consideration of the materiality of such property to the business of the Issuer and its Subsidiaries as a whole."

67.      Subject to certain exceptions enumerated in the indenture, if the Issuer (now Hexion Inc.) desires to grant a lien on a Principal Property or a portion thereof, it must grant equal and ratable security for the Borden Debentures.  The Debtors' security agreements in respect of their secured obligations do not grant a lien on any Principal Property.[6]

## II.    EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES

68.      The Debtors, together with their Non-Debtor Affiliates, are a strong business with a history of success and excellent long-term prospects.  At the same time, the Debtors, together with the Non-Debtor Affiliates, participate in a highly competitive industry with constant pressure on revenue and margins, which in turn pressures EBITDA and liquidity. The Debtors also face near-term maturities of the majority of their funded debt.  These two

---

[6] The foregoing is not an exhaustive description of the provisions addressing Principal Properties in the Debtors' debt documents but represents my understanding of particularly relevant provisions after discussions with the Debtors' advisors.

factors—declining liquidity and impending maturities—created an inflection point that required the Debtors to commence restructuring discussions with their key economic constituents in the late fall of 2018.

### A.    Maturities and Liquidity

69.    The Debtors' high leverage and burdensome debt-service have created the current situation.  The Debtors are over nine times levered relative to their 2018 segment EBITDA and face annual debt service in excess of $300 million.  As debt service has remained high, liquidity has become a critical issue.  The liquidity is further stressed in the first half of the year as seasonality in the Debtors' business has historically resulted in working capital builds of more than $100 million during the first quarter.

70.    The Debtors' business is global and diverse with 60% of the revenues generated outside the U.S. and no end market making up more than 18% of its total revenue base. This diversity has been both a benefit and a challenge for the Debtors' growth, as global and business cyclicality have resulted in flat to declining EBITDA profitability from 2012-2017.

71.    For example, in 2014, a large part of the Company's profitability was related to its Oilfield business unit ("**OTG**"). OTG represented 8% of the Debtors' sales and 28% of its segment EBITDA in 2014.  With the drop in oil prices and the producers' shift away from using resin coated sand, the Debtors' OTG segment EBITDA had fallen by approximately $150 million by 2016.  Growth in other business units could not fully offset this loss.  The continued low price of oil has resulted in an apparent permanent shift away from the use of resin coated sand by some parties, and the OTG business, despite cost reduction efforts, is still operating below a breakeven EBITDA level.

72.    The Debtors have continued to look for ways to reduce costs to improve profitability and cash flows across its businesses.  In 2018, for example, the Company further reduced its global headcount and reduced its cost base by approximately $50 million.  In 2018, SG&A represented 8% of the Company's consolidated sales, which is very low for a chemical company of comparable size.

73.     These cost reduction efforts contributed to strong performance in 2018. 2018 segment EBITDA of $440 million represents the Debtors' best operational performance since 2012 and an improvement of 21% over the prior year.  Despite this improvement, the Debtors were cash flow negative for fiscal 2018.

74.     Even beyond the current liquidity issues, the Debtors' leverage creates a second pressure—impending maturities.  Approximately $2.5 billion of the Debtors' secured debt matures in 2020.  Repaying, in the absence of refinancing, these maturities is not a viable option, and the Debtors have been advised that the current outlook in capital markets makes the likelihood of a reasonable refinancing of maturities unlikely, given the Debtors' leverage levels. As a result, the Debtors face a going-concern qualification in Hexion's 2018 audit, which would create increased liquidity pressures from the Debtors' vendors and would give rise to defaults under our ABL and cause cross defaults in all of our debt instruments.

75.     In response to the Debtors' liquidity and maturity issues, the Debtors launched an asset sale process in the 4th quarter of 2017 to generate proceeds to pay down debt and de-lever the company. The initial focus was centered around businesses within the EPCD segment, but when the process did not yield offers that would de-lever the company, the process was expanded to also explore the sale of our FPD businesses.  These processes continued through 2018 and the beginning of 2019 but did not result in offers for transactions that the Debtors considered to be in their best interests or those of their creditors and other stakeholders.

B.     **Restructuring Efforts**

76.     In response to these challenges, the Board actively pursued and examined a number of potential strategic alternatives.  These efforts included engaging advisors to assist the Debtors in their efforts to restructure their debt for the purpose of de-leveraging the Debtors' balance sheet and exploring a sale of assets.  Specifically, in November 2018, the Debtors retained Moelis & Company and Latham & Watkins LLP to assist the Debtors in analyzing their financial position and exploring potential financing and restructuring alternatives.  The Debtors also retained AlixPartners in January 2019 to perform a variety of restructuring related services.

23

In early March 2019, the Debtors, with the assistance of their advisors, initiated a process to evaluate and consider various potential strategic and financial alternatives for the Debtors with a view to maximizing enterprise value, including, among other alternatives, a debt or equity financing, or a recapitalization, either in or out of court.

77.     The Debtors focused their restructuring efforts on discussions with certain holders of the First Lien Notes (the "**First Lien Group**"), certain holders of the 1.5 Lien Notes (the "**1.5 Lien Group**"), and a group with holdings across the capital structure (the "**Crossover Group**" and together with the First Lien Group and the 1.5 Lien Group, the "**Ad Hoc Groups**"). The primary goal of those discussions, and these Chapter 11 Cases, was and is to restructure the Debtors' balance sheet through a plan of reorganization that enjoys the maximum achievable creditor support, is fair to all creditors and other stakeholders, and positions the Debtors and their Non-Debtor Affiliates for success upon emergence.

78.     After the advisors to the Ad Hoc Groups commenced due diligence on the Debtors through information provided in an online data room, the Debtors commenced good-faith, arm's-length negotiations regarding a potential restructuring that would materially de-lever the Debtors' balance sheet and allow the Debtors to retain sufficient liquidity to continue to operate their businesses going forward.  In the course of these negotiations, the Debtors and the Ad Hoc Groups exchanged and considered, with the assistance of their respective advisors, numerous restructuring proposals.  Throughout this process, the Board continued to seek refinancing alternatives and out-of-court restructuring options.

79.     Ultimately, the Debtors reached a global agreement with all of the Ad Hoc Groups and executed a restructuring support agreement on April 1, 2019.  These negotiations culminated in the restructuring support agreement attached hereto as <u>Exhibit B</u> the ("**RSA**"), certain key terms of which are discussed below in Part III.

80.     Thus, faced with a lack of viable options available in the financial markets and the upcoming interest payments in respect of the 6.625% and 10.000% First Lien Notes in an aggregate amount of approximately $67 million, the Board, after engaging in months of good

faith and arm's-length negotiations with the Ad Hoc Groups as well as other stakeholders, ultimately determined that entry into the RSA and, thereafter, commencement of these Chapter 11 Cases to consummate the transactions contemplated by the RSA, was necessary to preserve the Debtors' going concern value by de-levering their balance sheet.

## III.    RESTRUCTURING SUPPORT AGREEMENT

81.    The RSA[7] enjoys support at every level of the Debtors' prepetition capital structure, and, as of the Petition Date, includes holders of approximately 70% of the debt to be restructured, including 62% of the First Lien Notes, 98% of 1.5 Lien Notes, 84% of the Second Lien Notes, and 76% the Borden Debentures.  The RSA contemplates a financial restructuring that substantially reduces the Debtors' leverage and treats all creditors fairly in accordance with their claims.

82.    The RSA contemplates a substantial deleveraging. In accordance with the RSA, the Debtors agree to propose a Plan predicated upon a total enterprise value of $3.1 billion, including an exit facility of approximately $1.6 billion and a stipulated post-new money equity value of approximately $1.4 billion. The new money in question results from a backstopped rights offering of New Hexion Common Shares offered at a 35% discount to the stipulated equity value and sized to yield $300 million in cash proceeds.  The resulting total leverage at emergence is anticipated to be less than half of the Debtors' prepetition leverage, based on 2019 EBITDA estimates.

83.    The RSA also contemplates a restructuring that treats all creditors fairly in accordance with their respective claims and legal entitlements as they have been explained to me. The Debtors agree to propose a Plan that will distribute (a) to the 1L Notes Claims, $1.45 billion in cash (less the sum of adequate protection payments reflecting interest on the 1L Notes) and 72.5% of (X) the New Hexion Common Shares and (Y) the Rights in the Rights Offering,

---

[7] This description of the RSA is a summary based on my review of the documents in consultation with the Debtors' advisors.  Please refer to the RSA itself for a full recitation of its terms.  Capitalized terms used in this part of the Declaration and not defined herein shall have the meanings ascribed to them in the RSA.

and (b) to the 1.5L Notes Claims, the 2L Notes Claims, and the Unsecured Notes Claims their pro rata share of 27.5% of (X) the New Hexion Common Shares and (Y) the Rights in the Rights Offering.  General Unsecured Creditors will be paid in full.

84.     The RSA contains certain covenants on the part of the Debtors and the Consenting Noteholders, including that such Consenting Noteholders will vote in favor of the Plan and otherwise facilitate the restructuring transaction, in each case subject to certain terms and conditions in the RSA.  The consummation of the Plan will be subject to customary conditions and other requirements.  The RSA also provides for termination by each party, or by either party, upon the occurrence of certain events, including without limitation, termination by the Consenting Noteholders upon the failure of the Debtors to achieve certain milestones set forth in the Restructuring Support Agreement.

## IV.     SUMMARY OF FIRST DAY PLEADINGS

85.     To enable the Debtors to operate effectively and to avoid the adverse effects of the chapter 11 filings, the Debtors have filed, or will file upon scheduling of a further hearing by this Court, the motions and applications described below.[8]

86.     Having reviewed each of the First Day Pleadings or had their contents explained to me, I believe that the Debtors would suffer immediate and irreparable harm absent the ability to continue their business operations as sought in the First Day Pleadings.  In my opinion, approval of the relief sought in the First Day Pleadings is critical to the Debtors' efforts to reorganize and conduct these cases efficiently, thus permitting the Debtors to preserve and maximize value for the benefit of all stakeholders.

87.     Several of the First Day Pleadings request authority to pay prepetition claims.  I am told by the Debtors' advisors that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court may not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is

---

[8] Capitalized terms used in this part of the Declaration and not defined herein shall have the meanings ascribed to them in the relevant First Day Pleadings.

necessary to avoid immediate and irreparable harm." In light of this exception, the Debtors have limited their requests for immediate authority to pay prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Consequently, certain aspects of the relief sought in the First Day Pleadings will be deferred for consideration at a later hearing, as indicated therein.

A.    **Motions Related to Case Management**

a.    **Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases**

88.    The Debtors seek entry of an order directing joint administration of the chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015–1 and that the Court maintain one file and one docket for all of the chapter 11 cases under the lead case, Hexion Holdings LLC.

89.    Given the highly integrated nature of the Debtors' operations, I believe that joint administration of these chapter 11 cases would provide significant administrative convenience without harming the substantive rights of any parties in interest. Many of the motions, hearings, and orders in these cases will affect each Debtor, and joint administration would eliminate the need for duplicate pleadings, notices, and orders in each of the respective dockets. This, in turn, would save the Court, the Debtors, and other parties in interest substantial time and expense when preparing and filing such documents. Further, joint administration would protect any parties in interest by ensuring that they will be apprised of the various motions filed with the Court with respect to each of the Debtors' cases.

90.    Because the Debtors seek only administrative, not substantive consolidation of the estates, I do not believe joint administration would adversely affect the Debtors' respective constituencies. The relief requested in the Joint Administration Motion will not only preserve individual creditors' rights, but will also provide those creditors the benefit of the cost reductions associated with joint administration.

US-DOCS\106033993.27

91.     Accordingly, I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

### b.  Debtors' Motion for Order Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs

92.     The Debtors seek entry of an order seeking a 92-day extension of time (for a total of 120 days after the Petition Date) to file their Schedules of Assets and Liabilities (the "**Schedules**") and Statements of Financial Affairs (the "**Statements**").

93.     Due to the complexity of the Debtors' businesses, the number of Debtor entities, the substantial burden already imposed on the Debtors' management by the commencement of these chapter 11 cases, the limited number of employees available to collect the required information, and the fact that the Debtors have a substantial number of creditors, the Debtors will be unable to complete their Schedules and Statements by the deadline set forth pursuant to the Bankruptcy Code and Bankruptcy Rules.  Therefore, I believe that good cause exists for extending the deadline by which the Debtors must file their Schedules and Statements. I understand that granting this motion is in the best interest of the Debtors' estates as it will enable the Debtors and their professionals to concentrate their resources towards an efficient and timely reorganization process.

94.     The relief requested herein will not prejudice or adversely affect the rights of the Debtors' creditors or other parties-in-interest.  Rather, the extension requested herein will aid the Debtors' efforts to ensure the accuracy and completeness of the Schedules and Statements which, in turn, will promote efficient administration of these chapter 11 cases and ultimately benefit the Debtors' creditors and parties in interest.

95.     Accordingly, I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

US-DOCS\106033993.27

B.      **Motions Related to Financing of Operations**

a.   **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of the Debtors' Existing Cash Management System and Bank Accounts; (II) Waiving Certain United States Trustee Requirements, (III) Authorizing Continued Performance of Intercompany Transactions; and (IV) Granting Related Relief**

96.      The Debtors seek entry of interim and final orders approving the Debtors' continued use of their Cash Management System (as defined below).

i.   *Cash Management System*

97.      In the ordinary course of their businesses prior to the Petition Date, and as is typical with business organizations of similar size and scope, the Debtors maintain a centralized cash management system to collect, transfer, and disburse funds generated through their operations efficiently and to record such transactions accurately (the "**Cash Management System**").

98.      The Cash Management System has two main components: (a) cash collection and concentration; and (b) cash disbursement.  Substantially all of the Debtors' revenues are collected at receipt accounts in the name of Hexion Inc., maintained at Bank of America Merrill Lynch ("**BAML**").  All cash collected in the receipt accounts is automatically swept daily to a concentration account (the "**Concentration Account**") also in the name of Hexion Inc., and also maintained at BAML.

99.      The Debtors disburse funds directly from the Concentration Account, as well as through several additional accounts for limited purposes.  The Concentration Account funds vendor payments through ACH and wire transfer, as well as by funding virtual credit card accounts, issued by Comdata Network Inc., which accounts in turn fund payment of invoiced amounts from our vendors.  The Concentration Account also funds payment of the Debtors' balances on BAML purchasing cards, or "p-cards," which are used for ordinary-course business expenses.

100.    The Debtors also disburse funds from the Concentration Account to a funding account located at PNC Bank, from which the funds are swept into either of two linked sub-accounts also at PNC Bank. The first of these accounts funds payment of checks payable to vendors.  The second of these accounts funds direct debits to a limited number of vendors.

101.    The Debtors also disburse funds from the Concentration Account to several disbursement accounts also maintained at BAML that generally make limited disbursements for specific purposes.  These accounts include the Debtors' payroll funding account (the "**Payroll Account**").  Funds are manually transferred from the Concentration Account to the Payroll Account every two weeks, on Wednesday, to fund distributions made on Friday of the same week.  The Debtors' payroll service provider, Automatic Data Processing, Inc., then debits the Payroll Accounts and issues checks and direct deposits to the Debtors' employees.

102.    I believe that the cost and expense of changing bank accounts and related business forms and creating a new Cash Management System could cause confusion, disrupt payroll, introduce inefficiency when efficiency is most essential, and strain the Debtors' relationships with critical third parties, each of which could diminish the prospects for a successful reorganization.

ii.  *Receivables Management*

103.    In the ordinary course of business prior to the Petition Date, the Debtors engaged in certain practices designed to accelerate realization on their receivables, and also to accommodate custom in the Debtors' industry.

104.    First, Debtor Hexion Nimbus Inc. ("**Nimbus**"), manages the Debtors' and Non-Debtor Affiliates' factoring of accounts receivable ("**Factoring**").  Under this system, participating Debtors and Non-Debtor Affiliates transfer selected receivables to Nimbus. Nimbus sells those receivables to investors through LiquidX, an electronic receivables financing platform, for payment thereon at an agreed discount.  Nimbus then transfers the proceeds back to the participating Debtor or Non-Debtor Affiliate.  The factoring system ensures prompt payment

30

on receivables and transfers counterparty risk to the investors.  Neither any Debtor nor any Non-Debtor Affiliate is obligated to factor a minimum amount (or any) of its receivables under this system.

105.    Second, the Debtors are party to several agreements pursuant to which the Debtors receive accelerated payment on invoices, from their customers' banking institutions, in exchange for slight discounting of the invoiced amounts ("**Supplier Financing**").  This practice has the benefit of accelerating realization on receivables and transferring counterparty risk.  It is also a standard request made by customers in the Debtors' industry to provide those customers with flexibility in their own cash management.

106.    The Factoring and Customer Financing practices are highly important to the Debtors' cash management—and in the latter case, also to their customers' cash management.  If the Debtors were forced to discontinue these practices, it would negatively impact liquidity, consistency of payment on receivables, and, in the case of Customer Financing, the Debtors' customer relations.

iii. *Intercompany Transactions*

107.    In the ordinary course of business prior to the Petition Date, the Debtors have maintained Intercompany Transactions between and among the Debtors and certain of their Non-Debtor Affiliates in the ordinary course of the Debtors' businesses.  The costs and revenues associated with the Intercompany Transactions are accounted for among the legal entities resulting in Intercompany Claims.   The Debtors track all Intercompany Transactions electronically in their accounting system and can ascertain, trace and account for them as needed.

108.    Intercompany Accounts Receivable and Payable.  In the ordinary course of business, the Debtors sell and purchase goods and services from various Debtor and Non-Debtor Affiliates.  The Debtors also make corporate allocations and charges to the various Debtors and Non-Debtor Affiliates in respect of their proportional shares of collective corporate expenses including, most notably, insurance costs, procurement costs, headquarters costs, and royalties for use of intellectual property.  As noted above, the Debtors' factoring program also

31

creates short-term intercompany receivables and payables between Nimbus and those Debtors and Non-Debtor Affiliates selling receivables at any given time. The Debtors' records of Intercompany Transactions reflect the net position of both sales and purchases made between their affiliates.

109. <u>Intercompany Loans</u>. The Debtors also maintain a documented system of intercompany loans (the " **Prepetition Intercompany Loans**") between and among the Debtors and their Non-Debtor Affiliates, details of which are set forth in the motion and the exhibits thereto. The intercompany loans serve critical long- and short-term corporate needs of the Debtors and their Non-Debtor Affiliates, including supporting the Debtors' debt financing, promoting tax-efficient financing structures, and optimizing ABL utilization, among others. Maintenance of the Intercompany Loans, including the ability to make certain payments to Non-Debtor Affiliates in respect of the Intercompany Loans, is essential to avoiding disruptions in Hexion's global operations. Hexion Inc. is a substantial net creditor to the relevant foreign Non-Debtor Affiliates under these arrangements.

110. In addition, in connection with the proposed DIP financing facilities the Debtors propose to make and receive certain additional intercompany loans (the "**DIP Intercompany Loans**"), to the extent necessary to fully implement the proposed financing, which, as fully set forth in the motion and declaration relating to the proposed DIP financing, includes borrowings by foreign Non-Debtor Affiliates and will require DIP Intercompany Loans in order to make some funding available to the Debtors.

iv. <em>Guidelines and Bankruptcy Code Requirements</em>

111. It is my understanding that the U.S. Trustee Guidelines require chapter 11 debtors to, among other things, close all existing bank accounts and open new accounts which must be designated debtor-in-possession bank accounts and obtain, establish and maintain separate debtor-in-possession accounts. The Debtors intend to request a waiver of such requirements.

112.    In addition, I understand that section 345(b) of the Bankruptcy Code contains certain deposit, investment and reporting requirements.  The Debtors believe their current Cash Management System meets those requirements as all of their bank accounts are maintained at banks that have been approved by the U.S. Trustee as an authorized bank depository in accordance with the U.S. Trustee Guidelines.

113.    In sum, I believe that the Debtors' existing cash management and intercompany accounting and transacting procedures are essential to the orderly operation of the Debtors' businesses.  Accordingly, I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

**b.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Adequate Protection to Prepetition Secured Lenders, (II) Scheduling a Final Hearing, and (III) Granting Related Relief.**

114.    The Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to enter into debtor-in-possession ("**DIP**") financing facilities, grant certain liens, grant certain claims with superpriority administrative expense status, use cash collateral, and provide "adequate protection" to prepetition secured lenders, all as more fully described in the motion.  The factual support for the motion and the relief requested therein are set forth in the Declaration of Randall S. Eisenberg in support the motion, filed simultaneously therewith.

**C.    Motions to Pay Certain Prepetition Obligations and Maintain Certain Business Practices and Programs**

**a.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Certain Employee Compensation and Benefits, (B) Maintain and Continue Such Benefits and Other Employee-Related Programs, and (C) Pay Prepetition Claims of Contracted Labor and (II) Granting Related Relief ("Employee Wages Motion")**

115.    The Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to pay or honor certain prepetition claims and obligations, continue

33

programs and maintain funding, in the exercise of their discretion, relating to, among other things: (i) Employee Compensation Obligations, (ii) Payroll Taxes, Garnishments and other Deductions, (iii) Prepetition Contracted Labor Obligations, (iv) Bonus and Incentive Plans, (v) Health and Welfare Benefits, (vi) Employee retirement plans, (vii) Workers Compensation Claims, and (viii) other benefits.

116.    The Debtors estimate that before the final hearing on this motion, Prepetition Employee Obligations totaling approximately $16.15 million and Prepetition Contracted Labor Obligations totaling approximately $3.750 million will be due and payable.

117.    As described more fully in the Employee Wages Motion, the Prepetition Employee Obligations arise in connection with, without limitation plans, programs, policies, and agreements providing for: (a) wages, salaries, holiday pay, paid time off, incentive plans, and other accrued compensation; (b) reimbursement of business, travel, and other reimbursable expenses; and (c) benefits in the form of (i) medical and dental coverage, basic term life insurance, accidental death and dismemberment insurance, short-term disability coverage, long-term disability coverage, workers' compensation, and miscellaneous other benefits provided to the Workforce in the ordinary course of business, and (ii) prepetition contributions to, and benefits under 401(k) plans and pension plans.

118.    As of the Petition Date, the Debtors employed approximately 1,300 Employees primarily based in the United States, of whom 275 were located at the Debtors' headquarters in Columbus, Ohio.  Approximately 800 of the Debtors' current Employees are Salaried Employees and approximately 500 are Hourly Employees.  As of the Petition Date, 1,293 of the Employees work full-time and seven Employees work part-time.  Approximately 35 Senior Employees have the title of VP or above. The Debtors submit that not all of the Senior Employees are "Insiders" as the term is defined in section 101(a)(31) of the Bankruptcy Code.

Approximately 93 of the Employees are represented by local branches of the United Steel, Paper and Forestry, Rubber Manufacturing, Energy, Allied Industrial and Service Workers International Union: specifically, (a) Local 13-1401 in Diboll, Texas under the Collective Bargaining Agreement dated as of August 1, 2015 and expiring on July 31, 2020; and (b) Local 13-1 in Deer Park, Texas under the Collective Bargaining Agreement dated as of January 27, 2018 and expiring on September 30, 2021.  Each of these local branches is party with the Debtors to that certain Collective Bargaining Agreement (each, a "**CBA**" and collectively, the "**CBAs**").  The remaining approximately 1,207 Employees are not represented by any union.

119.    The Debtors also utilize the services of contract workers (the "**Contracted Labor**" and, together with the Employees, the "**Workforce**")[9] from time to time to provide a variety of services.  The Debtors engage Contracted Labor in three different capacities: (i) "temporary contract labor" (through which temporary contract workers are generally provided by various staffing agencies and from which approximately 25 temporary contract workers are currently engaged as of the Petition Date); (ii) outsourced services (which includes, among others, contract workers to provide helpdesk and IT services and other logistical labor) for which approximately 280 contract workers have been provided as of the Petition Date; and (iii) independent contractors providing interim or specialty services (generally, temporary contract services provided by specialists for certain specific transactions or projects on an as-needed basis, which includes contract review services) for which approximately 55 contract workers have been provided, as of the Petition Date.  As of the Petition Date, there are approximately 360 Contracted Labor employees currently engaged with the Debtors.  Contracted

---

[9] All references to Contracted Labor herein are limited to U.S.-based contracted labor engaged with Hexion Inc.

US-DOCS\106033993.27

Labor fills immediate business needs of the Debtors and allow the Debtors to have a flexible workforce to meet their operational needs in a cost-effective manner.

i.  *Wage and Salary Obligations*

120.    The Employees are paid bi-weekly on Fridays, with an aggregate average payroll each pay period of approximately $5,400,000.  Generally, Salaried Employees are paid current through the payroll date, and Hourly Employees are paid through either the Saturday or Sunday before the payroll date.

121.    The Debtors estimate that, as of the Petition Date, the Prepetition Employee Obligations and the Prepetition Contracted Labor Obligations, including accrued but unpaid wages and other compensation, including the Deductions and Garnishments, total approximately $19,900,000 (comprised of $3,900,000 owed to Employees, $3,750,000 owed to Contracted Labor, $1,500,000 owed on behalf of statutory deductions, $28,000 attributable to Garnishments, $2,270,000 attributable to Deductions, specifically Payroll Taxes and $9,938,000 attributable to prepetition Employee benefits), all of which will become due and owing before the final hearing on this motion.

ii.  *Bonuses and Incentive Programs*

122.    Historically, the Debtors have offered several bonus and incentive plans to their eligible Employees, including the ICP, the 2019 Deer Park LIP, the 2019 Geismar/Luling LIP, the KAR, the 2016 LTI, the 2019 LTI, the Recognition Program, the Service Award Program and the Project Bonus and Incentive Awards (each as defined below and, collectively, the "**Bonus and Incentive Plans**").

123.    The Debtors offer an annual incentive compensation opportunity to certain of their Employees to incentivize those Employees to perform at a high level throughout the applicable calendar year and to profitably grow the Debtors' business (the "**ICP**").  Awards

36

under the ICP are tied to the Debtors' annual performance, which is measured by annual metrics from the Debtors' audited financials, such as Segment EBITDA, environmental health and safety, and cash flow generated by business operations.  The ICP payout to be made to eligible Employees in accordance with the plan is, on average, approximately $27,250.  Approximately 735 Employees, including Insiders, are eligible for payouts as of the Debtors' next annual payout date in April 2020.  The Debtors' annual target bonuses under the ICP are expected to be approximately $20,000,000 in 2020, in the aggregate, to Employees in the United States in connection with the ICP.  From time to time after payout, there are corrections to a small number of payments to associates.  In connection with the 2018 ICP payment, the Debtors estimate that, as of the Petition Date, they owe associates approximately $150,000 in accrued but unpaid amounts related to such corrections, all of which will become due and owing before the final hearing on the Employee Wages Motion (the "**2018 ICP Corrections**").  For the avoidance of doubt, none of the recipients of the approximately $150,000 in 2018 ICP Corrections pursuant to the authority requested under the proposed Interim Order are Senior Employees.  The Debtors are seeking authority to make all ICP payments (other than the approximately $150,000 of 2018 ICP Corrections which will become due and owing before the final hearing on this motion) pursuant to the proposed Final Order and not the proposed Interim Order.

124.    The Debtors offer an annual incentive compensation opportunity to certain Employees at the Debtors' Deer Park, Texas facility (the "**2019 Deer Park LIP**").  Awards under the 2019 Deer Park LIP are based on the site achieving annual target goals of certain site productivity, environmental and safety metrics.  Approximately 80 Employees are eligible for awards under the 2019 Deer Park LIP.  The aggregate target amount expected to be paid under the 2019 Deer Park LIP is approximately $395,000. For the avoidance of doubt, none of the

recipients of payments to be made under the 2019 Deer Park LIP pursuant to the authority requested under the proposed Final Order are Insiders. Authority is sought to make any payments earned under the 2019 Deer Park LIP pursuant to the proposed Final Order and not the proposed Interim Order.

125.    The Debtors offer an annual incentive compensation opportunity to certain Employees at the Debtors' Geismar, Louisiana and Luling, Louisiana locations (the "**2019 Geismar/Luling LIP**"). Awards under the 2019 Geismar/Luling LIP are based on the sites achieving annual target goals of certain site productivity, environmental and safety metrics. Approximately 40 Employees are eligible for awards under the 2019 Geismar/Luling LIP. The aggregate target amount expected to be paid under the 2019 Geismar/Luling LIP is approximately $220,000. For the avoidance of doubt, none of the recipients of payments to be made under the 2019 Geismar/Luling LIP pursuant to the authority requested under the proposed Final Order are Insiders. Authority is sought to make any payments earned under the 2019 Geismar/Luling LIP pursuant to the proposed Final Order and not the proposed Interim Order.

126.    The Debtors provide a long-term incentive compensation opportunity to approximately 95 of their non-Insider Employees to incentivize performance under the Key Associate Reward program (the "**KAR**"). Awards under the KAR program are based fifty percent (50%) on the associate's continuing service with the Debtors and fifty percent (50%) on the Debtors' financial performance, measured based on Segment EBITDA, cash flow and environmental health and safety targets. The currently outstanding awards range from two to eleven percent (2%-11%) of the associate's annual salary. Payouts under the KAR program are due to be paid in July 2019, and the aggregate amount expected to be paid under the KAR program at that time to non-Insider Employees in the United States is approximately $830,000.

Authority is sought to make payments under the KAR program pursuant to the proposed Final Order and not the proposed Interim Order.

127.    The Debtors offer a long-term incentive opportunity to approximately 55 of their Employees, with the aim of driving long-term business success (the "**2016 LTI**"). Awards under the 2016 LTI program, which has been in place since 2016, are based both on the Employee's continuing service with the Debtors and the Debtors' financial performance, measured by achieving a target trailing twelve month Segment EBITDA and then maintaining the target Segment EBITDA for one additional quarter, measured by reference to the Debtors' financial statements.  The currently outstanding 2016 LTI awards range from approximately forty percent to three hundred percent (40%-300%) of the eligible Employee's annual salary. The aggregate amount that could be paid under the 2016 LTI program to all eligible Employees totals approximately $15 million.  Two 2016 LTI recipients are eligible to receive a payout in July 2019, one Insider and one non-Insider.  For the avoidance of doubt, no authority is sought to pay the Insider eligible to receive a payout under the 2016 LTI until consummation of a restructuring transaction.  The Debtors are seeking authority to pay the non-Insider Employee his 2016 LTI payment due to be paid in July 2019 pursuant to the proposed Final Order. The remainder of the 2016 LTI recipients are eligible to receive payouts in July 2020 or as earned under the performance-based portion of the award (currently estimated to be paid out no sooner than April 2020) and the Debtors are seeking authority to make such payments to non-Insider Employees pursuant to the proposed Final Order.

128.    The Debtors offer a long-term incentive opportunity to approximately 200 of their Employees, focused on incentivizing participants to drive business success during a challenging period (the "**2019 LTI**").  Awards under the 2019 LTI program are based on the

39

Debtors' financial and operating performance as measured by 2019 goals for Segment EBITDA, cash flow and environmental health and safety metrics.  Outstanding awards under the 2019 LTI program range from fifteen to two hundred percent (15%-200%) of the eligible Employee's annual salary.  Payouts under the 2019 LTI program are due to be paid in the third quarter of 2021 and the aggregate amount that could be earned under the 2019 LTI program by both Insider and non-Insider Employees is approximately $9 million.  The Debtors are seeking authority to pay any amounts owed under the 2019 LTI pursuant to the proposed Final Order and not the proposed Interim Order.

129.    The Debtors pay recognition awards to certain Non-Union Employees for contributions to business success that are above and beyond the Employee's normal job responsibilities, or based on the completion of certain associate developmental programs (the "**Recognition Program**").  Awards may be delivered in cash or a cash equivalent (i.e., gift card).  Generally, award amounts do not exceed $3,000.  The Debtors estimate that, as of the Petition Date, the total accrued but unpaid obligations in connection with the Recognition Program are approximately $25,000, all of which will become due and owing before the final hearing on this motion.  For the avoidance of doubt, none of the Recognition Program recipients to be paid pursuant to the authority requested under the proposed Interim Order are Senior Employees.

130.    The Debtors grant service awards to certain Non-Union Employees based on attainment of certain levels of tenure of employment with the organization (the "**Service Award Program**").  Awards are delivered in the form of specific gifts in varying amounts based on tenure with the Debtors.  The Debtors estimate that, as of the Petition Date, the total accrued but unpaid obligations in connection with the Service Award Program are approximately $5,000, all of which will become due and owing before the final hearing on this motion.  For the

40

avoidance of doubt, none of the Service Award Program recipients to be paid pursuant to the authority requested under the proposed Interim Order are Senior Employees.

131.    The Debtors offer project bonus and incentive awards to eligible Employees upon completion of a project or upon certain other criteria of achievement as determined by the Debtor in the ordinary course of business (the "**Project Bonus and Incentive Awards**").  The aggregate amount of Project Bonus and Incentive Awards expected to be paid to approximately 30 eligible Employees in 2019 is approximately $410,000.  For the avoidance of doubt, none of the Project Bonus and Incentive Awards recipients to be paid pursuant to the authority requested under the proposed Final Order are Insiders.  No authority is sought to make any payments under Project Bonus and Incentive Awards pursuant to the authority requested under the proposed Interim Order.

### iii. *Leave Policies*

132.    The Debtors offer their Employees other forms of compensation, including vacation days, holidays, civic duties leave and bereavement days.  The specifics of the Debtors' Leave Policies vary based upon whether the Employee is a Salaried Employee, Non-Union Employee, or a Union Employee.  I believe these programs are typical and customary, and continuing to offer them is necessary for the Debtors to retain Employees during the reorganization process.

### iv. *Severance*

133.    The Debtors do not adhere to a formal policy on extending severance payments to Non-Union Employees upon termination of employment; however, the Debtors have a history of entering into severance agreements with certain Non-Union Employees.  Generally, severance agreements conform to certain guidelines based on the individual Non-Union Employee's continuing service with the Debtors.  Certain eligible Union Employees who

41

have a minimum of one year of continuous full-time employment immediately prior to the date of termination are eligible for a severance payment upon termination.  As of the Petition Date, the Debtors owe severance obligations to ten (10) former Employees in the total amount of approximately $600,000, approximately $130,000 of which will become due and owing before the final hearing on this motion.  For the avoidance of doubt, none of the Employees to be paid severance payments pursuant to the authority requested under the proposed Interim Order are Senior Employees.   The Debtors believe it is important that they honor their severance commitments.  In doing so, the Debtors will show their current Employees that they fulfill the promises they make to their Employees, on which the Employees have relied in contributing their time and hard work to the Debtors' enterprise.  The Debtors feel such assurances are invaluable not only to maintain and boost the morale of their current workforce, but also to attract and retain new Employees.

v. *Expense Reimbursements*

134.    The Debtors, in the ordinary course of business, reimburse Employees and candidates for open positions for a variety of ordinary, necessary and reasonable business-related expenses that the Employees and candidates incur on behalf of the Debtors in the scope of their candidacy and/or employment (the "**Reimbursable Expenses**").  Reimbursable Expenses may include expenses for business travel (including lodging, automobile rentals, meals, and internet charges), business-related transportation and mileage costs and other general business-related expenses.  Employees and candidates are expected to use sound judgment and good business sense when incurring such expenses.  As of the Petition Date, there is outstanding and payable approximately $2,200,000 of Reimbursable Expenses.

135.    In certain instances, Employees may be issued corporate credit cards to pay for Reimbursable Expenses.  Such Employees are issued a company credit card through

American Express to be utilized for travel and other business-related expenses.  The Debtors reconcile the expenses charged on each Employee's issued credit card through the reporting software Concur and make payments directly to American Express on behalf of the Employees. As of the Petition Date, approximately 700 Employees have a company credit card, and the average aggregate monthly reimbursable amount incurred on the company credit cards is approximately $1,500,000.

136.    In certain instances, the Debtors provide company cars to certain Employees.  The company cars are provided by Merchants Automotive Group.  Expenses related to an Employee's personal use of the company car are withheld via a standard bi-weekly deduction from the Employee's paycheck, with an annual accounting re-allocation true-up to match any prior estimates with amounts actually withheld.   As of the Petition Date, approximately 65 Employees have a company car.  In addition, the Debtors reimburse certain Employees for certain uses of the Employee's personal vehicle in connection with the Debtors' business, in accordance with IRS guidelines on business expense reimbursements.  The average monthly reimbursable amount incurred in connection with the use of personal vehicles for business is approximately $600 for twenty (20) associates, paid to Motus, the third-party administrator. The total accrued and unpaid obligation currently owed for these reimbursements is approximately $15,000, substantially all of which will become due and owing before the final hearing on this motion.

vi. *Health and Welfare Benefits*

137.    The Debtors offer their eligible Employees a large portfolio of benefits, including medical and prescription drug coverage, dental coverage, vision coverage, health savings accounts, COBRA coverage, flexible spending accounts, life insurance, disability insurance and other benefit programs provided to Employees in the ordinary course of business

(collectively, the "**Health and Welfare Benefits**").  All Employees who work more than twenty hours per week are eligible to receive Health and Welfare Benefits.

138.    As further provided in the Employee Wages Motion, certain of the Health and Welfare Benefits remained unpaid or unprovided as of the Petition Date because certain obligations of the Debtors under the applicable plan, program, or policy accrued either in whole or in part prior to the commencement of the chapter 11 cases, but will not be required to be paid or provided in the ordinary course of the Debtors' business until a later date.  The Debtors request authority to pay or provide as they become due all prepetition Health and Welfare Benefits that have already accrued.  The Debtors estimate that the aggregate accrued amount of such prepetition Health and Welfare Benefits described in the Employee Wages Motion is approximately $1,600,000.

vii. *Other Benefit Programs*

139.    The Debtors offer several other customary benefits to their eligible Employees, which are funded by Employee contributions.  These benefits include, but are not limited to (i) group accident insurance coverage; critical illness insurance; home, auto and pet insurance and a hospital indemnity plan, each administered by Metlife, and (ii) legal services coverage and identity theft protection, each administered by Hyatt Legal (collectively, the "**Other Benefit Programs**").

viii.    *Retirement Plans*

140.    The Debtors maintain the Hexion Inc. Retirement Savings Plan, a qualified defined contribution plan (the "**Qualified DC Plan**"), a retirement savings plan for eligible Employees pursuant to section 401 of the Internal Revenue Code.  Approximately 1,250 Employees currently participate in the Qualified DC Plan, and 401(k) bi-weekly contributions total approximately $850,000, which includes approximately $600,000 of withholdings from

44

participating Employees' paychecks and approximately $250,000 of 401(k) Matching Contributions.  The Qualified DC Plan is administered by Fidelity.  As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid obligations on account of the Qualified DC Plan is $9,150,000.

141.    The Debtors maintain a Supplemental Executive Retirement Plan (the "**SERP**"), a nonqualified, unfunded deferred compensation plan for certain eligible Employees. The Debtors make annual credits of 5% of eligible earnings above the maximum limitations set by the IRS for contributions to a qualified defined contribution plan.  The current total accrued but unpaid obligations related to the SERP is approximately $1,100,000.

142.    The Debtors maintain the Hexion Inc. Pension Plan, a tax qualified defined benefit pension plan (the "**Pension Plan**") for certain eligible Employees.  Benefit accruals under the Pension Plan have been frozen and no Employees are continuing to accrue any benefits.  As of the Petition Date, approximately 7,450 Employees have benefits accrued under the Pension Plan, of whom 545 are active Employees, 1,275 are former Employees with rights to deferred benefits and 5,630 are retired Employees receiving benefits.  For the plan year 2019, the Debtors have not made any contributions to the Pension Plan and no contributions are expected to be made under the Pension Plan until 2020.

143.    The Debtors maintain the Executives' Supplemental Pension Plan ("**ESPP**"), a non-qualified retirement plan that provides "make up" benefits for Employees who were unable to fully participate in a legacy qualified defined contribution plan or the Borden Chemical, Inc. Employee Retirement Income Plan, which was merged into the Pension Plan in 2009, because of limitations imposed by the IRS.  The ESPP was frozen as to future benefit accruals effective as of December 31, 2008; accordingly, no Employees are continuing to accrue

any benefits under the ESPP and no Employees can defer compensation under the ESPP. However, the ESPP was amended in October of 2010 to allow Debtors to make discretionary contributions on behalf of participants, at such times and in such amounts as the Debtors may determine to make up for any negative adjustments that may be required to be made to a participant's account under the Pension Plan in order to comply with the applicable requirements of the Internal Revenue Code.  As of the Petition Date, approximately 40 current and former Employees have lump sum benefits accrued under the ESPP.  Additionally, approximately 40 beneficiaries are in pay of the ESPP and receive monthly benefits totaling approximately $50,000.  For the plan year 2019, the Debtors do not have scheduled, and do not plan to make, any discretionary contributions to the ESPP.  The total accrued but unpaid obligations, based on actuarial calculations, related to the ESPP are approximately $3,750,000.

144.    The Debtors maintain the Benefit Restoration Plan ("**BRP**"), which provides supplemental deferred compensation benefits to Employees which would have been available under the Pension Plan but for the limitations imposed by the Internal Revenue Code. The BRP is a non-qualified defined benefit plan that generally provides for payments to participants in the same form as participants may receive under the Pension Plan.  As of the Petition Date, approximately 4 Employees have benefits accrued under the BRP, of whom 3 are active Employees and 1 is a retired Employee receiving benefits.  For the plan year 2019, the Debtors have not made any contributions to the BRP.  The total accrued but unpaid obligations related to the BRP are approximately $160,000.

ix. *Other Retirement Benefit Obligations*

145.    <u>Legacy Retiree Life Insurance</u>.  The Debtors provide legacy life insurance benefits to certain retired Employees.  The average benefit across the 1,401 Hexion Inc. retirees is approximately $4,000 and the total aggregate benefit is approximately $5,100,000. A fixed

46

payment of approximately $300,000 is scheduled to be made on each of April 14, 2019, June 26, 2019 and September 17, 2019. The quarterly payment amounts change each year and the total aggregate payments to MetLife over the buyout term is approximately $5,000,000. The outstanding balance as of March 31, 2018 is approximately $4,400,000. As of the Petition Date, the Debtors are current on their payments to MetLife for these legacy life insurance policies, with no arrearage.

146.    <u>Legacy Retiree Medical Plan.</u>   The Debtors offer legacy retiree medical insurance benefits to certain retired Employees through the American Association of Retired Persons ("**AARP**").   These plans are provided by and administered by AARP, with the Debtors paying AARP approximately $5,000 per month in premiums and administrative service fees.   As of the Petition Date, the Debtors are current on their payments to AARP for these medical plans, with no arrearage.

147.    <u>Other Contingent Claims.</u>   Over their long history as an operating business, the Debtors have historically made available certain retirement benefits to Employees. Due in part to multiple corporate reorganizations and in part to the large base of Employees and applicable benefits, along with the practical challenges with accounting for all such Employees and benefits, Debtors, in some circumstances, are presented with legitimate benefit claims from retired Employees for which the Debtors have not accounted for ("**Contingent Claims**").   Over the past 12 months, the Debtors have paid out approximately $10,000 in Contingent Claims, and the Debtors seek authority to honor Contingent Claims as they are presented in the ordinary course of business postpetition.

148.    <u>Workers' Compensation.</u>   The Debtors maintain workers' compensation insurance that provides coverage for employee-related injuries, disability, or death, as prescribed

47

by state and federal workers' compensation laws and other statutes. In connection with these requirements, the Debtors maintain both self-insured workers' compensation programs (the "**Self-Insured Programs**") and workers' compensation insurance policies (collectively, the "**Workers' Compensation Policies**"), depending upon the state in which the covered Employees work. As described in further detail below, the Debtors' third party administrator, Zurich American Insurance Company ("**Zurich**"), manages all workers' compensation claims asserted by the Debtors' Employees. Under the deductible for the Workers' Compensation Policies, the Debtors paid approximately $1,200,000 in fiscal year 2018 on account of covered claims (collectively, the "**Workers' Compensation Claims**"). As of the Petition Date, there are 28 current Workers' Compensation Claims open against the Debtors. The Debtors estimate that, as of the Petition Date, the total accrued but unpaid obligations in connection with the Workers' Compensation Claims are approximately $3,400,000, all of which will become due and owing before the final hearing on this motion.

x. *Other Benefits*

149. The Debtors also maintain several other benefits including the Home Office Program, the Adoption Assistance Program, Relocation Benefit, Education Reimbursement Program, Associate Referral Program, contributions to United Way, and Union dues withholdings, each as more fully described in the Employee Wages Motion.

150. The Debtors expend approximately $3,000 per month, in the aggregate on account of the Home Office Program. The Debtors estimate that, as of the Petition Date, the total accrued but unpaid obligations in connection with the Home Office Program are approximately $6,000, all of which will become due and owing before the final hearing on this motion. The Debtors estimate that, as of the Petition Date, there are no accrued but unpaid obligations in connection with the Adoption Assistance Program. The Debtors estimate that, as

48

of the Petition Date, there are no accrued but unpaid obligations in connection with the Renter Assistance Program.  The Debtors estimate that, as of the Petition Date, the total accrued but unpaid obligations in connection with the Homeowner Buyout/Marketing Assistance Program are approximately $275,000, substantially all of which will become due and owing before the final hearing on this motion.  The Debtors estimate that, as of the Petition Date, the total accrued but unpaid obligations in connection with the Education Reimbursement Program are approximately $25,000, all of which will become due and owing before the final hearing on this motion.  The Debtors estimate that, as of the Petition Date, the total accrued but unpaid obligations in connection with the Associate Referral Program are approximately $4,000, all of which will become due and owing before the final hearing on this motion. The Debtors estimate that, as of the Petition Date, the total accrued but unpaid obligations in connection with contributions to United Way are approximately $40,000, all of which will become due and owing before the final hearing on this motion. The Debtors estimate that, as of the Petition Date, the total accrued but unpaid obligations in connection with Union dues withholdings are approximately $65,000, all of which will become due and owing before the final hearing on this motion.  The Debtors support the United Way and allow for Employees to make contributions via payroll deductions to the organization.  The monthly amount is approximately $7,000. The Debtors estimate that, as of the Petition Date, they owe United Way approximately $40,000 in accrued but unpaid fees related to such services, all of which will become due and owing before the final hearing on this motion. As part of the CBAs, union dues are withheld from participating Employees' paychecks. The monthly amount is approximately $5,500. The Debtors estimate that, as of the Petition Date, they owe approximately $65,000 in accrued but unpaid union dues, all of which will become due and owing before the final hearing on this motion.

49

151.    In addition to relocation expenses, expatriate Employees are offered tax services through Deloitte. The Debtors spend approximately $50,000 per month in aggregate on account of these services. The Debtors estimate that, as of the Petition Date, the total accrued but unpaid obligations in connection with these tax services are approximately $100,000, substantially all of which will become due and owing before the final hearing on this motion.

152.    <u>Board of Managers Compensation.</u>  Debtor Hexion Holdings LLC is the ultimate parent entity of all of the Debtors.  Its board of managers includes six (6) managers who are each compensated approximately $75,000 annually, paid in quarterly installments, in addition to up to $2,000 in expense reimbursements, paid in arrears, for each meeting attended in the performance of their duties as managers (the "**Manager Compensation**").  As of the Petition Date, there are no accrued but unpaid obligations outstanding with respect to Manager Compensation.  The Debtors request the authority, solely pursuant to the proposed Final Order, to pay Manager Compensation as it comes due in the ordinary course of business.

153.    Failure to satisfy certain prepetition obligations will likely lead to significant attrition and jeopardize Workforce morale and loyalty at a time when the support of the Workforce is critical to the Debtors' businesses.  The majority of the Debtors' Workforce rely exclusively on their compensation, benefits and reimbursement of expenses to satisfy their daily living expenses.  These members of the Workforce will be exposed to significant financial difficulties and other distractions if the Debtors are not permitted to honor their obligations for unpaid compensation, benefits and reimbursable expenses.  Authorizing the Debtors to pay prepetition wages, employee benefits, and similar items will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption.  Without the relief requested in the Employee Wages Motion, the Debtors' Workforce may seek alternative opportunities, which would cause the Debtors to incur additional expenses to find appropriate and experienced replacements.  The Debtors' very ability to run their businesses

50

safely and productively depends entirely on the expertise and continued motivation and service of their Workforce.  Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, the Debtors believe that the continuity and competence of their Workforce would be jeopardized if the relief requested herein is not granted.

154.    Accordingly, I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

### b. Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief

155.    The Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors to pay prepetition amounts owing in respect of all taxes, including, but not limited to sales, use, property, income, franchise (the "**Prepetition Taxes**") to various federal, state and local authority (collectively, the "**Taxing Authorities**"), and prepetition amounts owing in respect to certain custom duties, licensing, permitting and regulatory fees (the "**Fees**" or "**Regulatory Fees**" and together with the Prepetition Taxes, the "**Prepetition Taxes and Fees**") to certain federal state and local government agencies (collectively the "**Regulatory Authorities**" and together with the Taxing Authorities, the "**Authorities**"), and (ii) granting certain related relief.

156.    As corporate entities, the Debtors incur various tax liabilities and fees and in the past have generally paid such tax liabilities and fees to the relevant Authorities when due in the ordinary course of business.  The Debtors are subject to Sales and Use Taxes, Real and Personal Property Taxes, Income and Franchise Taxes, Customs Duties, and License, Reporting, and Regulatory Taxes and Fees.  Although, as of the Petition Date, the Debtors were substantially current in the payment of assessed and undisputed Prepetition Taxes and Fees, certain Prepetition Taxes and Fees may not yet have become due.  Certain Prepetition Taxes and Fees will not be due until the applicable monthly, quarterly, or annual payment dates – in some

cases immediately and in others not until next year.  I have been informed that, as of the Petition Date, the Debtors estimate that they have accrued liabilities, which are not yet due, in the approximate amount of $2,600,000 on account of Prepetition Taxes and Fees.

157.     Payment of the Prepetition Taxes and Fees is critical to the Debtors' continued, uninterrupted operations.  The Debtors' failure to pay these obligations may cause the Authorities to take precipitous action, including, but not limited to, seeking to lift the automatic stay, and imposing personal liability on the Debtors' officers and directors, which would disrupt the Debtors' day-to-day operations and could potentially impose significant costs on the Debtors' estates.  Failure to pay the Prepetition Taxes and Fees could also have a negative impact on the Debtors' existing permits and licenses.  In addition, the Debtors believe that most of the prepetition Taxes are entitled to priority, and thus permitting the Debtors to pay prepetition Taxes would affect only the timing of the payments, and not the amount of the ultimate recovery.

158.     Accordingly, I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

### c.   Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service; (II) Approving the Debtors' Proposed Form of Adequate Assurance of Payment to Utilities; and (III) Establishing Procedures for Resolving Objections to the Debtors' Proposed Form of Adequate Assurance

159.     The Debtors seek entry of interim and final orders (i) prohibiting utilities, as that term is used in section 366 of the Bankruptcy Code ("**Utility Companies**"), from altering, refusing, or discontinuing services to, or discriminating against, the Debtors solely on the basis of the commencement of the Debtors' chapter 11 cases, a debt owed by the Debtors for services rendered before the Petition Date, or any perceived inadequacy of the Debtors' proposed adequate assurance of payment to Utility Companies for postpetition services; (ii) approving the Debtors' proposed adequate assurance of payment to Utility Companies for postpetition services; and (iii) approving procedures for resolving objections to the Debtors' proposed adequate

assurance of payment to Utility Companies for postpetition services (the "**Adequate Assurance Procedures**").

160.    The Debtors obtain electricity, gas, water, sewer, waste, telephone and internet services, and other similar services (collectively, the "**Utility Services**") from Utility Companies to operate their business.  A select number of accounts, including electric, gas, water, and waste/sewer, are managed through Cass Information Systems, Inc. (the "**Third Party Payor**").  The Third Party Payor manages approximately 80 percent of the Debtors' Utility Services.  For all accounts managed by the Third Party Payor, the Utility Companies send invoices to the Third Party Payor, which then notifies the Debtors of the amounts due.  The Debtors then transfer the invoiced amounts to the Third Party Payor, typically three days prior to the applicable due date, and the Third Party Payor makes payment to the Utility Company.  Generally, payments for Utility Services are made in arrears after receiving a period bill from the applicable Utility Company.  Over the past 12 months, the Debtors have paid an average of approximately $2,500,000 per month for Utility Services.

161.    The Debtors intend to pay postpetition obligations owed to the Utilities in the ordinary course of business.  The Debtors expect that cash flows from operations and the use of the Debtors' proposed DIP Financing will be sufficient to pay postpetition obligations related to their utility services in the ordinary course of business.  Nevertheless, I have reviewed the Proposed Adequate Assurance Procedures and I believe that the procedures provide Utility Companies with adequate assurance of payment, and I do not believe that other or further assurances of payment to Utility Companies for postpetition Utilities Services are necessary.  However, I understand that the Debtors have also proposed procedures to resolve requests for additional or alternative assurance of payment in an orderly and fair manner.

162.    Preserving Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations and to the success of these cases.  Indeed, any interruption in Utility Services, even for a brief period, would disrupt the Debtors' ability to continue operations.  Given the Debtors' need to receive uninterrupted Utility Services, the relief requested fairly

balances Utility Companies' rights and the Debtors' rights under the Bankruptcy Code. I do not believe that Utility Companies will be prejudiced by either the proposed adequate assurance or the requirement to provide the Debtors with uninterrupted service.

163.    Accordingly, I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

    **d. Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain and Renew Their Prepetition Insurance Programs and Pay All Obligations in Respect Thereof and (B) Maintain Their Premium Financing Program and Pay All Obligations in Respect Thereof and (II) Granting Related Relief**

164.    The Debtors seek entry of interim and final orders authorizing the Debtors, in their discretion, to (i) maintain, supplement, amend, extend, renew, or replace their existing insurance policies, letters of credit, and surety bonds (collectively, the "**Insurance Programs**"), (ii) maintain their existing program (the "**Premium Financing Program**") of financing annual premiums under certain insurance policies and enter into new premium financing arrangements, and (iii) pay any obligations in respect of the foregoing, including amounts arising under the Insurance Programs, Premium Financing Programs, deductibles, assessments, self-insured retention amounts in connection with Self-Insured Claims, true-up amounts, broker fees, actuarial fees, administrative fees, bond fees and other fees and costs relating thereto (the "**Insurance Obligations**"), whether arising before or after the Petition Date.

165.    The Debtors currently maintain approximately forty-eight (48) insurance policies, which protect against operational risk inherent in the Debtors' business and provide coverage in compliance with various state and local laws. Hexion Holdings LLC or Hexion Inc. is the first named insured on each current Insurance Policy, with each of the other Debtors named as an additional insured where appropriate and applicable. Hexion Inc. pays the Insurance Obligations on behalf of all the Debtors.

166.    The Insurance Policies help to protect the Debtors against, among other things, property loss, environmental liability, umbrella and excess liability, automobile liability, aviation products and non-owned aircraft liability, acts of terrorism, marine cargo and marine liability, aboveground storage tank damage, workers compensation, cyber and technology attacks, and foreign liability.   In addition, the Debtors maintain several Insurance Policies protecting against directors' and officers' liability and other management liability, including among other things, crime, employment practices liability, and fiduciary liability.

167.    <u>Letters of Credit.</u>   The Debtors have outstanding fifteen (16) letters of credit (the "**Letters of Credit**"), totaling approximately $18,235,000, fourteen (14) of which secure their obligations under various workers' compensation insurance policies or to applicable workers' compensation funds in certain states, while the final two Letters of Credit support the Debtors' U.S. Customs bond.

168.    <u>The Surety Bond Program.</u>   From time to time, the Debtors post surety bonds (the "**Surety Bonds**" and together with the Insurance Policies and the Letters of Credit, the "**Insurance Programs**") as collateral to secure certain obligations, including (a) workers' compensation obligations, (b) obligations to U.S. Customs Service and other federal agencies, and (c) one utility payment.   The Surety Bonds are continuous and remain in full force and effect until cancelled.   As of the Petition Date, the Debtors have outstanding twenty-three (23) Surety Bonds totaling approximately $11,715,000, the premiums for which were paid in full prepetition.

169.    <u>Premium Financing Obligations.</u>   On average, the annual premiums due under the Insurance Policies total approximately $9,900,000, including $2,100,000 of premiums paid by the Debtors for insurance policies covering foreign operations.   The Debtors believe that, in some instances, it is economically beneficial to finance the premiums rather than pay them in a lump-sum.   Accordingly, the Debtors have financed substantially all of their insurance policies

under six (6) premium financing agreements   (collectively, the "**Premium Financing Program**") with First Insurance Funding ("**First**").   The Debtors have paid approximately $7,900,000 under the Premium Financing Program since July 2018 and the Debtors' remaining obligations under the Premium Financing Program are approximately $1,800,000. A portion of the payments are made by the Debtors, but some of these payments include those by non-Debtors, which the Debtor recoups through intercompany transfers.[10]   The Debtors expect to renew the Premium Financing Program in July, October and November 2019.

170.   <u>Third Party Administrators.</u>   The Debtors' third-party administrators—ESIS, Liberty Mutual and Gallagher Bassett—administer workers' compensation, auto liability and general liability claims under the relevant Insurance Programs.   They pay claims on behalf of the Debtors and then invoice the Debtors either weekly or monthly for reimbursement.   The Debtors' services agreement with ESIS expires on June 30, 2019.   Under the terms of this agreement, the Debtors pay an annual fee of $6,585 per year, which was paid in full prepetition. The Debtors estimate that they spend, on average, approximately $43,000 per month for payment amounts by third-party administrators.

171.   The nature of the Debtors' business makes it essential for the Debtors to maintain the Insurance Programs, including the Premium Financing Program, on an ongoing and uninterrupted basis.   The nonpayment of any Insurance Obligations could result in insurance carriers terminating or declining to renew the Debtors' insurance policies, or refusing to enter into new insurance agreements with the Debtors in the future.   As a result, the Debtors may be unable to find a carrier willing to provide them similar insurance coverage or a company willing to finance insurance premiums without charging significantly higher premiums and fees.   I

---

[10] The amount that the Debtors recoup through intercompany transfer is estimated to be no more than $500,000.

believe that any lapse in insurance coverage would leave the Debtors exposed to substantial liability, and it is therefore essential that the Debtors maintain their Insurance Programs and honor their Insurance Obligations throughout these cases.

172.    Accordingly, I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

### e.   Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Critical Vendors and (II) Granting Related Relief

173.    The Debtors seek entry of interim and final orders, (i) authorizing the Debtors, in their discretion, to pay prepetition obligations of certain vendors, suppliers, service providers, and similar entities that provide goods or services critical to the ongoing operation of the Debtors' business (the "**Critical Vendors**") in the ordinary course, and (ii) granting certain related relief. On an interim basis, the Debtors request to pay Critical Vendor Claims in the ordinary course of business in an aggregate amount not to exceed $27.1 million.

174.    As detailed above, the Debtors operate a complex, highly competitive, international business in the resins, wood adhesives, and epoxy industries.  The successful operation of these businesses requires the Debtors to rely on certain critical trade vendors without which the Debtors would be unable to maintain an uninterrupted supply of quality products and services to their customers.

175.    As of March 8, 2019, the last date for which the Debtors have certain accounts payable data due to a recent network security incident that prevented access to certain systems and data within their network, the Debtors estimated that the Critical Vendor Claims totaled approximately $23.3 million.  As a result of the network security incident and data and systems limitations that resulted therefrom, the Debtors and their advisors conducted a pro forma analysis to better estimate the Critical Vendor Claims amount as of the Petition Date.  Based on this analysis, which considered a by-vendor estimate of incremental accounts payable accrued

57

and amounts that are known to have been paid to vendors since the network security incident, the Debtors estimate that the Critical Vendor Claims total approximately $39.5 million as of the Petition Date.

176.    I believe that the Critical Vendors may refuse to continue providing services to the Debtors if their prepetition claims were not paid.  I believe that it would be extremely difficult to find replacement vendors to provide the materials of the same quality as those provided by the Critical Vendors.  Therefore, if Debtors are not granted the authority to pay the prepetition claims of the Critical Vendors, their access to quality materials may be severely limited.  Without such quality materials and services, the Debtors' own products will suffer and the resulting loss of customers and erosion of goodwill would decrease the value of the Debtors' estates.

177.    Accordingly, this motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

**f.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Foreign Vendors and (II) Granting Related Relief**

178.    The Debtors seek entry of interim and final orders authorizing Debtors, in their discretion, to pay (a) prepetition obligations (the "**Foreign Vendor Claims**") of certain foreign vendors (the "**Foreign Vendors**" ) in the ordinary course; and (ii) granting certain related relief.

179.    As detailed above, the Debtors operate a complex, highly competitive, international business in the resins, wood adhesives, and epoxy industries.  The successful operation of these businesses requires the Debtors to rely on foreign third-party vendors and suppliers, in addition to their domestic vendors, that provide the Debtors with numerous materials and services.  Given the size and global nature of their enterprise, the Debtors, in the ordinary course of their business, regularly transact with vendors outside of the United States that are critical to the Debtors' supply chain.  As of March 8, 2019, the last date for which the

Debtors have certain accounts payable data due to a recent network security incident that prevented access to certain systems and data within their network, the Debtors estimated that the Foreign Vendor Claims totaled approximately $1.3 million. As a result of the network security incident and data and systems limitations that resulted therefrom, the Debtors and their advisors conducted a pro forma analysis to better estimate the Foreign Vendor Claims amount as of the Petition Date. Based on this analysis, which considered a by-vendor estimate of incremental accounts payable accrued and amounts that are known to have been paid to vendors since the network security incident, the Debtors estimate that the Foreign Vendor Claims total approximately $2.3 million as of the Petition Date.

180. The majority of the Foreign Vendor Claims are held by various sole or limited source providers that supply the Debtors with specialized materials, which are essential to the Debtors' end products. Accordingly, I believe that Foreign Vendors are critical to maintaining and maximizing the value of the Debtors' operations. I also believe that the Foreign Vendors may refuse to continue providing services to the Debtors if their prepetition claims were not paid. It would be extremely difficult to find replacement vendors to provide the materials of the same quality as those provided by the Foreign Vendors. Therefore, if the Debtors are not granted the authority to pay the prepetition claims of the Foreign Vendors, their access to quality materials may be severely limited.

181. Accordingly, I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

### g. Debtors' Motion for Entry of an Interim and Final Order (I) Authorizing Payment of Prepetition Claims of Common Carriers, Warehouses, Toll Processors, Mechanics, Freight Forwarders, (II) Authorizing Payment of Section 503(b)(9) Claims, and (III) Granting Related Relief

182. The Debtors seek entry of interim and final orders (i) authorizing the Debtors to pay prepetition obligations of certain Lienholders in their discretion; (ii) authorizing

the Debtors to pay claims of certain 503(b)(9) Vendors entitled to administrative expense status under section 503(b)(9) of the Bankruptcy Code; and (iii) granting certain related relief.

183.    In the ordinary course of operations, the Debtors' supply and delivery system depends upon the use of common carriers operated by third parties, including vessels, trucking services, air transport, pipeline services providers, and rail carriers (the "**Common Carriers**") to receive shipments of raw materials from their vendors and to transport materials, goods and products throughout the manufacturing process.  As a result, the Common Carriers regularly possess certain of the Debtors' raw materials, goods and equipment in the ordinary course of the Debtors' operations.

184.    The Debtors also supplement their own storage and distribution facilities with third-party warehouse facilities (the "**Warehouses**") to store goods and inventory.  The Warehouse Providers regularly possess products and materials owned by the Debtors. The Debtors also utilize, in the ordinary course of business, the services of certain third-party toll processors and manufacturers (the "**Toll Processors**") with respect to the Debtors' finished products.

185.    Additionally, the Debtors require significant maintenance and repair work with respect to their equipment.  Although the Debtors utilize their own employees to perform some of this work, in the ordinary course of business the Debtors heavily rely on outside mechanics and repairmen (collectively, the "**Mechanics**") to perform maintenance and repair work.  Many of the Mechanics are currently in possession of equipment that is vital to the Debtors' operations, and these Mechanics may be able to assert mechanics', possessory or similar liens on such equipment. Further, the Debtors utilize the services of certain freight forwarders and customs processors (the "**Freight Forwarders**" and together with the Common Carriers, Warehouses, Toll Processors, and Mechanics, the "**Lienholders**").   The Freight Forwarders provide vital services that enable the Debtors to comply with the complex customs laws and regulations of the United States when importing products and materials from outside the United States.

60

186.    It is essential for the Debtors' continuing business viability and for the success of their restructuring efforts that they maintain the reliable and efficient flow of materials, goods and products through their distribution system.  The Debtors estimate that at any given time, a material amount of the Debtors' property is in the hands of the third-party Lienholders.

187.    The Debtors' manufacturing and customer service capabilities are dependent upon the storage and transportation of such goods by the Lienholders.  Even a short delay in the Debtors' supply pipeline could undermine the Debtors' ability to fulfill their customers' needs and adversely impact relationships with their customers.  As a result, the Debtors' ability to affect a successful restructuring may be jeopardized.  This risk is only heightened by the fact that the Debtors' customers may be tempted to source their business needs elsewhere due to the Debtors' commencement of these chapter 11 cases.  Thus, I believe that the prompt payment to the Lienholders of their claims in the ordinary course and satisfaction of any purported asserted liens is an exercise of the Debtors' sound business judgment and crucial for the orderly and efficient operation of the Debtors' business.

188.    As of March 8, 2019, the last date for which the Debtors have certain accounts payable data due to a recent network security incident that prevented access to certain systems and data within their network, the Debtors estimated that there were approximately $16.5 million in Lienholder Claims and approximately $38.7 million in 503(b)(9) Claims, which the Debtors had not yet paid to the Logistics Administrators or to other Lienholders or 503(b)(9) Claims that are paid directly by the Debtors.  As a result of the network security incident and data and systems limitations that resulted therefrom, the Debtors and their advisors conducted a pro forma analysis to better estimate the 503(b)(9) Claims amount as of the Petition Date.  Based on this analysis, which considered a by-vendor estimate of incremental goods received and of the amounts paid for those goods since the network security incident, the Debtors estimate that there are approximately $20.3 million in Lienholder Claims and approximately $37.5 million in 503(b)(9) Claims as of the Petition Date.

61

189.    I believe that the Debtors should have the ability to pay the claims of 503(b)(9) Vendors as they come due in the ordinary course, instead of satisfying these claims upon confirmation of a chapter 11 plan.    By altering the timing of payments that certain 503(b)(9) Vendors are entitled to receive as a matter of statute, such payments can induce the individual 503(b)(9) Vendors to adhere to favorable trade terms and do business with the Debtors on a go-forward basis.    I believe that this relief is in the best interests of the Debtors' estates because favorable trade terms will prevent the contraction of the Debtors' liquidity; and this Court's time and resources will not be burdened with motions from individual 503(b)(9) Vendors requesting payment on account of their 503(b)(9) Claims or seeking reclamation of goods received by the Debtors in the twenty days prior to the Petition Date.

190.    Accordingly, I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

### h.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain Customer Programs and Honor Related Prepetition Obligations and (II) Granting Related Relief

191.    The Debtors seek interim and final orders (i) authorizing the Debtors, in their discretion, to (a) maintain and administer customer-related programs, practices, and policies (collectively, the "**Customer Programs**") and honor prepetition obligations to customers arising under the Customer Programs in the ordinary course of business and in a manner consistent with past practice (collectively, the "**Prepetition Customer Obligations**") and (b) renew, replace, implement, modify, or terminate any of the Customer Programs, in each case, as the Debtors deem appropriate in their business judgment and in the ordinary course of business, without further application to the Court, and (ii) granting certain related relief.

192.    In the ordinary course of business, the Debtors maintain several Customer Programs designed to drive sales, meet competitive pressures, build key relationships, and develop and sustain customer loyalty, including Rebate Programs, Offset Programs, and Product

Claims (each as defined below).  The viability and success of the Debtors' business depends on the patronage and loyalty of their customers, including nearly 1,300 unique customers in the last eighteen (18) months.  In the ordinary course of business, the Debtors offer rebate programs (the "**Rebate Programs**") in an effort to, among other things, attract new customers, incentivize customers to purchase more products, and support the development, promotion, and marketing of their products.  Some customers' contracts include express offset agreements by which the Debtors and their customers agree that to the extent one party fails to pay for products, the non-defaulting party is entitled to offset any and all outstanding payment obligations or other indebtedness owed to it by the defaulting party against any payment obligations or other indebtedness that the non-defaulting party may owe to the defaulting party (the "**Offset Agreements**").  The Debtors incur costs each year replacing products or providing credits to customers when it ships products that do not meet the customers' specifications (the "**Product Claims**").  The Debtors' costs for the Product Claims were $23,000 in 2017 and $1.9 million in 2018.

193.    Continuing the Customer Programs without interruption and timely paying Prepetition Customer Obligations are vital to the Debtors' business and will facilitate a smooth transition into chapter 11, enhancing the prospect of success of these cases.  On the other hand, failing to honor the Customer Programs likely would erode the Debtors' reputation and harm the Debtors' customer relations, in turn, decreasing the Debtors' chance for a successful reorganization.  I believe that the requested relief will advance the restructuring of the Debtors' businesses, both in terms of profitability and the engendering of goodwill with essential customers, especially at this critical time early in these cases.  I also believe that the cost of maintaining the Customer Programs and honoring the Prepetition Customer Obligations will be more than offset by the revenue generated by virtue that the Customer Programs remain in place.

194.    Accordingly, I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

### D.     Certain Other Motions

#### a.   Debtors' Motion for Entry of an Order (I) Enforcing Protections of Sections 362 and 525 of the Bankruptcy Code and (ii) Approving Notice to Customers, Suppliers, and Other Stakeholders of Debtors' Non-Debtor Global Affiliates

195.     The Debtors seek entry of an order (i) enforcing the protections of sections 362 and 525 of the Bankruptcy Code and (ii) approving notice to customers, suppliers, and other stakeholders of the Debtors' non-Debtor global subsidiaries and affiliates.

196.     I am advised that Sections 362 and 525 of the Bankruptcy Code embody injunctions against adverse actions targeting the debtors or their property, whether from creditors, other parties in interest, or governmental bodies, upon the commencement of a chapter 11 case.  I am further advised that, although these injunctions are self-executing, they are often unfamiliar to non-U.S. creditors and parties in interest.  I am further advised that it is often necessary to advise such third parties of the existence and effect of sections 362 and 525 of the Bankruptcy Code through a separate order.

197.     The Debtors, together with their Non-Debtor Affiliates, operate production facilities, employ workers, interact with regulators, and serve customers worldwide.  As a result, the Debtors and their Non-Debtor Affiliates have many non-U.S. creditors, who may not be aware of the above-referenced protections.  Moreover, many of the Debtors' assets are located around the world, which may further confuse a non-U.S. creditor.  As customers and other third parties become aware of the Debtors cases, some may lose confidence and become hesitant or, worse yet, refuse to deal with Non-Debtor Affiliates under the mistaken assumption that such affiliates are part of these bankruptcy cases.  Further, I am advised that the "automatic" and self-executing nature of these protections may not be recognized by foreign creditors or tribunals unless embodied in an order of this Court.

198.     Accordingly, I believe an order from this Court, which the Debtors will be able to transmit to affected parties through court-approved notice, will maximize the protections afforded by sections 362 and 525 of the Bankruptcy Code.

Pursuant to 28 U.S.C. § 1746, to the best of my knowledge, information and belief, and after reasonable inquiry, I declare under penalty of perjury that the foregoing is true and correct.

Dated:   April 1, 2019

By:   _George F. Knight III_____

Name: George F. Knight, III
Title:   Executive Vice President and Chief
          Financial Officer of Hexion Holdings LLC

[FIRST DAY DECLARATION]

## **Exhibit A**

Organizational Chart

[*see attached*]



## **Exhibit B**

RSA

[*see attached*]

*EXECUTION VERSION*

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "***RSA***" and, together with the Term Sheet (as defined below), this "***Agreement***"), dated as of April 1, 2019, is entered into by and among the following parties:

(i) Hexion Holdings LLC ("***Hexion***"), Hexion LLC, Hexion Inc., Lawter International Inc., Hexion CI Holding Company (China) LLC, Hexion Nimbus Inc., Hexion Nimbus Asset Holdings LLC, Hexion Deer Park LLC, Hexion VAD LLC, Hexion 2 U.S. Finance Corp., Hexion HSM Holdings LLC, Hexion Investments Inc., Hexion International Inc., North American Sugar Industries Incorporated, Cuban-American Mercantile Corporation, The West India Company, NL Coop Holdings LLC, and Hexion Nova Scotia Finance, ULC (each, together with Hexion, a "***Company Entity***," and collectively, and together with Hexion, the "***Company***");

(ii) the undersigned beneficial holders, or investment managers, advisors, or subadvisors to beneficial holders (together with their respective successors and permitted assigns, the "***Consenting Creditors***"), of those certain: (a) 6.625% first lien notes due 2020 issued by Hexion Inc. (the "***6.625% Notes***"); (b) 10.00% first lien notes due 2020 issued by Hexion Inc. (the "***10% Notes***"); (c) 10.375% first lien notes due 2022 issued by Hexion Inc. (the "***10.375% Notes***" and, collectively with the 6.625% Notes and 10% Notes, the "***1L Notes***"); (d) 13.750% 1.5 lien notes due 2022 issued by Hexion Inc. (the "***1.5L Notes***"), (e) 9.00% second lien notes due 2020 issued by Hexion Inc. (the "***2L Notes***"), (f) 9.20% Debentures due 2021 and/or 7.875% Debentures due 2023 issued by Borden, Inc. (the "***Unsecured Notes***"); and

(iii) AIF Hexion Holdings, LP, AP Momentive Holdings, LLC, Apollo Investment Fund VI, L.P., and AIF Hexion Holdings II, L.P., each in its capacity as holder of outstanding common equity of Hexion (collectively the "***Consenting Sponsors***," and collectively with the Consenting Creditors, the "***Consenting Parties***").

Each of the Company Entities and the Consenting Parties are referred to as the "***Parties***" and individually as a "***Party***."

**WHEREAS**, the Parties have in good faith and at arm's length negotiated and agreed to the terms of a "pre-arranged" chapter 11 plan of reorganization as set forth on the term sheet attached hereto as <u>Exhibit A</u> (the "***Term Sheet***" and, the chapter 11 plan based thereon, together with all exhibits, annexes, and schedules thereto, as each may be amended, restated, amended and restated, supplemented, or otherwise modified in accordance with its terms and this Agreement, the "***Plan***") intended to be consummated through voluntary reorganization cases (the "***Chapter 11 Cases***") under chapter 11 of title 11 of the Bankruptcy Code (defined below) in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") on the terms set forth in this Agreement;

**WHEREAS**, as of the date hereof, the Consenting Creditors hold, in the aggregate, more than 50.1 percent of the aggregate outstanding principal amount of each of the 1L Notes, 1.5L Notes, 2L Notes, and Unsecured Notes;

**WHEREAS**, as of the date hereof, the Consenting Sponsors hold, in the aggregate, approximately 90 percent of the outstanding common equity of Hexion; and

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in this Agreement.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## 1. Certain Definitions.

Capitalized terms used but not defined in this Agreement have the meanings ascribed to them in the Term Sheet.  As used in this Agreement, the following terms have the following meanings:

a. "*1.5 Lien Ad Hoc Group*" means the ad hoc group of holders of 1.5L Notes represented by Jones Day ("*Jones Day*") and Perella Weinberg Partners.

b. "*1.5 Lien Noteholders*" means those beneficial holders, or investment managers, advisors, or subadvisors to beneficial holders of 1.5L Notes.

c. "*Ad Hoc Groups*" means the First Lien Ad Hoc Group, the 1.5 Lien Ad Hoc Group and the Crossholder Ad Hoc Group.

d. "*Agreement Effective Date*" means the date on which counterpart signature pages to this Agreement shall have been executed and delivered by (i) each Company Entity, (ii) Consenting Creditors holding at least 50.1% in aggregate principal amount outstanding of the 1L Notes, 1.5L Notes, 2L Notes and Unsecured Notes, and (iii) the Consenting Sponsors.

e. "*Alternative Transaction*" means any dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, joint venture, partnership, sale of assets, financing (debt or equity), restructuring or similar transaction of or by any of the Company Entities, other than the transactions contemplated by and in accordance with this Agreement.

f. "*Bankruptcy Code*" means title 11 of the United States Code.

g. "*Claim*" has the meaning ascribed to such term under section 101(5) of the Bankruptcy Code.

h. "*Consenting 1.5L Noteholders*" means certain holders, permitted successors, and assigns of the 1.5L Notes (constituting at least two thirds in amount of the outstanding 1.5L Notes) listed on the signature pages attached to this Agreement that, in each case, are members of the First Lien Ad Hoc Group or the 1.5 Lien Ad Hoc Group.

2

i.        "***Consenting Crossholder Noteholders***" means certain holders, permitted successors, and assigns of the 1L Notes, 1.5L Notes, 2L Notes and Unsecured Notes listed on the signatures pages attached to this Agreement that, in each case, are members of the Crossholder Ad Hoc Group.

j.        "***Consenting First Lien Noteholders***" means certain holders, permitted successors, and assigns of the 1L Notes (constituting at least two thirds in amount of the outstanding 1L Notes) listed on the signature pages attached to this Agreement that, in each case, are members of the First Lien Ad Hoc Group or the 1.5 Lien Ad Hoc Group.

k.        "***Crossholder Ad Hoc Group***" means the ad hoc group of holders of the 1L Notes, 1.5L Notes, 2L Notes and Unsecured Notes represented by Milbank LLP and Houlihan Lokey Capital, Inc.

l.        "***Effective Date***" means the date on which the Plan becomes effective in accordance with its terms.

m.        "***Exit Facilities***" means, collectively, the Exit Facility and the Exit ABL Facility.

n.        "***First Lien Ad Hoc Group***" means the ad hoc group of holders of 1L Notes represented by Akin Gump Strauss Hauer & Feld LLP and Evercore LLC.

o.        "***First Lien Noteholders***" means those beneficial holders, or investment managers, advisors, or subadvisors to beneficial holders of 1L Notes.

p.        "***Interest***" means an equity interest.

q.        "***Joinder Agreement***" means the form of joinder agreement attached hereto as Exhibit B.

r.        "***Person***" means an individual, firm, corporation (including any non-profit corporation), partnership, limited partnership, limited liability company, joint venture, association, trust, governmental entity, or other entity or organization.

s.        "***Representatives***" means, with respect to any Person, such Person's affiliates and its and their directors, officers, members, partners, managers, employees, agents, investment bankers, attorneys, accountants, advisors, and other representatives.

t.        "***Required Consenting 1.5L Noteholders***" means those Consenting 1.5 Lien Noteholders holding at least a majority in principal amount of the 1.5L Notes held by 1.5 Lien Noteholders party to this Agreement that are members of the 1.5 Lien Ad Hoc Group.

u.        "***Required Consenting Crossholder Noteholders***" means those Consenting Crossholder Noteholders holding at least 60% in aggregate principal amount of the 1L Notes, 1.5L Notes, 2L Notes and Unsecured Notes held by members of the Crossholder Ad Hoc Group that are Parties to this Agreement.

3

v.       "***Required Consenting First Lien Noteholders***" means Consenting First Lien Noteholders that are members of the First Lien Ad Hoc Group holding at least a majority in principal amount of the 1L Notes held by the First Lien Noteholders party to this Agreement that are members of the First Lien Ad Hoc Group.

w.       "***Required Consenting Parties***" means the Required Consenting First Lien Noteholders, the Required Consenting 1.5L Noteholders, the Required Consenting Crossholder Noteholders, the Consenting Sponsors and the Company.

x.       "***Support Period***" means, with respect to any Party, the period commencing on the Agreement Effective Date and ending on the earlier of (i) the date on which this Agreement is terminated by or with respect to such Party in accordance with <u>Section 7</u> hereof and (ii) the Effective Date.

The following terms are defined in the sections of this Agreement indicated in the table below:

| Defined Term | Section |
|---|---|
| Agreement | Preamble |
| Bankruptcy Court | Recitals |
| beneficial ownership | 4(b) |
| Chapter 11 Cases | Recitals |
| Company | Preamble |
| Company Entity | Preamble |
| Company Termination Event | 7(b) |
| Confidentiality Agreement | 3(b)(iii) |
| Confirmation Order | 2 |
| Consenting Creditors | Preamble |
| Consenting Creditor Termination Event | 7(a) |
| Consenting Parties | Preamble |
| Consenting Sponsors | Preamble |
| Consenting Sponsor Termination Event | 7(c) |
| Definitive Documents | 2 |
| DIP Credit Agreement | 2 |
| DIP Motion | 2 |
| Disclosure Statement Motion | 2 |
| Disclosure Statement Order | 2 |
| Exit Facilities Documents | 2 |
| Final DIP Order | 2 |
| Hexion | Preamble |
| Interim DIP Order | 2 |
| Mutual Termination Event | 7(d) |
| Party(ies) | Preamble |
| Permitted Transfer | 4(b) |
| Permitted Transferee | 4(b) |
| Plan | Recitals |

4

| Defined Term | Section |
|---|---|
| Plan Supplement | 2 |
| Qualified Marketmaker | 4(b) |
| Repo Agreement | 9(b) |
| Repo Securities | 9(b) |
| Term Sheet | Recitals |
| Termination Events | 7(f) |
| Transfer | 4(b) |

## 2.   **Definitive Documents**.

The definitive documents (the "***Definitive Documents***") with respect to the Restructuring shall include all documents (including[1] any related orders, agreements, instruments, schedules, or exhibits) that are contemplated by this Agreement and that are otherwise necessary or desirable to implement, or otherwise relate to the Restructuring, including (as applicable): (a) the Plan; (b) the related disclosure statement (such disclosure statement, together with any exhibits, schedules, attachments or appendices thereto, in each case as may be amended, supplemented or otherwise modified from time to time in accordance with the terms herein and therein, the "***Disclosure Statement***"); (c) any other documents and/or agreements relating to the Plan and/or the Disclosure Statement, including a motion seeking approval of the Disclosure Statement, the procedures for the solicitation of votes in connection with the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code (the "***Solicitation***") and the forms of ballots and notices and related relief (such motion, together with all exhibits, appendices, supplements, and related documents, the "***Disclosure Statement Motion***"), (d) the documents to be filed in the supplement to the Plan (collectively, the "***Plan Supplement***"); (e) the order approving the Disclosure Statement (the "***Disclosure Statement Order***"); (f) the order confirming the Plan (the "***Confirmation Order***"); (g) the motion seeking approval of the Company's incurrence of postpetition debt financing (the "***DIP Motion***") and the credit agreement with respect thereto (the "***DIP Credit Agreement***"); (h) the interim and final orders granting the DIP Motion (the "***Interim DIP Order***" and "***Final DIP Order***", respectively, and collectively, the "***DIP Orders***"); (i) a motion seeking the assumption of this Agreement pursuant to section 365 of the Bankruptcy Code authorizing, among other things, the payment of certain fees, expenses and other amounts hereunder, and granting related relief (the "***RSA Assumption Motion***"), and an order approving the RSA Assumption Motion (the "***RSA Order***"); (j) the Plan Supplement documentation with respect to a management incentive plan of the Company (the "***MIP***") and any documentation with respect to any key employee retention plan, key employee incentive plan or other similar plan or program; (k) the agreement with respect to the Exit Facilities, and any agreements, commitment letters, documents, or instruments related thereto (the "***Exit Facilities Documents***"); (l) the Equity Backstop Commitment Agreement, the BCA Approval Order, the documentation memorializing the Debt Backstop Commitments (the "***Debt Backstop Documents***"), and any order approving the Debt Backstop Documents (the "***Debt Backstop Order***"); (m) any organizational documents, operating agreements, management services agreements, shareholder and member-related agreements, registration rights agreements or other governance documents for the reorganized Company Entities (collectively, the

---

[1]   For the avoidance of doubt, the terms "includes" and "including" as used herein shall not be construed to be limiting.

"*Governance Documents*"); and (m) such other documents, pleadings, agreements, or supplements as may be reasonably necessary or advisable to implement the Restructuring. Each Definitive Document shall be consistent with this Agreement and otherwise reasonably acceptable to the Company, the Required Consenting First Lien Noteholders, the Required Consenting 1.5L Noteholders and the Required Consenting Crossholder Noteholders, provided, however, that notwithstanding the foregoing, the Governance Documents shall be acceptable only to the Company and the Board Committee; provided further that the Governance Documents shall contain customary minority protections reasonably acceptable to the Required Consenting First Lien Noteholders, the Required Consenting 1.5L Noteholders and the Required Consenting Crossholder Noteholders and there shall be a single class of stock, and, as to any inconsistencies between the Definitive Documents and this Agreement, (1) the economic treatment provided under the Definitive Documents (including, without limitation, any term or condition affecting or relating to any economic rights or obligations of any Consenting Creditors in connection with the Restructuring) shall be acceptable to the Company, on the one hand, and the Required Consenting First Lien Noteholders, the Required Consenting 1.5L Noteholders, the Required Consenting Crossholder Noteholders and/or the Consenting Sponsors (solely as to the respective treatment provided to each of the foregoing), as applicable; and (2) any release, exculpation and injunction provisions under the Plan shall be acceptable to the Required Consenting Parties.  In addition to the foregoing, any Definitive Document (and any amendments, modifications, supplements or waivers to such Definitive Document) that (X) affects the release, exculpation, injunction, indemnification or insurance provisions related to the Consenting Sponsors, (Y) adversely affects the rights or obligations of the Consenting Sponsors pursuant to or identified in this Agreement and to be implemented pursuant to the Plan, or (Z) relate to the Settlement Note, in each case shall be reasonably acceptable to the Consenting Sponsors.

### 3.    Milestones.

During the Support Period, the Company shall use commercially reasonable efforts to implement the Restructuring in accordance with the following milestones (the "*Milestones*"), as applicable, unless extended or waived in writing (with email from counsel being sufficient) by the Required Consenting First Lien Noteholders, the Required Consenting 1.5L Noteholders and the Required Consenting Crossholder Noteholders:[2]

a.    no later than 11:59 p.m. (prevailing Eastern Time) on April 1, 2019, the Company Entities shall have commenced the Chapter 11 Cases in the Bankruptcy Court (the "*Petition Date*");

b.    as soon as reasonably practicable, but in no event later than the date that is three (3) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

---

[2]    The date of each Milestone provided for in this <u>Section 3</u> shall be calculated in accordance with Rule 9006 of the Federal Rules of Bankruptcy Procedure.

c.      as soon as reasonably practicable, but in no event later than the date that is forty-five (45) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;

d.      as soon as reasonably practicable, but in no event later than the date that is sixty (60) calendar days after the Petition Date, the Bankruptcy Court shall have entered the RSA Order, the BCA Approval Order and the Debt Backstop Order;

e.      as soon as reasonably practicable, but in no event later than the date that is ninety (90) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Disclosure Statement Order;

f.      as soon as reasonably practicable, but in no event later than the date that is one hundred and twenty-five (125) calendar days after the Petition Date, the hearing to consider confirmation of the Plan shall have begun; and

g.      as soon as reasonably practicable, but in no event later than the date that is one hundred and fifty (150) calendar days after the Petition Date, the Effective Date shall occur;

provided that, the Milestones set forth in Sections (3)(e), (3)(f) and (3)(g) shall be extended by the number of days (not to exceed thirty-five (35) days for purposes of this clause) by which the deadline to file schedules of assets and liabilities and statements of financial affairs is extended beyond forty-five (45) calendar days, in the event the Company receives such an extension.

## 4.      **Agreements of the Consenting Parties.**

a.      Restructuring Support.  During the Support Period, subject to the terms and conditions hereof, each Consenting Party agrees, severally and not jointly, that it shall use commercially reasonable efforts to:

(i)      negotiate in good faith, execute, perform its obligations under, and consummate the transactions contemplated by, the Definitive Documents to which it is (or will be) a party, at such times as are contemplated herein;

(ii)      support the Plan and the transactions contemplated by this Agreement, the Term Sheet and the Definitive Documents and take all reasonable actions necessary or reasonably requested by the Company to effectuate the Plan and the transactions contemplated by this Agreement, the Term Sheet and the Definitive Documents, in a manner consistent with this Agreement, including the timelines set forth herein;

(iii)      not, directly or indirectly, seek, solicit, support, encourage, propose, assist, consent to, vote for, or enter or participate in any discussions or any agreement with any non-Party regarding, any Alternative Transaction;

(iv)      support and take all reasonable actions reasonably requested by the Company to facilitate entry of the DIP Orders (including adequate protection terms contained

7

therein), the Disclosure Statement Order, and the Confirmation Order, including consenting to the Company's use of cash collateral, incurrence of obligations and granting of liens as set forth in the DIP Orders (which consent is deemed to have been given by such Consenting Party's signature to this Agreement);

(v)     not, directly or indirectly, or encourage any other Person to, directly or indirectly, (A) object to, delay, postpone, challenge, oppose, impede, or take any other action or any inaction to interfere with or delay the acceptance, implementation, or consummation of the Plan on the terms set forth in this Agreement, the Term Sheet and any applicable Definitive Document, including, without limitation, commencing or joining with any Person in commencing any litigation or involuntary case for relief under the Bankruptcy Code against any Company Entity or any subsidiary thereof; (B) solicit, negotiate, propose, file, support, enter into, consummate, file with the Bankruptcy Court, vote for, or otherwise knowingly take any other action in furtherance of any restructuring, workout, plan of arrangement, or plan of reorganization for the Company that is inconsistent with this Agreement; (C) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Company or any direct or indirect subsidiaries of the Company that do not file for chapter 11 relief under the Bankruptcy Code, except in a manner consistent with this Agreement; or (D) object to or oppose, or support any other Person's efforts to object to or oppose, any motions filed by the Company that are consistent with this Agreement;

(vi)     subject to the receipt of the Disclosure Statement and related materials, it shall (A) timely vote or cause to be voted any Claims it holds to accept the Plan (to the extent permitted to vote) by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely basis following commencement of the solicitation of acceptances of the Plan in accordance with sections 1125(g) and 1126 of the Bankruptcy Code, provided, that, with respect to any Repo Securities (as defined below), the Consenting Party agrees to use its commercially reasonable efforts to cause such Repo Securities to be voted in accordance with the terms of this Section 4(a)(vi); (B) not change or withdraw such vote or the elections described below (or cause or direct such vote or elections to be changed or withdrawn) during the Support Period; *provided, however*, that nothing in this Agreement shall prevent any Party from changing, withholding, amending, or revoking (or causing the same) its timely election or vote with respect to the Plan if this Agreement has been duly-terminated with respect to such Party; and (C) to the extent it is permitted to elect whether to opt into or opt out of the releases set forth in the Plan, elect to opt into or not elect to opt out of the releases, as applicable, set forth in the Plan by timely delivering its duly executed and completed ballot or ballots indicating such election;

(vii)     support and take all commercially reasonable actions reasonably requested by the Company to facilitate the implementation and, if applicable, approval of the Disclosure Statement and confirmation and consummation of the Plan;

(viii)     not direct any administrative agent, collateral agent or indenture trustee (as applicable) to take any action inconsistent with such Consenting Creditor's obligations under this Agreement, and, if any applicable administrative agent, collateral agent or indenture trustee (as applicable) takes any action inconsistent with such Consenting Creditor's obligations under this Agreement, such Consenting Creditor shall use its commercially reasonable efforts

8

(which shall exclude the provision of any indemnity) to direct such administrative agent, collateral agent or indenture trustee (as applicable) to cease and refrain from taking any such action; and

(ix)    to the extent any legal or structural impediment arises that would prevent, hinder or delay the consummation of the Plan, negotiate with the Consenting Parties in good faith appropriate additional or alternative provisions to address any such impediment; provided that the economic outcome for the Consenting Creditors and other materials terms of this Agreement must be substantially preserved in such alternate provisions.

Notwithstanding the foregoing, nothing in this Agreement shall prohibit any Consenting Party from (1) appearing as a party-in-interest in any matter arising in the Chapter 11 Cases or (2) enforcing any right, remedy, condition, consent, or approval requirement under this Agreement or any Definitive Documents, provided that, in each case, any such action is not inconsistent with such Consenting Party's obligations hereunder.

The Parties agree that this Agreement does not constitute a commitment to, nor shall it obligate any of the Parties to, provide any new financing or credit support except as contemplated by the Term Sheet.

b.    Transfers.  During the Support Period, each Consenting Party agrees, solely with respect to itself, that it shall not sell, pledge, assign, transfer, permit the participation in, or otherwise dispose of (each, a "***Transfer***," provided, however, that any pledge, lien, security interest, or other encumbrance in favor of a bank or broker dealer at which a Consenting Party maintains an account, where such bank or broker dealer holds a security interest in or other encumbrances over property in the account generally shall not be deemed a "Transfer" for any purposes hereunder) any ownership (including any beneficial ownership)[3] in its Claims against or Interests in any Company Entity, or any option thereon or any right or interest therein (including by granting any proxies or depositing any interests in such Claims or Interests into a voting trust or by entering into a voting agreement with respect to such Claims or Interests), unless the intended transferee (1) is another Consenting Party, (2) as of the date of such Transfer, the Consenting Party controls, is controlled by, or is under common control with such transferee or is an affiliate, affiliated fund, or affiliated entity with a common investment advisor or (3) executes and delivers to counsel to the Company an executed Joinder Agreement before such Transfer is effective (it being understood that any Transfer shall not be effective as against the Company until notification of such Transfer and a copy of the executed Joinder Agreement (if applicable) is received by counsel to the Company, in each case, on the terms set forth herein) (such transfer, a "***Permitted Transfer***" and such party to such Permitted Transfer, a "***Permitted Transferee***").  Upon satisfaction of the foregoing requirements in this Section 4(b), (i) the Permitted Transferee shall be deemed to be a Consenting Party hereunder and shall be deemed to be a Consenting Creditor or Consenting Sponsor, or both, as applicable, and, for the avoidance of doubt, a Permitted Transferee is bound as a Consenting Party under this Agreement with respect to any and all Claims against, or Interests in, any of the Company Entities, whether held at the time such Permitted Transferee becomes a Party or later acquired by such Permitted Transferee and is deemed to make

---

[3]    As used herein, the term "***beneficial ownership***" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, the applicable Claims or Interests or the right to acquire such Claims or Interests.

all of the representations and warranties of a Consenting Party set forth in this Agreement and be entitled to the applicable rights of a Consenting Party hereunder, and (ii) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations.

(i)     This Agreement shall in no way be construed to preclude the Consenting Parties from acquiring additional Claims against or Interests in any Company Entity; *provided*, that (A) if any Consenting Party acquires additional Claims against or Interests in any Company Entity during the Support Period, such Consenting Party shall report its updated holdings to the legal advisors to the Ad Hoc Groups (on a professional eyes only basis) and the Company within five (5) business days of such acquisition, which notice may be deemed to be provided by the filing of a statement with the Bankruptcy Court as required by Rule 2019 of the Federal Rules of Bankruptcy Procedures, including revised holdings information for such Consenting Party, and (B) any acquired Claims or Interests shall automatically and immediately upon acquisition by a Consenting Party be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given); provided further that the acquisition of additional Claims by a Consenting Creditor shall in no way affect or dilute (A) the recoveries of other Consenting Creditors contemplated under the Plan or (B) any rights and/or premiums contemplated by this Agreement or the Term Sheet.

(ii)     This Section 4(b) shall not impose any obligation on the Company to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Party to Transfer any Claims or Interests. Notwithstanding anything to the contrary herein, to the extent the Company and another Party have entered into a separate agreement with respect to the issuance of a "cleansing letter" or other public disclosure of information (each such executed agreement, a "***Confidentiality Agreement***"), the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms.

(iii)     Any Transfer made in violation of this Section 4(b) shall be void *ab initio*.

c.     Marketmaking.

(i)     Notwithstanding anything to the contrary herein, a Consenting Party may Transfer any ownership in its Claims against or Interests in any Company Entity, or any option thereon or any right or interest therein, to a Qualified Marketmaker (as defined below) that acquires Claims against or Interests in any Company Entity with the purpose and intent of acting as a Qualified Marketmaker for such Claims or Interests, and such Qualified Marketmaker shall not be required to execute and deliver to counsel to any Party a Joinder Agreement in respect of such Claims or Interests if (A) such Qualified Marketmaker subsequently Transfers such Claims or Interests within ten (10) business days of its acquisition to an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor of such Qualified Marketmaker, (B) the transferee otherwise is a Permitted Transferee (including any requirement hereunder that such transferee execute a Joinder Agreement), and (C) the Transfer otherwise is a Permitted Transfer. To the extent that a Consenting Party is acting in its capacity as a

10

Qualified Marketmaker, it may Transfer any right, title, or interest in any Claims against or Interests in any Company Entity that such Consenting Party acquires in its capacity as a Qualified Marketmaker from a holder of such Claims or Interests who is not a Consenting Party without regard to the requirements set forth in Section 4(b) hereof.  As used herein, the term "*Qualified Marketmaker*" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims against the Company Entities (or enter with customers into long and short positions in claims against the Company Entities), in its capacity as a dealer or market maker in claims against the Company and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

(ii) The Company understands that the Consenting Creditors are engaged in a wide range of financial services and businesses.  In furtherance of the foregoing, the Company acknowledges and agrees that, to the extent a Consenting Creditor expressly indicates on its signature page hereto that it is executing this Agreement on behalf of specific trading desk(s) and/or business group(s) of the Consenting Creditor that principally manage and/or supervise the Consenting Creditor's investment in the Company, the obligations set forth in this Agreement shall only apply to such trading desk(s) and/or business group(s) and shall not apply to any other trading desk or business group of the Consenting Creditor so long as they are not acting at the direction or for the benefit of such Consenting Creditor or such Consenting Creditor's investment in the Company; provided that the foregoing shall not diminish or otherwise affect the obligations and liability therefor of any legal entity that executes this Agreement.

(iii) Further, notwithstanding anything in this Agreement to the contrary, the Parties agree that, in connection with the delivery of signature pages to this Agreement by a Consenting Creditor that is a Qualified Marketmaker before the occurrence of conditions giving rise to the effective date for the obligations and the support hereunder, such Consenting Creditor shall be a Consenting Creditor hereunder solely with respect to the Claims listed on such signature pages and shall not be required to comply with this Agreement for any other Claims it may hold from time to time in its role as a Qualified Marketmaker.

d.      Ad Hoc Group Composition.  On or before the 1st day of each month of the Support Period, counsel to each Ad Hoc Group shall provide counsel to the Company, on a professionals' eyes only basis, with a list of each member of such counsel's respective ad hoc group and such member's holdings of 1L Notes, 1.5L Notes, 2L Notes, and Unsecured Notes.

e.      Tax Matters.  During the Support Period, the Consenting Sponsors will not Transfer any equity of Hexion Holdings LLC if it would be reasonably expected to result in an "ownership change" of Hexion Holdings LLC for purposes of Section 382 of the Internal Revenue Code of 1986, as amended.

5. **Additional Provisions Regarding Consenting Party Commitments.**

Notwithstanding anything to the contrary herein, nothing in this Agreement shall:

      a.    affect the ability of any Consenting Party to consult with any other Consenting Party, the Company Entities, or any other party in interest in the Chapter 11 Cases (including any official committee or the United States Trustee);

      b.    impair or waive the rights of any Consenting Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring;

      c.    prevent any Consenting Party from enforcing this Agreement or any other Definitive Document, or from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, such documents; or

      d.    prevent any Consenting Party from taking any customary perfection step or other action as is necessary to preserve or defend the validity or existence of its Company Claims and Interests (including, without limitation, the filing of proofs of claim).

6. **Agreements of the Company.**

      a.    <u>Restructuring Support</u>.  During the Support Period, subject to the terms and conditions hereof (including, without limitation, Section 10), and except as expressly waived by the Required Consenting Parties in writing from time to time, the Company agrees that it shall use commercially reasonable efforts, and shall use commercially reasonable efforts to cause each of its subsidiaries to, without limitation:

      (i)    implement the Restructuring in accordance with the terms and conditions set forth herein;

      (ii)    implement and consummate the Plan in a timely manner and take any and all commercially reasonable and appropriate actions in furtherance of the Plan, as contemplated under this Agreement;

      (iii)    upon reasonable request, inform the legal and financial advisors to the Ad Hoc Groups as to: (A) the material business and financial (including liquidity) performance of the Company Entities; (B) the status and progress of the negotiations of the Definitive Documents; and (C) the status of obtaining any necessary or desirable authorizations (including consents) from any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange;

      (iv)    (A) support and take all commercially reasonable actions necessary to facilitate the solicitation, confirmation, and consummation of the Plan, as applicable, and the transactions contemplated thereby, (B) not take any action directly or indirectly that is materially inconsistent with, or that would reasonably be expected to prevent, interfere with, delay, or impede the confirmation and consummation of the Plan, and (C) not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with

this Agreement or delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptance or implementation of the Plan;

(v)    maintain good standing under the laws of the state in which each Company Entity is incorporated or organized;

(vi)    if the Company knows of a material breach by any Consenting Party of such Consenting Party's representations or warranties set forth in this Agreement or of a breach by any Consenting Party of such Consenting Party's obligations or covenants set forth in this Agreement, furnish prompt written notice (and in any event within three business days of such actual knowledge) to counsel to the Ad Hoc Groups;

(vii)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring contemplated herein, support and take all steps reasonably necessary and desirable to address any such impediment;

(viii)    prepare or cause to be prepared the Definitive Documents (including, without limitation, all relevant motions, applications, orders, agreements and other documents), each of which, for the avoidance of doubt, shall contain terms and conditions consistent with this Agreement, and use good faith efforts to provide draft copies of all Definitive Documents at least two (2) business days prior to the date when the Company intends to file or execute such document and shall consult in good faith with such parties regarding the form and substance of such Definitive Document or any such proposed filing with the Bankruptcy Court. The Company will provide draft copies of all other material pleadings the Company intends to file with the Bankruptcy Court to counsel to the Ad Hoc Groups, no later than two (2) business days prior to filing such pleading to the extent reasonably practicable and shall consult in good faith with such counsel regarding the form and substance of any such proposed pleading;

(ix)    file such "first day" motions and pleadings determined by the Company to be necessary, in form and substance reasonably acceptable to the Required Consenting First Lien Noteholders, the Required Consenting 1.5L Noteholders and the Required Consenting Crossholder Noteholders, and to seek interim and final (to the extent necessary) orders, in form and substance reasonably acceptable to the Required Consenting First Lien Noteholders, the Required Consenting 1.5L Noteholders and the Required Consenting Crossholder Noteholders, from the Bankruptcy Court approving the relief requested in such "first day" motions;

(x)    timely file a formal objection, in form and substance reasonably acceptable to the Required Consenting First Lien Noteholders, the Required Consenting 1.5L Noteholders and the Required Consenting Crossholder Noteholders, to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (A) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing the Chapter 11 Cases;

(xi)    not seek or solicit any Alternative Transaction;

(xii)    support and complete the Restructuring and all other actions contemplated in connection therewith and under the Definitive Documents, including support and take all actions as are reasonably necessary and appropriate to obtain any and all required regulatory and/or third-party approvals to consummate the Restructuring;

(xiii)    timely file a formal objection, in form and substance reasonably acceptable to the Required Consenting First Lien Noteholders, the Required Consenting 1.5L Noteholders and the Required Consenting Crossholder Noteholders, to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan reorganization, as applicable; and

(xiv)    (A) operate the business of the Company and its direct and indirect subsidiaries in the ordinary course in a manner that is consistent with this Agreement, past practices, and  to preserve intact the Company's business organization and relationships with third parties (including lessors, licensors, suppliers, distributors and customers) and employees, (B) subject to applicable non-disclosure agreements and the terms thereof, keep advisors to the Ad Hoc Groups reasonably informed about the operations of the Company and its direct and indirect subsidiaries, and (C) promptly notify advisors to the Ad Hoc Groups of any material governmental or third party complaints, litigations, investigations or hearings; and

(xv)    provide prompt written notice to counsel to the Ad Hoc Groups between the date hereof and the Effective Date of (A) the occurrence of a Termination Event; (B) any matter or circumstance which the Company knows, or suspects is likely, to be a material impediment to the implementation or consummation of the Restructuring; or (C) if any Person has challenged the validity or priority of, or has sought to avoid, any lien securing the 1L Notes, the 1.5L Notes or the 2L Notes pursuant to a pleading filed with the Bankruptcy Court.

b.    _Negative Covenants_.  The Company agrees that, for the duration of the Support Period, the Company shall not take any action materially inconsistent with, or omit to take any action required by, this Agreement, the Plan (if applicable), or any of the other Definitive Documents.

## 7.    **Termination of Agreement.**

a.    _Consenting Creditor Termination Events_.    This Agreement may be terminated by the Required Consenting First Lien Noteholders, the Required Consenting 1.5L Noteholders, or the Required Consenting Crossholder Noteholders, by the delivery to the Company and the other Consenting Parties of a written notice in accordance with Section 22 hereof, solely as to the Consenting Creditors delivering such notice, upon the occurrence and continuation of any of the following events (each, a "***Consenting Creditor Termination Event***"):

(i)    the breach by any Company Entity or any Consenting Party of (A) any affirmative or negative covenant contained in this Agreement or (B) any other obligations of such breaching Party set forth in this Agreement, in each case, in any material respect and which breach remains uncured (to the extent curable) for a period of ten (10) business days following the

Company's or the Consenting Party's (as applicable) receipt of notice pursuant to <u>Section 22</u> hereof.

(ii)    any representation or warranty in this Agreement made by any Company Entity or any Consenting Party shall have been untrue in any material respect when made or shall have become untrue in any material respect, and such breach remains uncured (to the extent curable) for a period of ten (10) business days following the Company's or the Consenting Party's (as applicable) receipt of notice pursuant to <u>Section 22</u> hereof;

(iii)    any Company Entity or any Consenting Party files any motion, pleading, or related document with the Bankruptcy Court that is materially inconsistent with this Agreement, the Term Sheet, or the Definitive Documents, and such motion, pleading, or related document has not been withdrawn ten (10) business days of the Company or such Consenting Party receiving written notice in accordance with <u>Section 22</u> that such motion, pleading, or related document is materially inconsistent with this Agreement;

(iv)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of any material portion of the Restructuring or rendering illegal the Plan or any material portion thereof, and either (A) such ruling, judgment, or order has been issued at the request of or with the acquiescence of any Company Entity or any Consenting Party, or (B) in all other circumstances, such ruling, judgment, or order has not been reversed or vacated within thirty (30) calendar days after such issuance;

(v)    the Bankruptcy Court (or other court of competent jurisdiction) enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in any of the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 Cases, or (D) the effect of which would render the Plan incapable of consummation on the terms set forth in this Agreement;

(vi)    any Company Entity or any Consenting Party files or supports (or fails to timely object to) another party in filing (A) a motion or pleading challenging the amount, validity, or priority of any Claims held by any Consenting Creditor against the Company (or any liens securing such Claims), (B) any plan of reorganization, liquidation, or sale of all or substantially all of the Company's assets other than the Plan, or (C) a motion or pleading asserting (or seeking standing to assert) any purported claims or causes of action against any of the Consenting Creditors, which event remains uncured for a period of ten (10) business days following the Company's or Consenting Party's (as applicable) receipt of notice pursuant to <u>Section 22</u> hereof;

(vii)    the Bankruptcy Court enters an order providing relief against any Consenting Creditor with respect to any of the causes of action or proceedings specified in <u>Section 7(a)(vi)(A)</u> or <u>(C)</u>;

(viii)    (A) any Definitive Document filed by the Company or any Consenting Party, or any related order entered by the Bankruptcy Court, in the Chapter 11 Cases, is inconsistent with the terms and conditions set forth in this Agreement or is otherwise not in

15

accordance with this Agreement, or (B) any of the terms or conditions of any of the Definitive Documents is waived, amended, supplemented, or otherwise modified in any material respect without the prior written consent of the Required Consenting First Lien Noteholders, the Required Consenting 1.5L Noteholders and the Required Consenting Crossholder Noteholders (or such parties as may be required by the terms of such Definitive Document, if then effective), in each case, which remains uncured for ten (10) Business Days after the receipt by the Company of written notice delivered in accordance herewith;

(ix)    any of the Milestones have not been achieved, extended, or waived within three (3) business days after such Milestone;

(x)    any termination or acceleration of the DIP Facility;

(xi)    any termination event in favor of the Required Consenting First Lien Noteholders, the Required Consenting 1.5L Noteholders, or the Required Consenting Crossholder Noteholders, or event of default by the Company under the RSA Order, the Equity Backstop Commitment Agreement, the BCA Approval Order, the Debt Backstop Documents, or the Debt Backstop Order, as applicable, that has not been waived or cured (to the extent curable) prior to the expiration of any applicable grace periods thereunder;

(xii)    if any Company Entity (A) withdraws the Plan, (B) publicly announces its intention not to support the Plan, (C) files a motion with the Bankruptcy Court seeking the approval of an Alternative Transaction, or (D) agrees to pursue (including, for the avoidance of doubt, as may be evidenced by a term sheet, letter of intent, or similar document executed by a Company Entity) or publicly announces its intent to pursue an Alternative Transaction;

(xiii)    the Company files or announces that it will file any motion or application seeking authority to sell any material assets without the prior written consent of the Required Consenting First Lien Noteholders, the Required Consenting 1.5L Noteholders and the Required Consenting Crossholder Noteholders;

(xiv)    the Company terminates any of its obligations under and in accordance with Sections 7(b) or (d), as applicable, of this Agreement;

(xv)    the Required Consenting First Lien Noteholders, the Required Consenting 1.5L Noteholders or the Required Consenting Crossholder Noteholders terminate any of their respective obligations under and in accordance with this Section 7(a) or (d), as applicable;

(xvi)    the Bankruptcy Court enters an order, or the Company files a motion seeking an order (without the prior written consent of the Required Consenting First Lien Noteholders, the Required Consenting 1.5L Noteholders and the Required Consenting Crossholder Noteholders), (i) converting one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases, (iii) denying the entry of the RSA Order, the BCA Approval Order, or the Debt Backstop

16

Order, or (iv) making a finding of fraud, dishonesty or misconduct by any executive, officer or director of the Company, regarding or relating to the Company;

(xvii) the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority or any other court of competent jurisdiction, of any ruling or order enjoining the consummation of the Plan; *provided*, *however*, that the Company shall have five (5) business days after the issuance of such ruling or order to obtain relief that would allow consummation of the Plan in a manner that (A) does not prevent or diminish in a material way compliance with the terms of this Agreement, and (B) is reasonably acceptable to the Required Consenting First Lien Noteholders, the Required Consenting 1.5L Noteholders and the Required Consenting Crossholder Noteholders;

(xviii) without the prior consent of the Required Consenting First Lien Noteholders, the Required Consenting 1.5L Noteholders, and the Required Consenting Crossholder Noteholders, the Company or any of the Company's foreign subsidiaries or affiliates (A) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect except as provided in this Agreement, (B) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described above, (C) files an answer admitting the material allegations of a petition filed against it in any such proceeding, (D) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official, (E) makes a general assignment or arrangement for the benefit of creditors or (F) takes any corporate action for the purpose of authorizing any of the foregoing;

(xix)   the Bankruptcy Court enters an order terminating any Company Entity's exclusive right to file and/or solicit acceptances of a plan of reorganization (including the Plan);

(xx)    the Company exercises its fiduciary out in accordance with Section 7(b) hereof;

(xxi)   the Bankruptcy Court enters an order denying confirmation of the Plan;

(xxii)  an order confirming the Plan is reversed or vacated;

(xxiii) any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring this Agreement to be unenforceable;

(xxiv)  an order is entered by the Bankruptcy Court granting relief from the automatic stay to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure on the same) on any of the Company's assets (other than in respect of insurance proceeds or with respect to assets having a fair market value of less than $15,000,000 in the aggregate); or

17

(xxv)   the failure of the Consenting Creditors to hold, in the aggregate, at least: (A) 66 2/3% of the aggregate principal amount outstanding of the 1L Notes; (B) 66 2/3% of the aggregate principal amount outstanding of the 1.5L Notes; and (C) 66 2/3% of the aggregate principal amount outstanding of the 2L Notes and the Unsecured Notes, in each case, at any time after April 5, 2019.

Notwithstanding the foregoing, if any Consenting Creditor Termination Event is caused by any Consenting Party, this Agreement shall be terminable solely with respect to that Consenting Party.

   b. <u>Company Termination Events</u>. This Agreement may be terminated by the Company by the delivery to counsel to the Consenting Parties of a written notice in accordance with <u>Section 22</u> hereof, upon the occurrence and continuation of any of the following events (each, a "***Company Termination Event***"):

   (i) the breach in any material respect by Consenting Creditors holding (A) an amount of 1L Notes that would result in non-breaching Consenting Creditors holding less than 66 2/3% in aggregate principal amount outstanding of the 1L Notes, (B) an amount of 1.5L Notes that would result in non-breaching Consenting Creditors holding less than 66 2/3% in aggregate principal amount outstanding of the 1.5L Notes, or (C) an amount of 2L Notes and Unsecured Notes that would result in non-breaching Consenting Creditors holding less than 66 2/3% in aggregate principal amount outstanding of 2L Notes and Unsecured Notes, in each case with respect to any of the representations, warranties, or covenants of such Consenting Creditors set forth in this Agreement and which breach remains uncured for a period of ten (10) business days after the receipt by the applicable Consenting Creditor from the Company of written notice of such breach, which written notice will set forth in detail the alleged breach;

   (ii) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of or rendering illegal the Plan or any material portion thereof, and either (A) such ruling, judgment, or order has been issued at the request of (or agreement by) the Consenting Parties, or (B) in all other circumstances, such ruling, judgment, or order has not been reversed or vacated within thirty (30) calendar days after such issuance;

   (iii) the failure of the Consenting Creditors to hold, in the aggregate, at least: (A) 66 2/3% of the aggregate principal amount outstanding of the 1L Notes; (B) 66 2/3% of the aggregate principal amount outstanding of the 1.5L Notes; (C) 66 2/3% of the aggregate principal amount outstanding of the 2L Notes and the Unsecured Notes, in each case, at any time after April 5, 2019;

   (iv) the failure of the Consenting Creditors (as a group, which is not required to include each Consenting Creditor) to execute commitment agreements in respect of the entire amount of the Rights Offering and the Exit Facility (each as defined in the Term Sheet) on or before April 15, 2019;

   (v) any termination event in favor of the Company or event of default by a party other than the Company under the RSA Order, the Equity Backstop Commitment Agreement, the BCA Approval Order, the Debt Backstop Documents, or the Debt Backstop Order,

18

as applicable, that has not been waived or cured (to the extent curable) prior to the expiration of any applicable grace periods thereunder;

(vi)     the Bankruptcy Court (or other court of competent jurisdiction) enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in any of the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 Cases, or (D) the effect of which would render the Plan incapable of consummation on the terms set forth in this Agreement;

(vii)    the board of directors or managers or similar governing body, as applicable, of any Company Entity determines that continued performance under this Agreement (including taking any action or refraining from taking any action) would be inconsistent with the exercise of its fiduciary duties under applicable law (as reasonably determined by such board or body in good faith after consultation with legal counsel);

(viii)   the Bankruptcy Court enters an order denying confirmation of the Plan;

(ix)     an order confirming the Plan is reversed or vacated; or

(x)      any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring this Agreement to be unenforceable.

c.      <u>Consenting Sponsor Termination Events</u>.    This Agreement may be terminated by the Consenting Sponsors, solely as to the Consenting Sponsors, by the delivery to counsel to the Company and the Consenting Parties of a written notice in accordance with <u>Section 22</u> hereof, upon the occurrence and continuation of any of the following events (each, a "***Consenting Sponsor Termination Event***"):

(i)      the breach in any material respect by Consenting Creditors holding (A) an amount of 1L Notes that would result in non-breaching Consenting Creditors holding less than 66 2/3% in aggregate principal amount outstanding of the 1L Notes, (B) an amount of 1.5L Notes that would result in non-breaching Consenting Creditors holding less than 66 2/3% in aggregate principal amount outstanding of the 1.5L Notes, or (C) an amount of 2L Notes and Unsecured Notes that would result in non-breaching Consenting Creditors holding less than 66 2/3% in aggregate principal amount outstanding of 2L Notes and Unsecured Notes, in each case with respect to any of the representations, warranties, or covenants of such Consenting Creditors set forth in this Agreement and which breach remains uncured for a period of ten (10) business days after the receipt by the applicable Consenting Creditor from the Consenting Sponsors of written notice of such breach, which written notice will set forth in detail the alleged breach;

(ii)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of or rendering illegal the Plan or any material portion thereof, and either (A) such ruling, judgment, or order has been issued at the request of (or agreement by) the Consenting Creditors, or (B) in all other circumstances, such ruling, judgment, or order has not been reversed or vacated within thirty (30) calendar days after such issuance;

(iii)    the failure of the Consenting Creditors to hold, in the aggregate, at least: (A) 66 2/3% of the aggregate principal amount outstanding of the 1L Notes; (B) 66 2/3% of the aggregate principal amount outstanding of the 1.5L Notes; and (C) 66 2/3% of the aggregate principal amount outstanding of the 2L Notes and the Unsecured Notes, in each case, at any time after April 5, 2019;

(iv)    the Bankruptcy Court (or other court of competent jurisdiction) enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in any of the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 Cases, or (D) the effect of which would render the Plan incapable of consummation on the terms set forth in this Agreement;

(v)    (A) any Definitive Document filed by the Company or any Consenting Party, or any related order entered by the Bankruptcy Court, in the Chapter 11 Cases, is inconsistent with the terms and conditions set forth in this Agreement or is otherwise not in accordance with this Agreement, or (B) any of the terms or conditions of any of the Definitive Documents is waived, amended, supplemented, or otherwise modified in any material respect without the prior written consent of the Consenting Sponsors (or such parties as may be required by the terms of such Definitive Document, if then effective), in each case, which remains uncured for five (5) Business Days after the receipt by the Company of written notice delivered in accordance herewith;

(vi)    the Company terminates any of its obligations under and in accordance with Sections 7(b) or (d), as applicable, of this Agreement;

(vii)    the Required Consenting First Lien Noteholders, the Required Consenting 1.5L Noteholders or the Required Consenting Crossholder Noteholders terminate any of their respective obligations under and in accordance with this Section 7(a) or (d), as applicable;

(viii)    the Bankruptcy Court enters an order denying confirmation of the Plan;

(ix)    an order confirming the Plan is reversed or vacated; or

(x)    any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring this Agreement to be unenforceable.

d.    <u>Mutual Termination</u>.  This Agreement may be terminated in writing by mutual agreement of the Company Entities, the Required Consenting First Lien Noteholders, the Required Consenting 1.5L Noteholders, the Required Consenting Crossholder Noteholders and the Consenting Sponsors (a "***Mutual Termination Event***").

e.    <u>Individual Termination</u>.   Any individual Consenting Party may terminate this Agreement, as to itself only, by the delivery to counsel to the Company and the Consenting Parties of a written notice in accordance with Section 22, upon the occurrence and continuation of any of the following events (each, an "***Individual Termination Event***"):

20

(i)    this Agreement is amended without its consent in such a way as to alter any of the economic terms thereof in a manner that is disproportionately adverse to such Consenting Party as compared to similarly situated Consenting Parties; or

(ii)    the Effective Date shall not have occurred by the date that is 270 calendar days after the Petition Date.

f.      Automatic Termination.  This Agreement shall terminate automatically without any further required action or notice upon the occurrence of the Effective Date (collectively with the Consenting Creditor Termination Events, the Company Termination Events, the Consenting Sponsor Termination Events, the Mutual Termination Event, and the Individual Termination Event, the "***Termination Events***").

g.      Effect of Termination.  Upon any termination of this Agreement that is not limited in its effectiveness to an individual Party or Parties in accordance with Section 7, this Agreement shall forthwith become null and void and of no further force or effect as to any Party, and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings, and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Plan or otherwise, that it would have been entitled to take had it not entered into this Agreement; *provided* that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder that arose prior to the date of such termination or any obligations hereunder that expressly survive termination of this Agreement under Section 16 hereof, provided further, however, that notwithstanding anything to the contrary herein, the right to terminate this Agreement under this Section 7 shall not be available to any Party whose failure to fulfill any material obligation under this Agreement has been the cause of, or resulted in, the occurrence of the applicable Termination Event.  Upon the occurrence of a validly-exercised Termination Event prior to entry of the Confirmation Order by the Bankruptcy Court, any and all consents or ballots tendered by the terminated Party shall be deemed, for all purposes, to be null and void ab initio and shall not be considered or otherwise used in any manner by any Party in connection with the Restructuring, this Agreement, or otherwise. Upon the termination of this Agreement that is limited in its effectiveness as to an individual Party or Parties in accordance with Section 7: (i) this Agreement shall become null and void and of no further force or effect with respect to the terminated Party or Parties, who shall be immediately released from its or their liabilities, obligations, commitments, undertakings, and agreements under or related to this Agreement and shall have all the rights and remedies that it or they would have had and such Party or Parties shall be entitled to take all actions, whether with respect to the Plan or otherwise, that it or they would have been entitled to take had it or they not entered into this Agreement; *provided,* the terminated Party or Parties shall not be relieved of any liability for breach or non-performance of its or their obligations hereunder that arose prior to the date of such termination or any obligations hereunder that expressly survive termination of this Agreement under Section 16 hereof; and (ii) this Agreement shall remain in full force and effect with respect to all Parties other than the terminated Party or Parties.

h.      Automatic Stay. The Company Entities acknowledge that, after the commencement of the Chapter 11 Cases, the giving of notice of default or termination by any other

21

Party pursuant to this Agreement shall not be a violation of the automatic stay under section 362 of the Bankruptcy Code, and the Company Entities hereby waive, to the fullest extent permitted by law, the applicability of the automatic stay as it relates to any such notice being provided; provided that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

## 8.    Definitive Documents; Good Faith Cooperation; Further Assurances.

a.    Subject to the terms and conditions described herein, during the Support Period, each Party, severally and not jointly, hereby covenants and agrees to reasonably cooperate with each other in good faith in connection with the negotiation, drafting, execution (to the extent such Party is a party thereto), and delivery of the Definitive Documents.  Furthermore, subject to the terms and conditions hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings (provided that no Consenting Party shall be required to incur any cost, expense, or liability in connection therewith unless such Consenting Party shall have received an assurance of reimbursement satisfactory to it).

b.    Each Consenting Creditor that is a Backstop Party entitled to receive a Structuring Premium and the Company hereby agree to work in good faith to negotiate and execute the Equity Backstop Agreement and the Debt Backstop Agreement as promptly as practicable after the date of this Agreement, with each such agreement to be in customary form for agreements of such type.  The Consenting Creditors and the Company hereby acknowledge and agree that the economic terms regarding the Equity Backstop Agreement and the Debt Backstop Agreement, including the associated fees and structuring premiums, shall be as described in the Term Sheet. In the event that any Backstop Party does not execute and deliver the Equity Backstop Agreement and/or the Debt Backstop Agreement after such agreements have been negotiated pursuant to the terms of this Agreement and the Term Sheet, any such non-executing Backstop Party shall not be entitled to receive any fees or structuring premiums pursuant to such agreements and (i) all commitments (along with all associated fees and premiums) allocable to any such non-executing Backstop Party under the Equity Backstop Agreement and/or the Debt Backstop Agreement, as applicable, will be offered on a pro rata basis (based on the pro forma equity splits among the Backstop Parties as described in the Term Sheet), to the other Equity Backstop Parties and/or Debt Backstop Parties, as applicable, and, if not fully subscribed after being offered to the other Equity Backstop Parties and/or Debt Backstop Parties, will be offered to on a pro rata basis to all Consenting Creditors (based on the pro forma equity splits among the Consenting Creditors as described in the Term Sheet) (ii) all structuring premiums allocable to any such non-executing Backstop Party under the Equity Backstop Agreement and/or the Debt Backstop Agreement, as applicable, will be allocated on a pro rata basis (based upon the percentages of the applicable structuring premium to be received by the Backstop Parties other than any non-executing Backstop Party) to the other Backstop Parties entitled to receive Equity Backstop Premium and/or Debt Backstop Obligation Premium, as applicable, as provided in the Term Sheet.  The Company and each Consenting Creditor shall be entitled to all of their rights and remedies hereunder in the event that any Backstop Party breaches its obligations under this Section 8(b).

22

9.     **Representations and Warranties.**

    a.     Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct, and complete as of the date hereof (or as of the date a Consenting Party becomes a party hereto):

    (i)     such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company, or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership, or other similar action on its part;

    (ii)     the execution, delivery, and performance by such Party of this Agreement does not and will not (A) violate any provision of law, rule, or regulation applicable to it, its charter, or bylaws (or other similar governing documents), or (B) conflict with, result in a breach of, or constitute a default under any material contractual obligation to which it is a party (provided, however, that with respect to the Company, it is understood that commencing the Chapter 11 Cases may result in a breach of or constitute a default under such obligations);

    (iii)     the execution, delivery, and performance by such Party of this Agreement does not and will not require any registration or filing with, consent, or approval of, or notice to, or other action, with or by, any federal, state, or governmental authority or regulatory body, except such filings as may be necessary and/or required by the Bankruptcy Court; and

    (iv)     this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

    b.     Each Consenting Party severally (and not jointly), represents and warrants to the Company that, as of the date hereof (or as of the date such Consenting Party becomes a party hereto), such Consenting Party (i) is the beneficial owner of (or investment manager, advisor, or subadvisor to one or more beneficial owners of) the aggregate principal amount of Claims and/or Interests set forth below its name on the signature page hereto (or below its name on the signature page of a Joinder Agreement for any Consenting Party that becomes a Party hereto after the date hereof), (ii) has, except in the case of Consenting Parties with Repo Securities, with respect to the beneficial owners of such Claims or Interests (as may be set forth on a schedule to such Consenting Party's signature page hereto), (A) sole investment or voting discretion with respect to such Claims or Interests, (B) full power and authority to vote on and consent to matters concerning such Claims or Interests, or to exchange, assign, and transfer such Claims or Interests, and (C) full power and authority to bind or act on the behalf of, such beneficial owners, (iii) other than pursuant to this Agreement or with respect to Repo Securities, such Claims or Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition or encumbrance of any kind, that would prevent in any

23

way such Consenting Party's performance of its obligations contained in this Agreement at the time such obligations are required to be performed, and (iv) such Consenting Party is not the beneficial owner of (or investment manager, advisor, or subadvisor to one or more beneficial owners of) any other Claims against and/or Interests in any Company Entity. "***Repo Securities***" means, with respect to a Consenting Creditor, Claims or Interests that are, on the date hereof, subject to the terms and conditions of a repurchase agreement, sell/buyback agreement or similar arrangement (each, a "***Repo Agreement***") entered into between, on the one hand, such Consenting Creditor (or one or more funds which the Consenting Creditor is the discretionary investment manager, advisor or sub-advisor of) and, on the other hand, a third-party. For the avoidance of doubt, it is acknowledged and agreed that Repo Securities shall constitute Claims for all purposes under this Agreement.

## 10.    Additional Provisions Regarding Company Entities' Commitments.

a.      Nothing in this Agreement shall require any director or officer of any Company Entity to violate their fiduciary duties to such Company Entity. No action or inaction on the part of any director or officer of any Company Entity that such directors or officers reasonably believe is required by their fiduciary duties to such Company Entity shall be limited or precluded by this Agreement; provided, however, that no such action or inaction shall be deemed to prevent any of the Consenting Parties from taking actions that they are permitted to take as a result of such actions or inactions, including terminating their obligations hereunder.

b.      Notwithstanding anything to the contrary in this Agreement, the Company Entities shall not, and shall instruct and direct their respective Representatives not to, seek or solicit any discussions or negotiations with respect to, any Alternative Transaction; provided, however, that nothing in this Section 10(b) shall limit the Parties' ability to engage in marketing efforts, discussions, and/or negotiations with any party regarding refinancing of the Exit Facilities to be consummated following the Effective Date; provided, further, that (a) if any of the Company Entities receive a proposal or expression of interest regarding any Alternative Transaction, the Company Entities shall be permitted to discuss or negotiate the terms of such proposal or expression of interest and shall promptly notify counsel to the Ad Hoc Group, orally and in writing, of any such proposal or expression of interest, with such notice to include the material terms thereof, including (unless prohibited by a separate agreement) the identity of the person or group of persons involved, and (b) the Company Entities shall promptly furnish counsel to the Ad Hoc Group with copies of any written offer, oral offer, or any other information that they receive relating to the foregoing and shall promptly inform counsel to the Ad Hoc Group of any material changes to such proposals.

c.      Notwithstanding anything to the contrary herein, nothing in this Agreement shall create any additional fiduciary obligations on the part of the Company, or the Consenting Creditors, or any members, partners, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents or other representatives of the same or their respective affiliated entities, in such person's capacity as a member, partner, manager, managing member, officer, director, employee, advisor, principal, attorney, professional, accountant, investment banker, consultant, agent or other representative of such Party or its affiliated entities, that such entities did not have prior to the execution of this Agreement.

24

d.      Nothing in this Agreement shall: (i) impair or waive the rights of any Company Entity to assert or raise any objection permitted under this Agreement in connection with the Restructuring, or (ii) prevent any Company Entity from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

## 11.      **Filings and Public Statements.**

a.      The Company shall submit drafts to counsel to the Consenting Parties of any press releases, public documents, and any and all filings with the SEC, the Bankruptcy Court, or otherwise that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least forty-eight hours prior to making any such disclosure, and shall afford them a reasonable opportunity under the circumstances to comment on such documents and disclosures and shall consider any such comments in good faith.  Except as required by law or otherwise permitted under the terms of any other agreement between the Company on the one hand, and any Consenting Party, on the other hand, no Party or its advisors (including counsel to any Party) shall disclose to any person (including other Consenting Parties), other than the Company's advisors, the principal amount or percentage of any Claims or Interests or any other securities of the Company held by any other Party, in each case, without such Party's prior written consent; provided that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Party a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (including by way of a protective order) (the expense of which, if any, shall be borne by the relevant disclosing Party) and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Claims or Interests held by all the Consenting Parties collectively.  Any public filing of this Agreement, with the Bankruptcy Court, the SEC or otherwise, shall not include the executed signature pages to this Agreement.  Nothing contained herein shall be deemed to waive, amend or modify the terms of any confidentiality or non-disclosure agreement between the Company and any Consenting Creditor.

## 12.      **Amendments and Waivers.**

During the Support Period, this Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended, or supplemented except in a writing signed by the Company Entities, the Required Consenting First Lien Noteholders, the Required Consenting 1.5L Noteholders, the Required Consenting Crossholder Noteholders and the Consenting Sponsors (as applicable and to the extent required herein); *provided* that:   (i) any waiver, modification, amendment, or supplement to Section 7(e) or this Section 12 shall require the prior written consent of each Party; (ii) any waiver, modification, amendment, or supplement to the definition of Required Consenting First Lien Noteholders, Required Consenting 1.5L Noteholders or Required Consenting Crossholder Noteholders shall require the prior written consent of each applicable Consenting Creditor that is a member of the Ad Hoc Groups; (iii) any waiver, modification, amendment or supplement to Section 4(c)(ii) of this Agreement or the last paragraph in the section of the Term Sheet entitled "Equity Backstop Commitment" shall require the consent of each Consenting Creditor and (iv) any waiver, modification, amendment, or supplement that disproportionately and adversely affects the economic recoveries or treatment of any Consenting Party compared to the economic recoveries or treatment set forth in the Term Sheet hereto may

not be made without the prior written consent of such Consenting Party. Amendments to any Definitive Document shall be governed as set forth in such Definitive Document. Any consent required to be provided pursuant to this <u>Section 12</u> may be delivered by email from counsel.

### 13.    **Effectiveness.**

This Agreement shall become effective and binding on the Parties on the Agreement Effective Date, and not before such date; *provided* that signature pages executed by Consenting Parties shall be delivered to (a) the Company, other Consenting Parties, and counsel to other Consenting Parties (if applicable) in a redacted form that removes such Consenting Parties' holdings of Claims and any schedules to such Consenting Parties' holdings (if applicable) and (b) the legal and financial advisors to the Company and the Ad Hoc Groups, respectively, in an unredacted form.

### 14.    **Governing Law; Jurisdiction; Waiver of Jury Trial.**

a.      This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York, without giving effect to the conflicts of law principles thereof.

b.      Each of the Parties irrevocably agrees that any legal action, suit, or proceeding arising out of or relating to this Agreement brought by any party or its successors or assigns shall be brought and determined in (a) the Bankruptcy Court, for so long as the Chapter 11 Cases are pending, and (b) otherwise, any federal or state court in the Borough of Manhattan, the City of New York, and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement. Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in the courts described above, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree, or award rendered by any such court as described herein. Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient. Subject to the foregoing, each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim, or otherwise, in any proceeding arising out of or relating to this Agreement, (i) any claim that it is not personally subject to the jurisdiction of the courts as described herein for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment, or otherwise) and (iii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper, or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

c.      EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH

PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

### 15. **Specific Performance/Remedies.**

a. The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions without the necessity of posting a bond to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity. Unless otherwise expressly stated in this Agreement, no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a Party from pursuing other rights and remedies to the extent available under this Agreement, at law, or in equity.

b. Notwithstanding anything to the contrary in this Agreement, none of the Parties will be liable for, and none of the Parties shall claim or seek to recover, any punitive, special, indirect or consequential damages or damages for lost profits.

### 16. **Survival.**

Notwithstanding the termination of this Agreement pursuant to <u>Section 7</u> hereof, the agreements and obligations of the Parties set forth in the following Sections: <u>7(g)</u>, <u>14</u>, <u>15</u>, <u>16</u>, <u>17</u>, <u>18</u>, <u>19</u>, <u>20</u>, <u>21</u>, <u>22</u>, <u>23</u>, <u>24</u>, <u>25</u>, and <u>27</u> hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof; *provided* that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

### 17. **Headings.**

The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

### 18. **Successors and Assigns; Severability; Several Obligations.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators, and representatives; *provided* that nothing contained in this <u>Section 18</u> shall be deemed to permit Transfers of interests in any Claims against or Interests in any Company Entity, other than in accordance with the express terms of this Agreement. If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and

effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible. The agreements, representations, and obligations of the Parties are, in all respects, several and neither joint nor joint and several. For the avoidance of doubt, the obligations arising out of this Agreement are several and not joint with respect to each Consenting Party, in accordance with its proportionate interest hereunder, and the Parties agree not to proceed against any Consenting Party for the obligations of another.

**19.    No Third-Party Beneficiaries.**

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.

**20.    Prior Negotiations; Entire Agreement.**

This Agreement, including the exhibits and schedules hereto (including the Term Sheet), constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each Consenting Party shall continue in full force and effect in accordance with its terms.

**21.    Counterparts.**

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by facsimile, electronic mail, or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

**22.    Notices.**

All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, facsimile, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers:

(1)    If to the Company, to:

Hexion Inc.
180 East Broad Street
Columbus, Ohio 43215
Attention:    Douglas Johns

with a copy to:

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
Attention:    George Davis (george.davis@lw.com)
              Andrew Parlen (andrew.parlen@lw.com)

- and -

Latham & Watkins LLP
330 North Wabash, Suite 2800
Chicago, IL 60611
Attention:    Caroline Reckler (caroline.reckler@lw.com)
              Jason Gott (jason.gott@lw.com)

(2) If to a Consenting Creditor, to the addresses or facsimile numbers set forth below following such Consenting Creditor's signature to this Agreement or on the applicable Joinder Agreement (if any), as the case may be,

with a copy to (solely in the case of Consenting Creditors that are members of the First Lien Ad Hoc Group):

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York  10036
Email: idizengoff@akingump.com; pdublin@akingump.com; dfisher@akingump.com and nmoss@akingump.com
Attention:  Ira S. Dizengoff, Esq., Philip C. Dublin, Esq., Daniel Fisher, Esq. and Naomi Moss, Esq.

with a copy to (solely in the case of Consenting Creditors that are members of the 1.5 Lien Ad Hoc Group):

Jones Day
250 Vesey Street
New York, NY 10281
Attention:    Sidney P. Levinson (slevinson@jonesday.com)
              Jeremy D. Evans (jdevans@jonesday.com)

with a copy to (solely in the case of Consenting Creditors that are members of the Crossholder Ad Hoc Group):

Milbank LLP
55 Hudson Yards

29

New York, New York 10001
Attention:      Samuel A. Khalil (skhalil@milbank.com)
                Matthew L. Brod (mbrod@milbank.com)

(3) If to a Consenting Sponsor, to the addresses or facsimile numbers set forth below following such Consenting Sponsor's signature to this Agreement or on the applicable Joinder Agreement (if any), as the case may be.

Any notice given by electronic mail, facsimile, delivery, mail, or courier shall be effective when received.

### 23.    **Reservation of Rights; No Admission.**

a.    Nothing contained herein shall (i) limit (A) the ability of any Party to consult with other Parties, or (B) the rights of any Party under any applicable bankruptcy, insolvency, foreclosure, or similar proceeding, including the right to appear as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as such consultation or appearance is consistent with such Party's obligations hereunder; (ii) limit the ability of any Consenting Party to sell or enter into any transactions in connection with the Claims, or any other claims against or interests in the Company, subject to the terms of Section 4(b) hereof; or (iii) constitute a waiver or amendment of any provision of any applicable credit agreement or indenture or any agreements executed in connection with such credit agreement or indenture.

b.    Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Parties to protect and preserve its rights, remedies, and interests, including its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in any bankruptcy case filed by the Company or any of its affiliates and subsidiaries. This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence, and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms. This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

### 24.    **Relationship Among Consenting Parties.**

Notwithstanding anything to the contrary herein, the duties and obligations of the Consenting Creditors under this Agreement shall be several, not joint. It is understood and agreed that no Consenting Creditor has any fiduciary duty, duty of trust or confidence in any kind or form with any other Consenting Creditor, the Company or any other stakeholder of the Company and, except as expressly provided in this Agreement, there are no commitments among or between them. In this regard, it is understood and agreed that any Consenting Party may trade in the debt

of the Company without the consent of the Company or any other Consenting Party, subject to applicable securities laws, the terms of this Agreement, and any Confidentiality Agreement entered into with the Company; provided that no Consenting Party shall have any responsibility for any such trading by any other Person by virtue of this Agreement.  No prior history, pattern, or practice of sharing confidences among or between the Consenting Parties shall in any way affect or negate this understanding and agreement.

## 25.   No Solicitation; Representation by Counsel; Adequate Information.

a.    This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan in the Chapter 11 Cases.  The acceptances of the Consenting Parties with respect to the Plan will not be solicited until such Consenting Parties has received the Disclosure Statement and related ballots and solicitation materials.

b.    Each Party acknowledges that it has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

c.    Although none of the Parties intends that this Agreement should constitute, and they each believe it does not constitute, a solicitation or acceptance of a chapter 11 plan of reorganization or an offering of securities, each Consenting Party acknowledges, agrees, and represents to the other Parties that it (i) is an "accredited investor" as such term is defined in Rule 501(a) of the Securities Act of 1933, (ii) understands that any securities to be acquired by it pursuant to the Plan have not been registered under the Securities Act and that such securities are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Party's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available, and (iii) has such knowledge and experience in financial and business matters that such Consenting Party is capable of evaluating the merits and risks of the securities to be acquired by it pursuant to the Plan and understands and is able to bear any economic risks with such investment.

## 26.   Conflicts.

In the event of any conflict among the terms and provisions of the RSA and of the Term Sheet, the terms and provisions of the Term Sheet shall control.

## 27.   Payment of Fees and Expenses.

The Company shall pay or reimburse all reasonable and documented fees and out-of-pocket expenses (expenses when due (including travel costs and expenses) of the attorneys, accountants, other professionals, advisors, and consultants of the Ad Hoc Groups (whether incurred directly or on their behalf and regardless of whether such fees and expenses are incurred before or after the

Petition Date), including the fees and expenses of (a) the following advisors to the First Lien Ad Hoc Group: (i) Akin Gump Strauss Hauer & Feld, LLP as counsel; (ii) Ashby & Geddes, as local counsel; and (iii) Evercore Group, L.L.C., as financial advisor; (b) the following advisors to the 1.5 Lien Ad Hoc Group:  (i) Jones Day, as counsel; (ii) Young Conaway Stargatt & Taylor LLP, as local counsel; and (iii) Perella Weinberg Partners, as financial advisor; and (c) the following advisors to the Crossholder Ad Hoc Group (i) Milbank LLP, as counsel (ii) Morris, Nichols, Arsht & Tunnell LLP, as local counsel; and (iii) Houlihan Lokey Capital, Inc., as financial advisor; in each case, including all amounts payable or reimbursable under applicable fee or engagement letters with the Company (which agreements shall not be terminated by the Company before the termination of this Agreement); *provided, further*, that to the extent that the Company terminates this Agreement under <u>Section 7(b)</u>, the Company's reimbursement obligations under this <u>Section 27</u> shall survive with respect to any and all fees and expenses incurred on or prior to the date of termination and such termination shall not automatically terminate any applicable fee or engagement letters.  Each of the RSA Order, the BCA Approval Order and the Debt Backstop Order shall contain language approving the payment of all such fees and expenses by the Company, including any back-end, transaction, success or similar fees provided for under the applicable fee or engagement letters with the Company.

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

[*Signature pages follow.*]

## COMPANY ENTITIES

Hexion Holdings LLC
Hexion LLC
Hexion Inc.
Hexion Nimbus Inc.
Hexion Nimbus Asset Holdings LLC
Hexion Deer Park LLC
Hexion VAD LLC
Hexion 2 U.S. Finance Corp.
Hexion HSM Holdings LLC

By: _George F. Knight III_____
Name:  George F. Knight, III
Title:   Executive Vice President
         and Chief Financial Officer

Hexion CI Holding Company (China) LLC
Hexion Investments Inc.
Hexion International Inc.
North American Sugar Industries Incorporated
Cuban-American Mercantile Corporation
The West India Company
NL Coop Holdings LLC
Lawter International Inc.

By: _George F. Knight III_____
Name:  George F. Knight, III
Title:   Executive Vice President

Hexion Nova Scotia Finance, ULC

By: _George F. Knight III_____
Name:  George F. Knight, III
Title:   President

# **EXHIBIT A**

**Term Sheet**

*EXECUTION VERSION*

**THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN AND IN THE RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

## Hexion Restructuring Term Sheet

This Term Sheet, which is Exhibit A to a Restructuring Support Agreement dated April 1, 2019, by and among the Debtors, the Consenting Noteholders, and the Consenting Sponsors (the "Restructuring Support Agreement"), describes the proposed terms of the Debtors' restructuring (the "Restructuring"). The Debtors will implement the Restructuring through a plan of reorganization under chapter 11 of the Bankruptcy Code, which shall be consistent with the terms of this Term Sheet and the Restructuring Support Agreement (as it may be amended or supplemented from time to time in accordance with the terms of the Restructuring Support Agreement, the "Plan"), in voluntary chapter 11 cases (the "Chapter 11 Cases") to be commenced in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). This Term Sheet incorporates the rules of construction set forth in section 102 of the Bankruptcy Code. Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Restructuring Support Agreement.

This Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the Definitive Documents, which remain subject to discussion and negotiation in accordance with the Restructuring Support Agreement. Consummation of the transactions contemplated by this Term Sheet are subject to (1) the negotiation and execution of definitive documents evidencing and related to the Restructuring contemplated herein, (2) satisfaction of all of the conditions in any definitive documentation evidencing the transactions comprising the Restructuring, and (3) entry of a Final Order of the Bankruptcy Court confirming the Plan and the satisfaction of any conditions to the effectiveness thereof. The Definitive Documents will contain terms and conditions that are dependent on each other, including those described in this Term Sheet.

## **OVERVIEW OF THE RESTRUCTURING**

| | |
|---|---|
| **Summary** | Subject in all respects to and as provided by the other terms of this Term Sheet and to the Restructuring Support Agreement, Hexion Inc. and certain of its affiliates (collectively, the "<u>Debtors</u>") will restructure their funded debt obligations with the proceeds of a new, $1.641 billion Exit Facility and a $300 million common equity Rights Offering available to holders of Notes Claims, in each case backstopped by certain holders of Notes Claims that have executed the Restructuring Support Agreement, as well as with a new Exit ABL Facility and through the issuance of new common equity in exchange for all outstanding Notes Claims, in each case as set forth in this Term Sheet, the Restructuring Support Agreement and the exhibits and schedules annexed thereto.  The Debtors' creditors and equityholders will receive the following treatment:<br><br>• holders of the Debtors' 1L Notes will receive $1.45 billion in cash (less adequate protection payments reflecting interest on the 1L Notes paid during the Chapter 11 Cases), 72.5% of the New Hexion Common Shares (subject to dilution for the Rights Offering Shares, the equity issued pursuant to the MIP and any equity issued pursuant to the Equity Backstop Premium and the Debt Backstop Premium (collectively, the "<u>Agreed Dilution</u>")), and 72.5% of the Rights in the Rights Offering;<br><br>• holders of the Debtors' 1.5L Notes, 2L Notes, and Unsecured Notes will receive 27.5% of the New Hexion Common Shares (subject to the Agreed Dilution) and 27.5% of the Rights in the Rights Offering;<br><br>• general unsecured creditors will be paid in full; and<br><br>• holders of the Debtors' outstanding common equity will receive no recovery on account of such common equity interests.<br><br>The Restructuring will be supported through the Debtors' borrowing under a new, $350 million DIP term facility and a $350 million DIP ABL facility. |
| **Implementation** | The Debtors will effectuate the Restructuring through the Chapter 11 Cases and Confirmation of the Plan, which shall be consistent with this Term Sheet and subject to the terms and conditions set forth in the Restructuring Support Agreement. |
| **Rights Offering** | The Plan will provide for a rights offering (the "<u>Rights Offering</u>") that will provide Holders of allowed Notes Claims with rights to |

|  | purchase for cash (the "Rights") their *pro rata*[1] share of $300 million of New Hexion Common Shares issued on the Effective Date (the "Rights Offering Shares") at a 35% discount to a stipulated post-new money plan total equity value of $1.374 billion (such stipulated value, the "Plan Equity Value") (based on a total enterprise value of $3.1 billion) (the "Rights Offering Purchase Price").[2]  Participation in the Rights Offering will be available to Holders of allowed Notes Claims, in each case who are eligible to participate in the Rights Offering under applicable securities laws. |
|  | New Hexion Common Shares issued pursuant to the Rights Offering shall be issued in reliance on the exemption from the registration requirements of the federal securities laws pursuant to section 1145 of the Bankruptcy Code to the maximum extent permitted by law, and otherwise pursuant to Section 4(a)(2) and/or Regulation S of the Securities Act of 1933 (the "Securities Act"), or another available exemption from registration, as applicable. |
| **Equity Backstop Obligations** | The Rights Offering will be backstopped on a several, and not joint and several, basis by certain parties to the Restructuring Support Agreement (the "Equity Backstop Parties") pursuant to, and in the amounts set forth in, the schedule attached as Schedule 1 to the Restructuring Support Agreement (the "Equity Backstop Allocation Schedule") subject to negotiation and execution of Definitive Documentation following receipt of all necessary internal approvals. Schedule 1 shall be redacted in the Restructuring Support Agreement, including in any filing with the Bankruptcy Court, provided that, to the extent required as evidentiary support, it will be filed under seal with the Bankruptcy Court. |
|  | The Rights Offering will be conducted on the terms and conditions to be set forth in the Equity Backstop Agreement to be entered into after the date of the Restructuring Support Agreement and an order of the Bankruptcy Court approving the Debtors' entry into the Equity Backstop Agreement (the "BCA Approval Order"). |

---

[1]  The Rights shall be allocated on a *pro rata* basis on the same basis as the allocation of the primary equity among holders of allowed 1L Notes Claims and holders of Junior Notes Claims (i.e., 72.5% of the Rights shall be made available to holders of allowed 1L Notes Claims and 27.5% to holders of allowed Junior Notes Claims ratably based on Claim amounts within the respective classes).

[2]  On the closing date of the Rights Offering, each Equity Backstop Party that is a registered investment company under the Investment Company Act of 1940, as amended (each an "Investment Company") shall deliver and pay its respective Funding Amount by wire transfer of immediately available funds in U.S. dollars to a segregated bank account of the subscription agent for the Rights Offering (the "Rights Offering Subscription Agent") designated by the Rights Offering Subscription Agent in a funding notice delivered to Equity Backstop Parties, or make other arrangements that are acceptable to the applicable Investment Company and the Debtors, in satisfaction of such Equity Backstop Party's Rights Offering backstop obligation and its obligations to fully exercise its subscription rights in accordance with the Equity Backstop Agreement.

|  | As consideration for the Put Option and the obligations of the Equity Backstop Parties and whether or not the Put Option is exercised, under the terms of the Equity Backstop Agreement, each Equity Backstop Party will receive, based on its Equity Backstop Obligations, its *pro rata* share of a premium (the "<u>Equity Backstop Premium</u>"), which shall equal 8% of the aggregate Equity Backstop Obligations and which shall be fully earned and nonrefundable upon entry of the BCA Approval Order, payable free and clear of and without withholding on account of any taxes, treated as an administrative expense of each of the Debtor's Estates, and paid in cash (or, at the option of each Equity Backstop Party, in New Hexion Common Shares at the Plan Equity Value) upon closing of the Rights Offering or in such other circumstances as may be agreed by the parties in the Equity Backstop Agreement. |
|---|---|
|  | New Hexion Common Shares purchased pursuant to the Equity Backstop Agreement shall be issued in reliance on the exemption from the registration requirements of the federal securities laws pursuant to section 1145 of the Bankruptcy Code to the maximum extent permitted by law, and otherwise in reliance on the exemption from the registration requirements of the federal securities laws pursuant to Section 4(a)(2) and/or Regulation S of the Securities Act, or another available exemption from registration. |
|  | The Debtors and Reorganized Debtors shall use commercially reasonable efforts to 1) obtain "restricted" and "unrestricted" CUSIP identifiers for the New Hexion Common Shares (as necessary), 2) make the New Hexion Common Shares (including "restricted" and "unrestricted" securities) eligible for clearance and settlement through the Depository Trust Company, and 3) make the New Hexion Common Shares eligible for transfer pursuant to Rule 144A of the Securities Act, including commercially reasonable efforts to comply with the requirements of Rule 144(A)(d)(4).  Other than restrictions imposed by state "blue sky" laws and federal securities law and regulations, the New Hexion Common Shares shall not be subject to any transfer restrictions, including, without limitation, any rights of first offer, rights of first refusal, or rights of last offer provisions, other than customary provisions relating to the protection of net operating losses, if any, to be agreed upon by the Required Consenting Noteholders. |
| **Exit Facility** | Pursuant to a competitive bidding process among third party financing sources in consultation with the Required Consenting Noteholders, the Debtors shall obtain an exit facility in an amount of not more than $1.641 billion (the "<u>Exit Facility</u>").  Certain Consenting Noteholders (the "<u>Debt Backstop Parties</u>," and together with the Equity Backstop Parties, the "<u>Backstop Parties</u>") will backstop the Exit Facility on a several basis in the amounts set forth |

in, the schedule attached as Schedule 2 to the Restructuring Support Agreement (the "Debt Backstop Allocation Schedule"), subject to negotiation and execution of Definitive Documents following receipt of all necessary internal approvals, and on the following terms, such other terms as are on Schedule 4 to the Restructuring Support Agreement and on such other terms to be agreed upon by the Debt Backstop Parties.   Schedules 2 and 4 shall be redacted in the Restructuring Support Agreement, including in any filing with the Bankruptcy Court, provided that, to the extent required as evidentiary support, it will be filed under seal with the Bankruptcy Court:

- Security: First Lien on all US assets (with carve out for ABL collateral), including Principal Properties, if any, plus 100% of foreign sub stock

- Commitment Length: until December 31, 2019

As consideration for the obligations of the Debt Backstop Parties, and whether or not the Debt Backstop Parties provide the Exit Facility, under the terms of the Debt Backstop Agreement to be entered into after the date of the Restructuring Support Agreement, each Debt Backstop Party will receive, based on its Debt Backstop Obligations, its *pro rata* share of a premium (the "Debt Backstop Premium"), which shall consist of a premium equal to 3.375% of the aggregate amount of Debt Backstop Obligations, which shall be fully earned and nonrefundable upon entry of the DCA Approval Order, payable free and clear of and without withholding on account of any taxes, treated as an administrative expense of each of the Debtor's Estates, and payable in cash (or, at the option of each Debt Backstop Party, in New Hexion Common Shares at the Plan Equity Value) upon the closing of the Exit Facility or in such other circumstances as may be agreed by the parties in the Debt Backstop Agreement.

The obligations of the Debt Backstop Parties as set forth above shall be referred to as the "Debt Backstop Obligations."

In addition, the parties listed on Schedule 3 to the Restructuring Support Agreement (the "Additional Put Option Premium Schedule") shall receive as additional consideration for providing the Debt Backstop Obligation, their pro rata share of 1.5% of the aggregate amount of Debt Backstop Obligation (the "Additional Put Option Premium"), which shall be fully earned and nonrefundable upon entry of the DCA Approval Order, payable free and clear of and without withholding on account of any taxes, treated as an administrative expense of each of the Debtor's Estates, and payable in cash upon the closing of the Exit Facility in connection with the Restructuring or in such other circumstances as may be agreed by the parties in the Debt Backstop Agreement.   Schedule 3 shall be

| | |
|---|---|
| | redacted in the Restructuring Support Agreement, including in any filing with the Bankruptcy Court, provided that, to the extent required as evidentiary support, it will be filed under seal with the Bankruptcy Court. |
| **Exit ABL Facility** | The Debtors will enter into an undrawn new asset-based revolving loan facility on the Effective Date. |

## TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

| Type of Claim | Treatment | Impairment / Voting |
|---|---|---|
| **DIP Facility Claims** | In full satisfaction of each allowed DIP Facility Claim, each Holder thereof will be repaid in full in cash. | N/A |
| **Administrative Claims** | Except to the extent that a Holder of an allowed Administrative Claim and the Debtor against which such allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, each Holder of an allowed Administrative Claim shall receive, in full satisfaction of its Claim, payment in full in cash. | N/A |
| **Priority Tax Claims** | In full satisfaction of the allowed Priority Tax Claims, each Holder of an allowed Priority Tax Claim will be paid in full in cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | N/A |
| **Other Secured Claims** | In full satisfaction of each allowed Other Secured Claim, each Holder thereof will receive (a) payment in full in cash, (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code, (c) Reinstatement of such Claim, or (d) other treatment rendering such Claim Unimpaired. | Unimpaired; deemed to accept |
| **Other Priority Claims** | Except to the extent that a Holder of an allowed Other Priority Claim and the Debtor against which such allowed Other Priority Claim is asserted agree to less favorable treatment for such Holder, in full satisfaction of each allowed Other Priority Claim against the Debtors, each Holder thereof shall receive payment in full in cash or other treatment | Unimpaired; deemed to accept |

| | rendering such Claim Unimpaired. | |
|---|---|---|
| **1L Notes Claims** | In full satisfaction of each allowed 1L Notes Claim, each Holder thereof will receive its *pro rata* share of (a) cash in the amount of $1,450,000,000 (but less the sum of adequate protection payments reflecting interest on the 1L Notes paid during the Chapter 11 Cases), (b) 72.5% of New Hexion Common Shares, subject to the Agreed Dilution, and (c) 72.5% of the Rights. | Impaired; entitled to vote |
| **Junior Notes Claims** | In full satisfaction of each allowed Junior Notes Claim, each Holder thereof will receive its *pro rata* share of (a) 27.5% of New Hexion Common Shares, subject to the Agreed Dilution; and (b) 27.5% of the Rights. | Impaired; entitled to vote |
| **General Unsecured Claims** | Except to the extent that a Holder of an allowed General Unsecured Claim and the Debtor against which such allowed General Unsecured Claim is asserted agree to less favorable treatment for such Holder (including, without limitation, with respect to the Consenting Sponsor Claim Settlement), in full satisfaction of each allowed General Unsecured Claim against the Debtors, each Holder thereof shall receive payment in cash in an amount equal to such allowed General Unsecured Claim in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Claim. | Unimpaired; deemed to accept |
| **Subordinated Securities Claims** | No recovery | Imparied; deemed to reject |
| **Intercompany Claims** | No property will be distributed to the Holders of allowed Intercompany Claims.  Unless otherwise provided for under the Plan, each Intercompany Claim will either be Reinstated or canceled and released at the option of the Debtors with the consent of the Required Consenting Noteholders. | Unimpaired; deemed to accept; or Impaired deemed to reject |
| **Intercompany Interests** | Intercompany Interests shall receive no recovery or distribution and be Reinstated solely to the extent necessary to maintain the Debtors' corporate structure. | Unimpaired; deemed to accept; or Impaired; deemed to |

| | | reject |
|---|---|---|
| **Existing Equity Interests** | Each Holder of Existing Equity Interests shall receive no distribution on account of such Existing Equity Interests. | Impaired; deemed to reject. |

**OTHER TERMS OF THE RESTRUCTURING**

| | |
|---|---|
| **Executory Contracts and Unexpired Leases** | Except as otherwise provided in this Term Sheet or the Restructuring Support Agreement, the Debtors shall assume all executory contracts and unexpired leases other than those to be identified on a schedule of rejected contracts included in the Plan Supplement, which shall be consistent with the Restructuring Support Agreement and this Term Sheet, including as specified in "Employee Matters" and "Indemnification of Prepetition Directors, Officers, Managers, et al." The schedule of rejected contracts included in the Plan Supplement shall be acceptable to the Debtors and reasonably acceptable to the Required Consenting Noteholders. |
| **Charter; Bylaws; Corporate Governance** | Corporate governance for the Reorganized Debtors, including charters, bylaws, a shareholder rights agreement, operating agreements, or other organization or formation documents, as applicable, shall be consistent with section 1123(a)(6) of the Bankruptcy Code, as applicable. |
| | The Reorganized Hexion Board shall consist of seven (7) members, which shall be comprised of Craig Rogerson, in his capacity as Chief Executive Officer of the Reorganized Debtors, and six (6) other directors, which shall be selected by a committee consisting of representatives from the following six (6) institutions: Cyrus Capital Partners, L.P.; Monarch Alternative Capital LP; GoldenTree Asset Management; GSO Capital Partners; Brigade Capital Management; and Davidson Kempner Capital Management LP (collectively, the "Board Committee") in consultation with Craig Rogerson, in his capacity as Chief Executive Officer of the Reorganized Debtors; provided, that, (x) if a holder represented on the Board Committee determines to give up its seat the next largest pro forma holder willing to serve will replace such resigning holder and (y) if any holder represented on the Board Committee sells claims and, after such sale, such holder is not then one of the six (6) largest holders, on a pro forma basis (without giving effect to the Agreed Dilution), the other members of the Board Committee shall determine whether to request such selling member resign from the Board Committee and be replaced by the next largest pro forma holder willing to serve; provided, further, that if the Reorganized Hexion Board is not fully selected by the Effective Date then the Reorganized Board shall select the remaining members in consultation with the Board |

| | |
|---|---|
| | Committee. |
| **Employee Matters** | Substantially all employees of the Debtors to be retained by the Reorganized Debtors. The Reorganized Debtors shall assume any employment, confidentiality, and non-competition agreements, bonus, gainshare and incentive programs (other than awards of stock options, restricted stock, restricted stock units, and other equity awards), vacation, holiday pay, severance, retirement, supplemental retirement, executive retirement, pension, deferred compensation, medical, dental, vision, life and disability insurance, flexible spending account, and other health and welfare benefit plans, programs and arrangements, and all other wage, compensation, employee expense reimbursement, and other benefit obligations of the Debtors, in each case, so long as current or future liabilities associated with such programs have previously been provided or made available to the First Lien Advisors, the 1.5L Advisors, and the Crossover Advisors; *provided*, *however*, that neither the Restructuring nor the transactions contemplated by the Plan will constitute a change of control or other acceleration event for purposes of any of the foregoing. |
| **Consenting Sponsor Claim Settlement** | Subject to and upon the occurrence of the Effective Date, the Consenting Sponsors shall receive the Settlement Note, in full satisfaction, compromise, and discharge of any General Unsecured Claims held by such Consenting Sponsors as of the Effective Date other than any Claims arising under or related to the Debtors' indemnification provisions or director and officer insurance policies (the "Consenting Sponsor Claim Settlement"). |
| **Indemnification of Prepetition Directors, Officers, Managers, et al.** | The Plan shall provide that, consistent with applicable law all indemnification provisions currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts or otherwise) for the current and former direct and indirect sponsors, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be reinstated and remain intact and irrevocable and shall survive effectiveness of the Restructuring. |
| **MIP** | Up to 10% of the fully diluted New Hexion Common Shares issued on the Effective Date shall be issuable in connection with a management incentive plan, the details and allocation of which shall be determined by the Reorganized Hexion Board (including with respect to form, structure and vesting) (the "MIP") |

| | |
|---|---|
| **Tax Issues** | The Debtors and the Consenting Noteholders shall cooperate in good faith to structure the Restructuring and related transactions in a tax-efficient manner; *provided* that such structure shall be reasonably acceptable to the Debtors and the Required Consenting Noteholders. |
| **Company Status Upon Emergence** | The Debtors and, following the Effective Date, Reorganized Hexion will use best efforts to attempt to obtain a listing of the New Hexion Common Shares on the NYSE or NASDAQ on the Effective Date, or, if such a listing is not reasonably possible, on the OTCQX Premier (if the OTCQX Premier is not possible, the OTCQX, and if the OTCQX is not possible, the OTCQB) and will use best efforts to obtain a NYSE or NASDAQ listing as soon as possible following the Effective Date; provided, however, the foregoing covenant shall not apply to the extent (i) the Board of Directors of Hexion Holdings LLC, or Reorganized Hexion (on or after the Effective Date) determines that such listing is not in the best interests of the Company, (ii) the holders of 73%, on a pro forma basis, of the New Hexion Common Shares (without giving effect to the Agreed Dilution), determine otherwise[3] or (iii) such covenant shall cause a potential termination event under the RSA to be reasonably likely to occur. |
| **Registration Rights** | Registration rights (including piggyback registration rights) will be provided to the Equity Backstop Parties to the extent they receive any "restricted" or "control" New Hexion Common Shares (but shall be provided with respect to all New Hexion Common Shares such Equity Backstop Parties receive) under the Securities Act, on terms (including time periods, "cut back" provisions, lockup agreements) and conditions determined as set forth in the Equity Backstop Agreement. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be canceled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Issuance of New Securities; Execution of the Plan Restructuring Documents** | On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring. |

---

[3]    Mechanic for determination to be discussed.

| | |
|---|---|
| **Fees and Expenses** | The Debtors shall pay (a) the reasonable and documented fees and expenses of all of the First Lien Advisors, the 1.5 Lien Advisors, and the Crossover Advisors, (b) any applicable filing or other similar fees required to be paid by such parties in all applicable jurisdictions, in each case, (i) subject to entry of the BCA Approval Order and the DCA Approval Order (as applicable), and (ii) in accordance with the terms and conditions of the existing fee letters between the Debtors and the applicable advisors and the BCA Approval Order and DCA Approval Order (as applicable), and (c) the reasonable and documented fees and expenses, including the fees and expenses of one counsel and one local counsel each, of (w) the trustee under the 1L Notes Indentures, (x) the trustee under the 1.5L Notes Indenture, and (y) the trustee under the 2L Notes Indenture or (z) the trustee under the Unsecured Notes Indenture. |
| **Retention of Jurisdiction** | The Plan will provide for the retention of jurisdiction by the Bankruptcy Court for usual and customary matters. |
| **Releases** | The exculpation provisions, Debtor releases, and third-party releases to be included in the Plan will be consistent with Exhibit 1 attached hereto in all material respects, to the fullest extent permissible under applicable law. |
| **Consent Rights** | All consent rights not otherwise set forth herein shall be set forth in the Restructuring Support Agreement. |
| **Conditions Precedent to the Effective Date** | The Plan shall contain customary conditions precedent to occurrence of the Effective Date, including the following: <br><br> 1) the Equity Backstop Agreement and the Debt Backstop Agreement shall remain in full force and effect and shall not have been terminated, and the parties thereto shall be in compliance therewith; <br> 2) the Bankruptcy Court shall have entered the DCA Approval Order and the BCA Approval Order; <br> 3) the Restructuring Support Agreement shall remain in full force and effect and shall not have been terminated, and the parties thereto shall be in compliance therewith; <br> 4) all conditions precedent to the effectiveness of the Exit Facility and the Exit ABL Facility shall have been satisfied or duly waived; <br> 5) the Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent with the Restructuring Support Agreement and such order shall be a final order; <br> 6) the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are |

|  | necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Restructuring;<br><br>7) the final version of the Plan, Plan Supplement, and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements, and exhibits to the Plan, shall be consistent with the Restructuring Support Agreement;<br><br>8) the Consenting Sponsors, on behalf of them and their affiliates, shall have permanently waived any and all management, monitoring or like fees or expenses owed by any Company entity and any agreements providing for the same shall have been terminated with no liability of the Company other than in connection with the Consenting Sponsor Claim Settlement; provided, however, that the foregoing shall not limit, reduce, modify or impair the Debtors' or the Reorganized Debtors' indemnification obligations of the Consenting Sponsors and their affiliates, which shall be assumed and unimpaired;<br><br>9) all fees, expenses, and other amounts payable to the Consenting Noteholders pursuant to the Restructuring Support Agreement, the Equity Backstop Agreement , and the Debt Backstop Agreement, shall have been paid in full; and<br><br>10) the Restructuring to be implemented on the Effective Date shall be consistent with the Plan and the Restructuring Support Agreement. |

## ANNEX 1

## DEFINITIONS

| | |
|---|---|
| **1L Notes Claims** | Any claim arising under, derived from, or based on the 1L Notes Indentures. |
| **1L Notes Indentures** | Those certain: (i) Indenture, dated as of March 14, 2012, among Hexion Inc., as Issuer, the Guarantors party thereto, and Wilmington Trust, National Association, as trustee, pursuant to which Hexion Inc. issued 6.625% First-Priority Senior Secured Notes due 2020; (ii) Indenture, dated as of April 15, 2015, among Hexion Inc., as Issuer, the Guarantors party thereto, and Wilmington Trust, National Association, as trustee, pursuant to which Hexion Inc. issued 10.00% First-Priority Senior Secured Notes due 2020; and (iii) Indenture, dated as of February 8, 2017, among Hexion Inc., as Issuer, the Guarantors party thereto, and Wilmington Trust, National Association, as trustee, pursuant to which Hexion Inc. issued 10.375% First-Priority Senior Secured Notes due 2022. |
| **1.5L Advisors** | Means (i) Jones Day, as counsel; (ii) Young Conaway Stargatt & Taylor LLP, as local counsel; and (iii) Perella Weinberg Partners, as financial advisor. |
| **1.5L Notes Claims** | Any claim arising under, derived from, or based on the 1.5L Notes Indenture. |
| **1.5L Notes Indenture** | That certain Indenture, dated as of February 8, 2017, among Hexion Inc., as Issuer, the Guarantors party thereto, and Wilmington Trust, National Association, as trustee, pursuant to which Hexion Inc. issued 13.75% Senior Secured Notes due 2022. |
| **2L Notes Claims** | Any claim arising under, derived from, or based on the 2L Notes Indenture. |
| **2L Notes Indenture** | That certain Indenture, dated as of November 5, 2010, among Hexion Inc. and Hexion Nova Scotia Finance, ULC as Issuers, the Guarantors party thereto, and Wilmington Trust Company, as trustee, pursuant to which Hexion Inc. issued 9.00% Second-Priority Senior Secured Notes due 2020. |
| **ABL Agent** | JPMorgan Chase Bank, N.A., as administrative agent under the ABL Agreement. |
| **ABL Agreement** | That certain Amended and Restated Asset-Based Revolving Credit Agreement, dated as of December 21, 2016, as amended, restated, supplemented or otherwise modified from time to time, by and |

| | |
|---|---|
| | among Hexion Inc., as U.S. borrower, certain subsidiaries of Hexion Inc. from time to time party thereto, as co-borrowers, the lenders party thereto from time to time, the ABL Agent, and the other parties thereto. |
| **Administrative Claim** | A Claim incurred by the Debtors on or after the Petition Date and before the Effective Date for a cost or expense of administration of the Chapter 11 Cases entitled to priority under sections 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code. |
| **Affiliate** | With respect to any Person, all Persons that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code, if such Person was a debtor in a case under the Bankruptcy Code. |
| **Avoidance Actions** | Means any and all avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code. |
| **Bankruptcy Rules** | Means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court. |
| **Causes of Action** | Means any and all claims, actions, causes of action, choses in action, suits, debts, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including all claims and any avoidance, recovery, subordination, or other actions against insiders and/or any other Entities under the Bankruptcy Code), whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, that are or may be pending on the Effective Date against any Entity, based in law or equity, including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order. |
| **Claim** | As defined in section 101(5) of the Bankruptcy Code against a Debtor. |

| Class | Each class of Holders of Claims or Interests established under the Plan pursuant to section 1122(a) of the Bankruptcy Code. |
| --- | --- |
| **Confirmation** | Entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to the conditions set forth in the Plan. |
| **Confirmation Order** | The order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code. |
| **Consenting Noteholders** | The Holders of 1L Notes Claims, 1.5L Notes Claims, 2L Notes Claims, and/or Unsecured Notes Claims who agree to support the Restructuring set forth in this Term Sheet and are parties to the Restructuring Support Agreement. |
| **Consenting Sponsors** | AIF Hexion Holdings, LP, AP Momentive Holdings, LLC, AIF Hexion Holdings II, L.P., and Apollo Investment Fund VI, L.P., in their respective capacities as holders of outstanding common equity of Hexion Holdings LLC. |
| **Consummation** | Means the occurrence of the Effective Date. |
| **Crossover Advisors** | (i) Milbank LLP, as co-counsel, (ii) Morris, Nichols, Arsht and Tunnel LLP, as co-counsel, and (iii) Houlihan Lokey Capital, Inc., as financial advisor. |
| **Debt Backstop Agreement** | That certain Debt Backstop Agreement, to be executed among the Debtors and the Debt Backstop Parties (including all exhibits, schedules, attachments and/or addendum thereto), pursuant to which the Debt Backstop Parties will agree to backstop the Exit Facility. |
| **Debt Backstop Percentage** | With respect to any Debt Backstop Party, such Debt Backstop Party's percentage of the Debt Backstop Obligations as set forth opposite such Debt Backstop Party's name under the column titled "Debt Backstop Percentage" on the Debt Backstop Allocation Schedule; provided, that nothing herein shall prohibit the consensual reallocation of such obligations among the Debt Backstop Parties. |
| **DIP Agent** | Means the administrative agent(s) under the DIP Facility, solely in its capacity as such. |

| **DIP Credit Agreement** | Means that certain senior secured debtor-in-possession credit agreement, dated as of April 1, 2019, as amended, restated, modified, supplemented, or replaced from time to time in accordance with its terms, by and among the Debtors, the DIP Lenders, and the DIP Agent. |
|---|---|
| **DIP Facility** | Means (i) a debtor-in-possession term loan financing facility in the amount of $350 million to be provided by certain lenders, with JPMorgan Chase Bank, N.A., as administrative and collateral agent, and (ii) a debtor-in-possession ABL facility in the amount of $350 million to be provided by certain lenders, with JPMorgan Chase Bank, N.A. as administrative and collateral agent. The proceeds of the DIP Facility shall be used for general corporate purposes and to provide adequate protection payments to Holders of 1L Notes Claims on the terms agreed in the orders approving the DIP Facility. |
| **DIP Facility Claims** | Any claim arising under, derived from, or based on the DIP Facility. |
| **DIP Lenders** | Means each of the lenders and their Affiliates under the DIP Facility, solely in their capacities as such. |
| **Disclosure Statement** | The disclosure statement in respect of the Plan. |
| **Disclosure Statement Order** | The order entered by the Bankruptcy Court approving the Disclosure Statement and Solicitation Materials as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code. |
| **Effective Date** | The first date upon which all of the conditions precedent to the effectiveness of the Plan have been satisfied or waived in accordance with the terms of the Plan. |
| **Entity** | As defined in section 101(15) of the Bankruptcy Code. |
| **Equity Backstop Agreement** | That certain Equity Backstop Agreement, to be executed among the Debtors and the Equity Backstop Parties (including all exhibits, schedules, attachments and/or addendum thereto), pursuant to which the Equity Backstop Parties will agree to backstop the Rights Offering on the terms set forth in this Term Sheet. |
| **Equity Backstop Percentage** | With respect to any Equity Backstop Party, such Equity Backstop Party's percentage of the Equity Backstop Obligations as set forth opposite such Equity Backstop Party's name under the column titled "Equity Backstop Percentage" on the Equity Backstop Allocation Schedule; provided, that nothing herein shall prohibit the consensual reallocation of such obligations among the Equity |

16

| | |
|---|---|
| | Backstop Parties. |
| **Estate** | As to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code. |
| **Exculpated Parties** | Collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Noteholders; (d) the Equity Backstop Parties; (e) the Debt Backstop Parties; (f) the DIP Lenders; (g) the DIP Agent; (h) the Consenting Sponsors; and (i) with respect to each of the foregoing Entities in clauses (a) through (h), each such Entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, current and former officers, directors, managers, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such Entities' respective heirs, executors, Estate, servants, and nominees. |
| **Existing Equity Interests** | Shares of common stock in Hexion Holdings LLC, as well as Claims subject to subordination under section 510(b) of the Bankruptcy Code. |
| **Exit ABL Agreement** | That certain asset-based revolving credit agreement, which shall be on terms substantially consistent with those of the ABL Agreement. |
| **Exit ABL Facility** | A new asset-backed facility governed by the Exit ABL Agreement. |
| **Final Order** | An order entered by the Bankruptcy Court or other court of competent jurisdiction: (a) that has not been reversed, stayed, modified, amended, or revoked, and as to which (i) any right to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has been waived or (ii) the time to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has expired and no appeal, motion for leave to, or petition for certiorari, review, reargument, stay, or rehearing is pending or (b) as to which an appeal has been taken, a motion for leave to appeal, or petition for certiorari, review, reargument, stay, or rehearing has been filed and (i) such appeal, motion for leave to appeal or petition for certiorari, review, reargument, stay, or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which leave to appeal, certiorari, review, reargument, stay, or rehearing was sought and (ii) the time to appeal (in the event leave is granted) further or seek leave to appeal, certiorari, further review, reargument, stay, or rehearing has expired and no such appeal, motion for leave to appeal, or petition for certiorari, further review, reargument, stay, or rehearing is pending. |

17

| First Lien Advisors | (i) Akin Gump Strauss Hauer & Feld, LLP as counsel; (ii) Ashby & Geddes, as local counsel; and (iii) Evercore Group, L.L.C., as financial advisor. |
|---|---|
| General Unsecured Claim | Any Claim, other than an ABL Claim, a 1L Notes Claim, a 1.5L Notes Claim, a 2L Notes Claim, an Administrative Claim, a Professional Fee Claim, a Secured Tax Claim, an Other Secured Claim, a Priority Tax Claim, a Litigation Claim, an Intercompany Claim, any Claim subject to subordination under section 510(b) of the Bankruptcy Code, or an Other Priority Claim. |
| Holder | An Entity holding a Claim or Interest, as applicable. |
| Impaired | With respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code. |
| Intercompany Claim | A prepetition Claim held by a Debtor against a Debtor. |
| Intercompany Interest | An Interest in any Debtor other than Hexion Holdings LLC. |
| Interest | Any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor. |
| Junior Notes Claims | All 1.5L Notes Claims, 2L Notes Claims, and Unsecured Notes Claims. |
| New Hexion Common Shares | Common equity interests in Reorganized Hexion. |
| Notes Claims | Any Claim that is a 1L Notes Claim, 1.5L Notes Claims, 2L Notes Claim, or Unsecured Notes Claim. |
| Other Priority Claim | Any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code. |
| Other Secured Claim | Any Secured Claim against any of the Debtors, other than an ABL Claim, a 1L Notes Secured Claim, a 1.5L Notes Secured Claim, or a 2L Notes Secured Claim. |
| Person | An individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, governmental entity, or political subdivision thereof, or any other entity. |
| Petition Date | The date on which the Debtors commence the Chapter 11 Cases. |

| | |
|---|---|
| **Plan Supplement** | All documents that are contained in any supplements filed in connection with the Plan. |
| **Priority Tax Claims** | Claims of governmental units of the type described in section 507(a)(8) of the Bankruptcy Code. |
| **Professional** | An entity employed pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the date of Confirmation, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code. |
| **Professional Fee Claims** | All Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Effective Date to the extent such fees and expenses have not been previously paid. |
| **Put Option** | On and subject to the terms and conditions of the Equity Backstop Agreement, including entry of the BCA Approval Order, each Equity Backstop Party shall grant to Hexion Inc. an option to require such Equity Backstop Party to purchase unsubscribed shares in the Rights Offering subject to the terms and conditions of the Equity Backstop Agreement.  Upon the exercise of the Put Option, each Equity Backstop Party agrees, severally and not jointly, to purchase, and Hexion Inc. agrees to sell to such Equity Backstop Party at a price equal to the Rights Offering Purchase Price, the number of unsubscribed shares equal to (a) such Equity Backstop Party's Equity Backstop Percentage multiplied by (b) the aggregate number of unsubscribed shares, rounded among the Equity Backstop Parties solely to avoid fractional shares as the Equity Backstop Parties may reasonably determine.  The obligations of the Equity Backstop Parties as set forth above shall be referred to as the "<u>Equity Backstop Obligations</u>." |
| **Reinstated** | With respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code. |
| **Released Parties** | Collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Noteholders; (d) the Equity Backstop Parties; (e) the Debt Backstop Parties; (f) the DIP Lenders; (g) the DIP Agent; (h) the Consenting Sponsors; and (i) with respect to each of the foregoing Entities in clauses (a) through (h), each such Entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, current and former officers, directors, managers, principals, |

| | |
|---|---|
| | shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such Entities' respective heirs, executors, Estate, servants, and nominees; *provided*, that, with respect to the Equity Backstop Parties, the Debt Backstop Parties, and the Consenting Noteholders, the entities listed in clause "m" shall only be Releasing Parties to the extent such entities are managed or controlled by such Equity Backstop Parties, Debt Backstop Parties, or Consenting Noteholders. |
| **Releasing Parties** | Collectively, and in each case in its capacity as such:  (a) the Debtors;  (b) the   Reorganized Debtors;  (c) the   Consenting Noteholders; (d) the Equity Backstop Parties; (e) the Debt Backstop Parties; (f) the DIP Lenders; (g) the DIP Agent; (h) the Consenting Sponsors; (i) each Holder of a Claim or Interest who votes to accept the Plan; (j) each Holder of a Claim or Interest who is Unimpaired; (k) each Holder of a Claim or Interest who abstains from voting; (l) each Holder of a Claim or Interest who votes to reject the Plan but does not opt out of the releases provided in the Plan; and (m) with respect to each of the foregoing Entities in clauses (a) through (l), each such Entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, current and former officers, directors, managers, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such Entities' respective heirs, executors, Estate, servants, and nominees; *provided*, that, with respect to the Equity Backstop Parties, the Debt Backstop Parties, and the Consenting Noteholders, the entities listed in clause "m" shall only be Releasing Parties to the extent such entities are managed or controlled by such Equity Backstop Parties, Debt Backstop Parties, or Consenting Noteholders. |
| **Reorganized Debtors** | The Debtors, as reorganized pursuant to and under the Plan or any successor thereto. |
| **Reorganized Hexion** | Hexion LLC, as reorganized pursuant to and under the Plan or any successor thereto, or such other entity type as determined by the Debtors and the Required Consenting Creditors. |
| **Reorganized Hexion Board** | The initial board of directors of Reorganized Hexion. |
| **Rights** | The rights to participate in the Rights Offerings on the terms set |

| | forth in the rights offering procedures. |
|---|---|
| **Secured** | When referring to a Claim:  (a) secured by a lien on property in which any of Debtors has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a secured claim. |
| **Settlement Note** | The $2.5 million senior unsecured note issued by Reorganized Hexion on the Effective Date, which shall (i) mature on March 31, 2020, (ii) be payable upon any public offering or listing of New Hexion Common Shares (or any other equity interests of the Reorganized Debtors) on The Nasdaq Global Select Market, The New York Stock Exchange, or any successor national securities exchanges, on or after the Effective Date, (iii) be freely transferrable by the holder, and (iv) contain other terms and conditions reasonably acceptable to the Required Consenting Parties. |
| **Solicitation Materials** | The solicitation materials in respect of the Plan. |
| **Unimpaired** | With respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired. |
| **Unsecured Notes Claims** | Any claim arising under, derived from, or based on the Unsecured Notes Indenture. |
| **Unsecured Notes Indenture** | That certain Indenture, dated as of December 15, 1987, between Hexion Inc. and the Bank of New York, as trustee, pursuant to which Hexion Inc. issued 9.200% debentures due 2021 and 7.875% debentures due 2023. |

**Exhibit 1** to Term Sheet

Release and Exculpation Provisions to be Included in the Plan

**Releases by the Debtors**

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Action brought as counterclaims or defenses to Claims asserted against the Debtors), the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, or any transaction contemplated by the Restructuring, or any contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Rights Offering, the DIP Facility, the DIP Credit Agreement, the Debt Backstop Agreement, the Equity Backstop Agreement, the Exit Facility, the Exit ABL Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, any post-Effective Date transaction contemplated by the Restructuring, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (b) any individual from any claim related to an act or omission that is determined in a Final Order by a court competent jurisdiction to have constituted actual fraud or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

**Releases by Holders of Claims and Interests**

Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, or any transaction contemplated by Restructuring, or any contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Rights Offering, the DIP Facility, the Debt Backstop Agreement, the Equity Backstop Agreement, the Exit Facility, the Exit ABL Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, any post-Effective Date transaction contemplated by the Restructuring, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (b) any individual from any claim related to an act or omission that is determined in a Final Order by a court competent jurisdiction to have constituted actual fraud or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of this third-party release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that this third party release is:  (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good-faith settlement and compromise of the Claims released by the third-party release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to this third party release.

**Exculpation**

Notwithstanding anything contained herein to the contrary, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement,

the Plan, the Plan Supplement, or any transaction contemplated by Restructuring, or any contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the Restructuring Support Agreement, the Rights Offering, the DIP Facility, the DIP Credit Agreement, the Debt Backstop Agreement, the Equity Backstop Agreement, the Exit Facility, the Exit ABL Facility, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

**Exhibit B**

**Form of Joinder Agreement**

The undersigned hereby acknowledges that it has reviewed and understands the Restructuring Support Agreement (as amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "***Agreement***") dated as of April 1, 2019 by and among (i) Hexion Holdings LLC ("***Hexion***"), Hexion LLC, Hexion Inc., Borden Holdings, LLC, Lawter International Inc., Hexion CI Holding Company (China) LLC, Hexion Nimbus Inc., Hexion Nimbus Asset Holdings LLC, Hexion Deer Park LLC, Hexion VAD LLC, Hexion 2 U.S. Finance Corp., Hexion HSM Holdings LLC, Hexion Investments Inc., Hexion International Inc., North American Sugar Industries Incorporated, Cuban-American Mercantile Corporation, The West India Company, NL Coop Holdings LLC, and Hexion Nova Scotia Finance ULC, (each, together with Hexion, a "***Company Entity***," and collectively, and together with Hexion, the "***Company***"), (ii) certain beneficial holders (or investment managers, advisors, or subadvisors to certain beneficial holders) of those certain 1L Notes, 1.5L Notes, 2L Notes and Unsecured Notes (collectively, the "***Consenting Creditors***"), and (iii) certain holders of common equity of Hexion (the "***Consenting Sponsors***," and, collectively with the Consenting Creditors, the "***Consenting Parties***") and agrees to be bound as a Consenting Party by the terms and conditions thereof binding on the Consenting Parties with respect to all Claims/Interests held by the undersigned.[1]

The undersigned hereby makes the representations and warranties of the Consenting Parties set forth in the Agreement to each other Party, effective as of the date hereof.

This joinder agreement shall be governed by the governing law set forth in the Agreement.

Date: _____, 2019

**[CONSENTING PARTY]**

By:_____
Name:_____
Title:_____
Address:_____

Claims/Interests under the [_____]:                    $_____

Other Claims/Interests:                                  $_____

---

[1]    Defined terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.