## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | x | |
| In re: | : | Chapter 11 |
| | : | |
| HEXION HOLDINGS LLC, et al.,[1] | : | Case No. 19-10684 (  ) |
| | : | |
| Debtors. | : | Joint Administration Requested |
| | x | |

### DEBTORS' MOTION FOR ENTRY OF
### INTERIM AND FINAL ORDERS (I) AUTHORIZING
### THE DEBTORS TO (A) PAY CERTAIN EMPLOYEE COMPENSATION
### AND BENEFITS, (B) MAINTAIN AND CONTINUE SUCH BENEFITS AND
### OTHER EMPLOYEE-RELATED PROGRAMS, AND (C) PAY PREPETITION CLAIMS
### OF CONTRACTED LABOR AND (II) GRANTING RELATED RELIEF

Hexion Holdings LLC ("**Hexion**") and its affiliated debtors and debtors in possession (collectively, the "**Debtors**") respectfully submit this motion (the "**Motion**") for the entry of interim and final orders, substantially in the forms attached as Exhibit A and Exhibit B (the "**Proposed Orders**"), pursuant to sections 105(a) and 521(a)(1)(B) of title 11 of the United States Code (the "**Bankruptcy Code**"), rule 1007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and rule 1007-1(b) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), (i) authorizing the Debtors, in their discretion, to pay Prepetition Employment Obligations and Prepetition Contracted Labor Obligations (each as defined below) and maintain

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Hexion Holdings LLC (6842); Hexion LLC (8090); Hexion Inc. (1250); Lawter International Inc. (0818); Hexion CI Holding Company (China) LLC (7441); Hexion Nimbus Inc. (4409); Hexion Nimbus Asset Holdings LLC (4409); Hexion Deer Park LLC (8302); Hexion VAD LLC (6340); Hexion 2 U.S. Finance Corp. (2643); Hexion HSM Holdings LLC (7131); Hexion Investments Inc. (0359); Hexion International Inc. (3048); North American Sugar Industries Incorporated (9735); Cuban-American Mercantile Corporation (9734); The West India Company (2288); NL Coop Holdings LLC (0696); and Hexion Nova Scotia Finance, ULC (N/A). The address of the Debtors' corporate headquarters is 180 East Broad Street, Columbus, Ohio 43215.

the Employee Benefit Obligations (as defined below) and (ii) granting certain related relief.  In support of this Motion, the Debtors respectfully represent:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and, under Rule 9013-1(f) of the Local Rules, the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief requested herein are sections 105(a), 363(b), 507(a), 541, 1107(a), and 1108 of the Bankruptcy Code and rules 6003 and 6004 of the Federal Rules of the Bankruptcy Rules.

## BACKGROUND

2.      On April 1, 2019 (the "**Petition Date**"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware.  The Debtors are authorized to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committees have been appointed in these chapter 11 cases and no request has been made for the appointment of a trustee or examiner.

3.      Additional information about the Debtors' business, capital structure, and the events leading up to the Petition Date are set forth in the *Declaration of George F. Knight,*

*Executive Vice President and Chief Financial Officer, in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "**Knight Declaration**), filed on the Petition Date.[2]

## RELIEF REQUESTED

4.      By this Motion, pursuant to sections 105(a), 363(b), 507(a), 541, 1107(a), and 1108 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, the Debtors request entry of interim and final orders authorizing, but not directing, the Debtors, in their discretion, to (i) pay all prepetition wages, salaries, and compensation and related administrative and incidental costs (all as described below and collectively, the "**Employee Compensation Obligations**") and prepetition employee benefits (all as described below and collectively, the "**Employee Benefit Obligations**"); (ii) pay all employment, unemployment, Social Security, and federal, state, and local taxes relating to the Employee Compensation Obligations and Employee Benefit Obligations, whether withheld from wages or paid directly by the Debtors to governmental authorities (collectively, "**Payroll Taxes**"), and make other payroll deductions, including, but not limited to, retirement and other employee benefit plan contributions, union dues, garnishments, and voluntary deductions (all as described below and collectively with the Payroll Taxes, the "**Payroll Deduction Obligations**" and collectively with the Employee Compensation Obligations and Employee Benefit Obligations, the "**Prepetition Employee Obligations**"); (iii) honor and continue the Debtors' prepetition programs, policies, and practices as described in this Motion with respect to the Prepetition Employee Obligations in the ordinary course of business; and (iv) pay all prepetition claims of the Debtors' contracted labor (all as described below and collectively, the "**Prepetition Contracted Labor Obligations**").

---

[2] Capitalized terms used but not defined in this Motion have the meanings used in the Knight Declaration.

US-DOCS\105687250.29 RLF1 21032675v.1

5.      The Debtors estimate that before the final hearing on this Motion, Prepetition Employee Obligations totaling approximately $16,150,000 and Prepetition Contracted Labor Obligations totaling approximately $3,750,000 will be due and payable (together, the "**Interim Amount**").  To fulfill these imminent commitments, the Debtors request entry of the proposed Interim Order, authorizing the Debtors to pay Prepetition Employee Obligations and Prepetition Contracted Labor Obligations in an aggregate amount not to exceed the Interim Amount, subject to the $13,650 per-payee cap established by sections 507(a)(4) and (a)(5) of the Bankruptcy Code. The Debtors also seek the final hearing on this Motion so that they may pay all other Prepetition Employee Obligations and Prepetition Contracted Labor Obligations.

6.      Further, the Debtors request that this Court authorize applicable banks and other financial institutions to receive, process, honor, and pay all checks, drafts, electronic fund transfers, or other forms of payment drawn or issued on the Debtors' bank accounts before the Petition Date for Prepetition Employee Obligations and Prepetition Contracted Labor Obligations (or to reissue checks, drafts, electronic fund transfers, or other forms of payment drawn or issued on the Debtors' bank accounts, as may be necessary), and authorize, but not direct, the banks and financial institutions to rely on the Debtors' representations as to which checks, drafts, electronic fund transfers, or other forms of payment drawn or issued on the Debtors' bank accounts are subject to this Motion; *provided* that sufficient funds are on deposit in the applicable bank accounts to cover such payments.[3]

---

[3] Contemporaneously with the filing of this Motion, the Debtors have filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of the Debtors' Existing Cash Management System and Bank Accounts, (II) Waiving Certain United States Trustee Requirements, (III) Authorizing Continued Performance of Intercompany Transactions, and (IV) Granting Related Relief*, which seeks, among other things, authority to continue using the Debtors' cash management system, including their bank accounts.

## BASIS FOR RELIEF REQUESTED

### I.    FACTS SPECIFIC TO RELIEF REQUESTED

### A.    The Debtors' Workforce

7.    As of the Petition Date, the Debtors employed approximately 1,300 employees primarily based in the United States (the "**Employees**")[4], of whom 275 were located at the Debtors' headquarters in Columbus, Ohio (the "**Headquarters**").  Approximately 800 of the Debtors' current Employees are salaried Employees (such Employees, "**Salaried Employees**") and approximately 500 are hourly Employees (such Employees, "**Hourly Employees**").  As of the Petition Date, 1,293 of the Employees work full-time and seven Employees work part-time.

8.    The Debtors have seven Employees who, the Debtors believe, constitute "insiders" as the term is defined in section 101(31) of the Bankruptcy Code (each, an "**Insider**" and collectively, the "**Insiders**").[5]

9.    Approximately 35 of the Employees have the title of VP or above (such Employees, the "**Senior Employees**").  The Debtors submit that not all of the Senior Employees are Insiders.

10.    Approximately 93 of the Employees are represented by local branches of the  United Steel, Paper and Forestry, Rubber Manufacturing, Energy, Allied Industrial and Service Workers International Union: specifically, (a) Local 13-1401 in Diboll, Texas under the Collective Bargaining Agreement dated as of August 1, 2015 and expiring on July 31, 2020; and

---

[4] All references to Employees herein are limited to employees of Hexion Inc., which Debtor entity employs all of the Debtors' employees.

[5] The following seven executives are considered to be potential "insiders" as defined by the Bankruptcy Code: Craig A. Rogerson, Chief Executive Officer; George F. Knight, Chief Financial Officer; Douglas A. Johns, General Counsel; John P. Auletto, Executive Vice President – Human Resources; Matt Sokol, Executive Vice President and Chief Administrative Officer; Nathan Fisher, Executive Vice President – Procurement and Paul Barletta, Senior Vice President – Environmental Health and Safety and Epoxy Manufacturing.

(b) Local 13-1 in Deer Park, Texas under the Collective Bargaining Agreement dated as of January 27, 2018 and expiring on September 30, 2021. Each of these local branches is party with the Debtors to that certain Collective Bargaining Agreement (each, a "**CBA**" and collectively, the "**CBAs**") (such Employees, collectively, the "**Union Employees**"). The remaining approximately 1,207 Employees are not represented by any union (such Employees, the "**Non-Union Employees**").

11.    The Employees perform a variety of critical functions throughout the Debtors' businesses, including, among other things, operating and managing the Debtors' facilities across the country, developing new and varied products and processes, establishing and growing sales relationships with customers, and providing necessary administrative, managerial, and financial support services from the Debtors' headquarters in Columbus, Ohio and elsewhere.

12.    The Debtors also utilize the services of contract workers (the "**Contracted Labor**" and, together with the Employees, the "**Workforce**")[6] from time to time to provide a variety of services. The Debtors engage Contracted Labor in three different capacities: (i) "temporary contract labor" (through which temporary contract workers are generally provided by various staffing agencies and from which approximately 25 temporary contract workers are currently engaged as of the Petition Date); (ii) outsourced services (which includes, among others, contract workers to provide helpdesk and IT services and other logistical labor) for which approximately 280 contract workers have been provided as of the Petition Date; and (iii) independent contractors providing interim or specialty services (generally, temporary contract services provided by specialists for certain specific transactions or projects on an as-needed basis, which includes contract review services) for which approximately 55 contract

---

[6] All references to Contracted Labor herein are limited to U.S.-based contracted labor engaged with Hexion Inc.

workers have been provided, as of the Petition Date.   As of the Petition Date, there are approximately 360 Contracted Labor employees currently engaged with the Debtors.  Contracted Labor fills immediate business needs of the Debtors and allow the Debtors to have a flexible workforce to meet their operational needs in a cost-effective manner.

13.     The Debtors' very ability to run their businesses safely and productively depends entirely on the expertise and continued enthusiasm and service of their Workforce.  Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, the Debtors believe that the continuity and competence of their Workforce would be jeopardized if the relief requested herein is not granted.

14.     Moreover, if the Debtors fail to pay the Prepetition Employee Obligations or the Prepetition Contracted Labor Obligations in the ordinary course of business, the Workforce will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses.  This would have a highly negative impact on Workforce morale and productivity and would risk immediate and irreparable harm to the Debtors' continuing operations and their estates.   Accordingly, the Debtors have determined that paying those obligations and continuing all of the compensation and benefits programs described in this Motion are each vital to preventing the loss of key members of the Workforce during the pendency of the chapter 11 cases and to maintaining the continuity and stability of the Debtors' operations.

**B.     The Prepetition Employee Obligations and Prepetition Contracted Labor Obligations**

15.     The Prepetition Employee Obligations and Prepetition Contracted Labor Obligations that the Debtors seek authority to pay are summarized in the following table:

| Prepetition Employee Obligations and Contracted Labor Obligations | Requested Interim Order Amount | Requested Final Order Amount |
|---|---:|---:|
| Wage and Salary Obligations | $6,170,000 | $6,170,000 |
| *Net payroll* | *$3,900,000* | *$3,900,000* |
| *Deductions* | *$2,270,000* | *$2,270,000* |
| Payroll Processing Services | $14,000 | $14,000 |
| Bonuses and Incentive Programs | | |
| *Corporate Annual Incentive Compensation Plan* | *$150,000* | *$20,150,000* |
| *2019 Local Incentive Compensation Plan – Deer Park* | *$0* | *$395,000* |
| *2019 Local Incentive Compensation Plan – Geismar and Luling* | *$0* | *$220,000* |
| *Key Associate Reward Program* | *$0* | *$830,000* |
| *2016 Long Term Incentive Plan* | *$0* | *$9,300,000* |
| *2019 Long Term Incentive Plan* | *$0* | *$9,000,000* |
| *Recognition Program* | *$25,000* | *$50,000* |
| *Service Award Program* | *$5,000* | *$50,000* |
| *Project Bonus and Incentive Awards* | *$0* | *$410,000* |
| Severance | $130,000 | $600,000 |
| Expense Reimbursements | $2,215,000 | $2,215,000 |
| Death Benefits | $0 | $650,000 |
| Health and Welfare Benefits | $1,783,000 | $3,013,000 |
| *Medical Plans & Stop Loss* | *$1,360,000* | *$2,460,000* |
| *Dental Plans* | *$200,000* | *$200,000* |
| *Flexible Benefits Plans* | *$12,000* | *$12,000* |
| *Life & Disability Insurance* | *$154,000* | *$154,000* |
| *Employee Assistance Program and Healthy Steps* | *$54,000* | *$54,000* |
| *Craig Rogerson* | *$3,000* | *$133,000* |
| Other Benefit Programs | $413,000 | $413,000 |
| Retirement Plans | $1,715,000 | $12,915,000 |
| *Defined Contribution Plans* | *$1,650,000* | *$9,150,000* |

8

| | | |
|---|---|---|
| *Supplemental Executive Retirement Program* | *$0* | *$0* |
| *Defined Benefit Pension Plans* | *$50,000* | *$3,750,000* |
| *Other Retirement Benefit Obligations* | *$15,000* | *$15,000* |
| Workers' Compensation Claims | $3,400,000 | $3,400,000 |
| Other Benefits | $515,000 | $515,000 |
| Board of Managers Obligations | $0 | $0 |
| Prepetition Contracted Labor Obligations | $3,750,000 | $5,800,000 |

## 1.      Wage and Salary Obligations

16.      The Employees are paid bi-weekly on Fridays, with an aggregate average payroll each pay period of approximately $5,400,000. Generally, Salaried Employees are paid current through the payroll date, and Hourly Employees are paid through either the Saturday or Sunday before the payroll date.

17.      In the ordinary course of their businesses, the Debtors take deductions from Employees' paychecks for payments to third parties on behalf of Employees for various federal, state, and local income, employment, payroll, and other taxes, as well as for savings programs, benefit plans, flexible spending accounts, insurance programs, and other similar programs (collectively, the "**Deductions**"). The Debtors' average bi-weekly Deductions for Employees were, in the aggregate, approximately $2,600,000. As of the Petition Date, the Debtors estimate that they owe approximately $2,270,000 in Deductions, including Payroll Taxes amounts owed by the Debtors and amounts withheld from Employees and not yet remitted, all of which will become due and owing before the final hearing on this Motion.

18.      In the ordinary course of processing payroll checks for their Employees, the Debtors may be required by law, in certain circumstances, to withhold from certain Employees' wages amounts for various garnishments, such as tax levies, child support, and other

9

court-ordered obligations (collectively, the "**Garnishments**").  When required, the Debtors withhold Garnishments from the applicable Employees' paychecks, and remit the same to the appropriate governmental authorities on a bi-weekly basis.  The Debtors withhold an average of approximately $50,000 per month in Garnishments from Employees' paychecks.  As of the Petition Date, the Debtors estimate that they owe approximately $28,000 in Garnishments, all of which will become due and owing before the final hearing on this Motion.

19.     The Debtors estimate that, as of the Petition Date, the Prepetition Employee Obligations and the Prepetition Contracted Labor Obligations, including accrued but unpaid wages and other compensation, including the Deductions and Garnishments, total approximately $19,900,000 (comprised of $3,900,000 owed to Employees, $3,750,000 owed to Contracted Labor, $1,500,000 owed on behalf of statutory deductions, $28,000 attributable to Garnishments, $2,270,000 attributable to Deductions, specifically Payroll Taxes and $9,938,000 attributable to prepetition Employee benefits), all of which will become due and owing before the final hearing on this Motion.

### 2.     Payroll Processing Services

20.     As of the Petition Date, all Employees have elected to have their payroll administered via direct deposit, with the exception of approximately 20 Employees who receive payroll via physical checks.  The Debtors use Automatic Data Processing, Inc. ("**ADP**") to administer their payroll (including the delivery of physical checks) and coordinate the payment of any Deductions, Garnishments or other applicable withholdings.  The Debtors use their own in-house program to calculate and process gross-to-net payroll, and rely on ADP only for the actual distribution of funds and generation of pay statements.  The ongoing services of ADP are imperative to the smooth functioning of the Debtors' operations and payroll processing.  The Debtors pay ADP approximately $7,000 per month for its services, which amounts are paid out

of the Debtors' accounts payable.  The Debtors estimate that, as of the Petition Date, they owe ADP approximately $14,000 in accrued but unpaid fees related to such services, all of which will become due and owing before the final hearing on this Motion.

### 3.     Bonuses and Incentive Programs

21.     Historically, the Debtors have offered several bonus and incentive plans to their eligible Employees, including the ICP, the 2019 Deer Park LIP, the 2019 Geismar/Luling LIP, the KAR, the 2016 LTI, the 2019 LTI, the Recognition Program, the Service Award Program and the Project Bonus and Incentive Awards (each as defined below and, collectively, the "**Bonus and Incentive Plans**").  By this Motion, the Debtors seek authority to continue making payments under the Bonus and Incentive Plans (to the extent the performance measures or other qualifications for such payments have been achieved) to the Debtors' Employees in the ordinary course and in accordance with section 503(c) of the Bankruptcy Code.

22.     *Corporate Annual Incentive Compensation Plan*.  The Debtors offer an annual incentive compensation opportunity to certain of their Employees to incentivize those Employees to perform at a high level throughout the applicable calendar year and to profitably grow the Debtors' business (the "**ICP**").  Awards under the ICP are tied to the Debtors' annual performance, which is measured by annual metrics from the Debtors' audited financials, such as Segment EBITDA, environmental health and safety, and cash flow generated by business operations.  The ICP payout to be made to eligible Employees in accordance with the plan is, on average, approximately $27,250.  Approximately 735 Employees, including Insiders, are eligible for payouts as of the Debtors' next annual payout date in April 2020.  The Debtors' annual target bonuses under the ICP are expected to be approximately $20,000,000 in 2020, in the aggregate, to Employees in the United States in connection with the ICP.

US-DOCS\105687250.29 RLF1 21032675v.1

23.     From time to time after payout, there are corrections to a small number of payments to associates.  In connection with the 2018 ICP payment, the Debtors estimate that, as of the Petition Date, they owe associates approximately $150,000 in accrued but unpaid amounts related to such corrections, all of which will become due and owing before the final hearing on this Motion (the "**2018 ICP Corrections**").  For the avoidance of doubt, none of the recipients of the approximately $150,000 in 2018 ICP Corrections pursuant to the authority requested under the proposed Interim Order are Senior Employees.  The Debtors are seeking authority to make all ICP payments (other than the approximately $150,000 of 2018 ICP Corrections which will become due and owing before the final hearing on this Motion) pursuant to the proposed Final Order and not the proposed Interim Order.

24.     *2019 Local Incentive Compensation Plan – Deer Park*.  The Debtors offer an annual incentive compensation opportunity to certain Employees at the Debtors' Deer Park, Texas facility (the "**2019 Deer Park LIP**").  Awards under the 2019 Deer Park LIP are based on the site achieving annual target goals of certain site productivity, environmental and safety metrics.  Approximately 80 Employees are eligible for awards under the 2019 Deer Park LIP. The aggregate target amount expected to be paid under the 2019 Deer Park LIP is approximately $395,000.  For the avoidance of doubt, none of the recipients of payments to be made under the 2019 Deer Park LIP pursuant to the authority requested under the proposed Final Order are Insiders.  Authority is sought to make any payments earned under the 2019 Deer Park LIP pursuant to the proposed Final Order and not the proposed Interim Order.

25.     *2019 Local Incentive Compensation Plan – Geismar and Luling*.  The Debtors offer an annual incentive compensation opportunity to certain Employees at the Debtors' Geismar, Louisiana and Luling, Louisiana locations (the "**2019 Geismar/Luling LIP**").  Awards

12

under the 2019 Geismar/Luling LIP are based on the sites achieving annual target goals of certain site productivity, environmental and safety metrics.  Approximately 40 Employees are eligible for awards under the 2019 Geismar/Luling LIP.  The aggregate target amount expected to be paid under the 2019 Geismar/Luling LIP is approximately $220,000.  For the avoidance of doubt, none of the recipients of payments to be made under the 2019 Geismar/Luling LIP pursuant to the authority requested under the proposed Final Order are Insiders.  Authority is sought to make any payments earned under the 2019 Geismar/Luling LIP pursuant to the proposed Final Order and not the proposed Interim Order.

26.    _Key Associate Reward Program_.    The Debtors provide a long-term incentive compensation opportunity to approximately 95 of their non-Insider Employees to incentivize performance under the Key Associate Reward program (the "**KAR**").  Awards under the KAR program are based fifty percent (50%) on the associate's continuing service with the Debtors and fifty percent (50%) on the Debtors' financial performance, measured based on Segment EBITDA, cash flow and environmental health and safety targets.  The currently outstanding awards range from two to eleven percent (2%-11%) of the associate's annual salary. Payouts under the KAR program are due to be paid in July 2019, and the aggregate amount expected to be paid under the KAR program at that time to non-Insider Employees in the United States is approximately $830,000.  Authority is sought to make payments under the KAR program pursuant to the proposed Final Order and not the proposed Interim Order.

27.    _2016 Long-Term Incentive Plan_.  The Debtors offer a long-term incentive opportunity to approximately 55 of their Employees, with the aim of driving long-term business success (the "**2016 LTI**").  Awards under the 2016 LTI program, which has been in place since 2016, are based both on the Employee's continuing service with the Debtors and the Debtors'

financial performance, measured by achieving a target trailing twelve month Segment EBITDA and then maintaining the target Segment EBITDA for one additional quarter, measured by reference to the Debtors' financial statements. The currently outstanding 2016 LTI awards range from approximately forty percent to three hundred percent (40%-300%) of the eligible Employee's annual salary. The aggregate amount that could be paid under the 2016 LTI program to all eligible Employees totals approximately $15,000,000.

28.    Two 2016 LTI recipients are eligible to receive a payout in July 2019, one Insider and one non-Insider. For the avoidance of doubt, no authority is sought to pay the Insider eligible to receive a payout under the 2016 LTI until consummation of a restructuring transaction. The Debtors are seeking authority to pay the non-Insider Employee his 2016 LTI payment due to be paid in July 2019 pursuant to the proposed Final Order. The remainder of the 2016 LTI recipients are eligible to receive payouts in July 2020 or as earned under the performance-based portion of the award (currently estimated to be paid out no sooner than April 2020) and the Debtors are seeking authority to make such payments to non-Insider Employees pursuant to the proposed Final Order.

29.    *2019 Long-Term Incentive Plan*. The Debtors offer a long-term incentive opportunity to approximately 200 of their Employees, focused on incentivizing participants to drive business success during a challenging period (the "**2019 LTI**"). Awards under the 2019 LTI program are based on the Debtors' financial and operating performance as measured by 2019 goals for Segment EBITDA, cash flow and environmental health and safety metrics. Outstanding awards under the 2019 LTI program range from fifteen to two hundred percent (15%-200%) of the eligible Employee's annual salary. Payouts under the 2019 LTI program are due to be paid in the third quarter of 2021 and the aggregate amount that could be earned under

14

the 2019 LTI program by both Insider and non-Insider Employees is approximately $9,000,000. The Debtors are seeking authority to pay any amounts owed under the 2019 LTI pursuant to the proposed Final Order and not the proposed Interim Order.

30.     _Recognition Program_.    The Debtors pay recognition awards to certain Non-Union Employees for contributions to business success that are above and beyond the Employee's normal job responsibilities, or based on the completion of certain associate developmental programs (the "**Recognition Program**").    Awards may be delivered in cash or a cash equivalent (i.e., gift card).    Generally, award amounts do not exceed $3,000.    The Debtors estimate that, as of the Petition Date, the total accrued but unpaid obligations in connection with the Recognition Program are approximately $25,000, all of which will become due and owing before the final hearing on this Motion.    For the avoidance of doubt, none of the Recognition Program recipients to be paid pursuant to the authority requested under the proposed Interim Order are Senior Employees.

31.     _Service Award Program_.    The Debtors grant service awards to certain Non-Union Employees based on attainment of certain levels of tenure of employment with the organization (the "**Service Award Program**").    Awards are delivered in the form of specific gifts in varying amounts based on tenure with the Debtors.    The Debtors estimate that, as of the Petition Date, the total accrued but unpaid obligations in connection with the Service Award Program are approximately $5,000, all of which will become due and owing before the final hearing on this Motion.    For the avoidance of doubt, none of the Service Award Program recipients to be paid pursuant to the authority requested under the proposed Interim Order are Senior Employees.

US-DOCS\105687250.29 RLF1 21032675v.1

32. _Project Bonus and Incentive Awards_. The Debtors offer project bonus and incentive awards to eligible Employees upon completion of a project or upon certain other criteria of achievement as determined by the Debtor in the ordinary course of business (the "**Project Bonus and Incentive Awards**"). The aggregate amount of Project Bonus and Incentive Awards expected to be paid to approximately 30 eligible Employees in 2019 is approximately $410,000. For the avoidance of doubt, none of the Project Bonus and Incentive Awards recipients to be paid pursuant to the authority requested under the proposed Final Order are Insiders. No authority is sought to make any payments under Project Bonus and Incentive Awards pursuant to the authority requested under the proposed Interim Order.

**4. Leave Policies**

33. The Debtors offer their Employees other forms of compensation, including vacation days, holidays, civic duties leave and bereavement days. These forms of compensation are, in certain cases, required by statute, and in all cases, usual, customary and necessary if the Debtors are to retain qualified Employees to operate their business. Failure to provide these benefits could contravene applicable law and harm Employee morale and encourage the premature departure of Employees. The Debtors therefore request authority to continue these programs in the ordinary course of business during these chapter 11 cases.

**(a) Vacation Days**

34. All Employees are eligible for vacation days, which are generally granted based on the Employee's length of service with the Debtors. The Debtors do not allow Employees to carry over unused balances of vacation days from one year to the next, therefore, any contingent obligations related to accrued but unused vacation days at any point in time is _de minimis_.

35.     Generally, full-time Employees in their first four years of employment with the Debtors, as measured on January 1 of the applicable year, are eligible for 80 hours of vacation in the subsequent calendar year.  Under the same principles, eligible Employees that have more than 4 years of employment with the Debtors are eligible for 120 hours of vacation, eligible Employees that have more than 9 years of employment with the Debtors are eligible for 160 hours of vacation, eligible Employees that have more than 19 years of employment with the Debtors are eligible for 200 hours of vacation, and eligible Employees that have more than 29 years of employment with the Debtors are eligible for 240 hours of vacation in the subsequent calendar year.  Part-time Employees who work more than 20 hours per week are eligible for a prorated portion of the vacation time allocable to a full-time Employee, based on the amount of hours worked. Authority is sought to make payments to Employees in respect of paid time off in accordance with accrued vacation days pursuant to the proposed Final Order and not the proposed Interim Order, unless state or local law require otherwise.

36.     Vacation days do not accrue or roll over from one year to the next, or get paid out in cash, except upon termination or unless state or local law requires otherwise.

**(b)      Bereavement Leave and Civic Duties**

37.     With some exceptions, Employees are entitled to take three calendar days of paid bereavement leave in the event of a death of an immediate family member. In addition, Employees who are obligated to perform certain civic duties, including jury duty, are granted leave to fulfill such obligations.  Employees who are required to participate in annual active duty training as a member of the National Guard or Military Reserve are paid the difference between their regular salary and their total military pay for up to ten working days per calendar year.  The Debtors estimate that, as of the Petition Date, there are no outstanding obligations connected to bereavement leave and other civic duty pay.

**(c)     Holiday Pay**

38.     The Debtors also observe eleven paid holidays per year (eight scheduled plus three holidays designated by individual site or designated as personal, floating holidays). Non-exempt hourly Employees required to work on a company-recognized holiday are paid overtime pay for all hours worked in addition to eight hours of holiday pay.

**(d)     Severance**

39.     The Debtors do not adhere to a formal policy on extending severance payments to Non-Union Employees upon termination of employment; however, the Debtors have a history of entering into severance agreements with certain Non-Union Employees. Generally, severance agreements conform to certain guidelines based on the individual Non-Union Employee's continuing service with the Debtors.  Certain eligible Union Employees who have a minimum of one year of continuous full-time employment immediately prior to the date of termination are eligible for a severance payment upon termination.

40.     As of the Petition Date, the Debtors owe severance obligations to ten (10) former Employees in the total amount of approximately $600,000, approximately $130,000 of which will become due and owing before the final hearing on this Motion.  For the avoidance of doubt, none of the Employees to be paid severance payments pursuant to the authority requested under the proposed Interim Order are Senior Employees.  The Debtors believe it is important that they honor their severance commitments.  In doing so, the Debtors will show their current Employees that they fulfill the promises they make to their Employees, on which the Employees have relied in contributing their time and hard work to the Debtors' enterprise.  The Debtors feel such assurances are invaluable not only to maintain and boost the morale of their current workforce, but also to attract and retain new Employees.

### 5.      Expense Reimbursements

41.      The Debtors, in the ordinary course of business, reimburse Employees and candidates for open positions for a variety of ordinary, necessary and reasonable business-related expenses that the Employees and candidates incur on behalf of the Debtors in the scope of their candidacy and/or employment (the "**Reimbursable Expenses**").  Reimbursable Expenses may include expenses for business travel (including lodging, automobile rentals, meals, and internet charges), business-related transportation and mileage costs and other general business-related expenses.  Employees and candidates are expected to use sound judgment and good business sense when incurring such expenses.  As of the Petition Date, there is outstanding and payable approximately $2,200,000 of Reimbursable Expenses.

42.      In certain instances, Employees may be issued corporate credit cards to pay for Reimbursable Expenses.  Such Employees are issued a company credit card through American Express to be utilized for travel and other business-related expenses.  The Debtors reconcile the expenses charged on each Employee's issued credit card through the reporting software Concur and make payments directly to American Express on behalf of the Employees.  As of the Petition Date, approximately 700 Employees have a company credit card, and the average aggregate monthly reimbursable amount incurred on the company credit cards is approximately $1,500,000.

43.      In certain instances, the Debtors provide company cars to certain Employees.  The company cars are provided by Merchants Automotive Group.  Expenses related to an Employee's personal use of the company car are withheld via  a standard bi-weekly deduction from the Employee's paycheck, with an annual accounting re-allocation true-up to match any prior estimates with amounts actually withheld.  As of the Petition Date, approximately 65 Employees have a company car.  In addition, the Debtors reimburse certain

19

Employees for certain uses of the Employee's personal vehicle in connection with the Debtors'
business, in accordance with IRS guidelines on business expense reimbursements. The average
monthly reimbursable amount incurred in connection with the use of personal vehicles for
business is approximately $600 for twenty (20) associates, paid to Motus, the third-party
administrator. The total accrued and unpaid obligation currently owed for these reimbursements
is approximately $15,000, substantially all of which will become due and owing before the final
hearing on this Motion.

**C.     Health and Welfare Benefits**

44.    The Debtors offer their eligible Employees a large portfolio of benefits,
including medical and prescription drug coverage, dental coverage, vision coverage, health
savings accounts, COBRA coverage, flexible spending accounts, life insurance, disability
insurance and other benefit programs provided to Employees in the ordinary course of business
(collectively, the "**Health and Welfare Benefits**"). All Employees who work more than twenty
hours per week are eligible to receive Health and Welfare Benefits.

**1.     Medical Plan**

45.    The Debtors offer a self-insured medical plan (the "**Medical Plan**") to all
eligible Employees and their dependents. The Debtors offer two qualified high deductible health
plans (the "**Coverage Plans**") administered by Cigna, with different coverage amounts available
to eligible Employees, with respect to medical and prescription drug claims. As the Coverage
Plans are qualified high deductible health plans, participants have the opportunity to contribute
pre-tax dollars to a health savings account. The Debtors contribute $0.50 for each $1.00 the
participant contributes up to a maximum Debtor contribution of $1,000 or $2,000 depending
upon the qualified high deductible health plan and coverage level elected by the participant. The
Debtors subsidize monthly Employee premiums in connection with the Medical Plan and

20

Employees contribute through payroll Deductions.    The total cost of the Medical Plan is approximately $1,600,000 per month, inclusive of Employee contributions.    As of the Petition Date, 1,155 Employees participate in the Medical Plan and 20 former Employees are continuing their benefits coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act (COBRA).    The total accrued but unpaid obligations related to the Medical Plan and Coverage Plans are approximately $2,350,000, approximately $1,250,000 of which will become due and owing before the final hearing on this Motion.

46.    In the event of significant claims under the Medical Plan, the Debtors maintain a $450,000 deductible stop-loss insurance policy (the "**Stop Loss Policy**") administered by Cigna.    Payment of medical claims incurred under the Medical Plan is supported by a segregated bank account owned by the Debtors and controlled by Cigna, which the Debtors fund on a daily basis and from which Cigna withdraws to cover the Debtors' liability on these claims up to the deductible amount.    In the event Cigna withdraws more than the deductible for any individual claim, the excess amount withdrawn is credited against future withdrawals by Cigna. The Debtors' monthly premiums under the Stop Loss Policy are approximately $55,000.    The total accrued but unpaid obligations related to the Stop Loss Policy are approximately $110,000, all of which will become due and owing before the final hearing on this Motion.

### 2.    Dental Plan

47.    The Debtors also offer all eligible Employees dental benefits through the dental plan administered by Delta Dental of Ohio (the "**Dental Plan**").    As of the Petition Date, approximately 1,170 Employees participate in the Dental Plan.

48.    The Debtors subsidize Employee premiums in connection with the Dental Plan and Employees contribute through payroll Deductions.    The total cost of the Dental Plan is approximately $100,000 per month, inclusive of Employee contributions.    As of the Petition

21

Date, the total accrued but unpaid obligations related to the Dental Plan are approximately $200,000, all of which will become due and owing before the final hearing on this Motion.

### 3.    Flexible Benefits Plans

49.    All eligible Employees may elect to participate in the Debtors' tax-advantaged flexible spending plans (the "**FSA Plans**") administered by Cigna and WageWorks, under which the Debtors offer their Employees the ability to contribute a portion of their pre-tax compensation to flexible spending accounts to pay for eligible out-of-pocket health care and dependent care expenses and qualified transportation expenses.  Eligible Employees who are not covered under one of the Debtors' qualified high deductible health plans may set aside pre-tax dollars up to the maximum amount allowed under IRS regulations to pay for eligible health care expenses.  All eligible Employees may set aside pre-tax dollars up to the maximum amount allowed under IRS regulations to pay for eligible dependent care expenses and/or qualified transportation expenses.  Employees who elect to participate in the FSA Plans designate a certain amount per month to be withheld from their payroll as a Deduction.  As of the Petition Date, the total accrued but unpaid obligations owed in connection with the FSA Plans are approximately $12,000 all of which will become due and owing before the final hearing on this Motion.

### 4.    Life and Disability Insurance

#### (a)    Life and Accidental Death and Dismemberment Insurance

50.    The Debtors provide eligible Employees with basic life and basic accidental death and dismemberment insurance coverage in the event of serious illness, injury or death (the "**Basic Life/AD&D Insurance**") through Aetna. Basic Life/AD&D Insurance costs the Debtors approximately $55,000 per month. As of the Petition Date, the total accrued but unpaid obligations owed in connection with the Basic Life/AD&D Insurance are approximately $110,000, all of which will become due and owing before the final hearing on this Motion.

22

**(b)** **Short-Term and Long-Term Disability Insurance**

51.     The Debtors provide eligible Employees short-term disability coverage ("**STD Coverage**"), a self-insured benefit administered by the Lincoln Financial Group.  The STD Coverage allows eligible Employees to receive pay continuation for up to six (6) months for an approved medical condition that requires the eligible Employee to be out of work.  STD Coverage costs the Debtors approximately $7,000 per month.  As of the Petition Date, the total accrued but unpaid obligations owed in connection with the STD Coverage are approximately $14,000, all of which will become due and owing before the final hearing on this Motion.

52.     The Debtors provide eligible Employees long-term disability insurance ("**LTD Insurance**") through the Lincoln Financial Group. LTD Insurance costs the Debtors approximately $15,000 per month. As of the Petition Date, the total accrued but unpaid obligations owed in connection with the LTD Insurance are approximately $30,000 all of which will become due and owing before the final hearing on this Motion.

**5.     Employee Assistance Program and Healthy Steps**

53.     The Debtors provide eligible Employees with counseling services through the Employee Assistance Program ("**EAP**") through Cigna, which is funded entirely by Debtors. EAP costs the Debtors approximately $3,000 per month. As of the Petition Date, the total accrued but unpaid obligations owed in connection with the EAP are approximately $12,000, all of which will become due and owing before the final hearing on this Motion.

54.     The Debtors provide eligible Employees with a gift-card incentive program to  encourage healthy activities ("**Healthy Steps**") through Cigna. Healthy Steps costs the Debtors approximately $10,500 per month. As of the Petition Date, the total accrued but unpaid obligations owed in connection with Healthy Steps are approximately $42,000, all of which will become due and owing before the final hearing on this Motion.

6.        **Other Benefit Programs**

55.      The Debtors offer several other customary benefits to their eligible Employees, which are funded by Employee contributions.  These benefits include, but are not limited to (i) group accident insurance coverage; critical illness insurance; home, auto and pet insurance and a hospital indemnity plan, each administered by Metlife, and (ii) legal services coverage and identity theft protection, each administered by Hyatt Legal (collectively, the "**Other Benefit Programs**").  The Debtors estimate that, as of the Petition Date, there are no accrued but unpaid obligations in connection with the Other Benefit Programs.

56.      The Debtors offer eligible Employees a tax-advantaged parking and transportation benefit to help defray the cost of commuting to work and securing parking in two (2) of its U.S. locations (the "**Parking and Transportation Benefit**"). The Parking and Transportation Benefit consists of the following: (i) Employees whose annual base salary exceeds $120,000 are eligible to receive a free bus pass, (ii) Employees whose annual base salary is between $75,000 and $120,000 are eligible to receive an annual parking subsidy of $300 or $420 (depending on location) or, in the alternative, a free bus pass, and (iii) Employees whose annual base salary is $75,000 or less are eligible to receive an annual parking subsidy of $600 or $840 (depending on location) or, in the alternative, a free bus pass.  Employees must elect the benefit in order to receive it and Employees must coordinate any subsidy amount received with pre-tax contributions the Employee may have elected under the FSA Plans so as not to exceed the maximum allowable amount under Section 132(f) of the Internal Revenue Code.  The Debtors estimate that, as of the Petition Date, there are no accrued but unpaid subsidy amounts in connection with the Parking and Transportation Benefit.

57.      In connection with an executed employment agreement, the Debtors provide Craig Rogerson, Chief Executive Officer, with a customary commuting allowance.

24

Specifically, the Debtors fund a Wheels Up account that provides Mr. Rogerson with travel necessary to his position as an executive. Under this arrangement, the Debtors pay up to $200,000 per year in connection with Mr. Rogerson's commuting allowance. In connection with the employment agreement, the Debtors also provide Mr. Rogerson with housing benefits, paid directly to the housing provider on Mr. Rogerson's behalf. The Debtors also provide Mr. Rogerson with reimbursement for furniture rental. The Debtors pay approximately $3,000 per month in connection with housing and furniture rental on Mr. Rogerson's behalf. The Debtors also provide related tax gross-up payments to Mr. Rogerson in connection with the aforementioned programs, in the approximate amount of $130,000 per year.

**D.      Retirement Plans**

       **1.      Defined Contribution Plans**

       58.      The Debtors maintain the Hexion Inc. Retirement Savings Plan, a qualified defined contribution plan (the "**Qualified DC Plan**"), a retirement savings plan for eligible Employees pursuant to section 401 of the Internal Revenue Code. Employees participating in the Qualified DC Plan may contribute up to the federal statutory cap of $19,000 per year (or $25,000 per year for those Employees age 50 or over). In addition, the Debtors match the Employees' Qualified DC Plan contributions dollar-for-dollar in an amount up to 100 percent (100%) of the first 5 percent (5%) of an Employee's eligible compensation (a "**401(k) Matching Contribution**" and collectively, the "**401(k) Contributions**"). Approximately 1,250 Employees currently participate in the Qualified DC Plan, and 401(k) bi-weekly contributions total approximately $850,000, which includes approximately $600,000 of withholdings from participating Employees' paychecks and approximately $250,000 of 401(k) Matching Contributions.

US-DOCS\105687250.29 RLF1 21032675v.1

59.     Under the Qualified DC Plan, the Debtors contribute an "Annual Retirement Contribution" to each Employee's Qualified DC Plan account, regardless of whether the Employee makes contributions to the Qualified DC Plan, of up to seven percent (7%) of the Employee's eligible compensation, based upon the Employee's years of employment with the Debtors (the "**ARC Payment**"). In addition, the Debtors may make an additional "Employer Achievement Match" contribution to the Employee's Qualified DC Plan account in each year that the Debtors achieve certain annual performance goals, in an amount up to twenty-five (25%) of the 401(k) Matching Contribution (the "**CAM**").

60.     The Qualified DC Plan is administered by Fidelity.  As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid obligations on account of the Qualified DC Plan, including any 401(k) Contributions, ARC Payment and CAM is $9,150,000.

### 2.     Supplemental Executive Retirement Plan

61.     The Debtors maintain a Supplemental Executive Retirement Plan (the "**SERP**"), a nonqualified, unfunded deferred compensation plan for certain eligible Employees. The Debtors make annual credits of 5% of eligible earnings above the maximum limitations set by the IRS for contributions to a qualified defined contribution plan. Account credits are made to the plan during the third quarter of each year. No participant contributions are permitted and the Debtors may also make discretionary credits. Employee participants in the SERP are fully vested in the Debtors' contributions to SERP once the Employee has been employed by the Debtors for three (3) years. Within 90 days of the Employee's six-month anniversary of termination of employment with the Debtors, the vested portion of the Employee's SERP account will be distributed to the Employee in a lump sum. As of the Petition Date, approximately 45 Employees

participate in, and will be owed amounts in connection with, the SERP. The current total accrued but unpaid obligations related to the SERP is approximately $1,100,000.

### 3.    Defined Benefit Pension Plans

62.    The Debtors maintain the Hexion Inc. Pension Plan, a tax qualified defined benefit pension plan (the "**Pension Plan**") for certain eligible Employees. Benefit accruals under the Pension Plan have been frozen and no Employees are continuing to accrue any benefits. As of the Petition Date, approximately 7,450 Employees have benefits accrued under the Pension Plan, of whom 545 are active Employees, 1,275 are former Employees with rights to deferred benefits and 5,630 are retired Employees receiving benefits. For the plan year 2019, the Debtors have not made any contributions to the Pension Plan and no contributions are expected to be made under the Pension Plan until 2020.

63.    The Debtors maintain the Executives' Supplemental Pension Plan ("**ESPP**"), a non-qualified retirement plan that provides "make up" benefits for Employees who were unable to fully participate in a legacy qualified defined contribution plan or the Borden Chemical, Inc. Employee Retirement Income Plan, which was merged into the Pension Plan in 2009, because of limitations imposed by the IRS. The ESPP was frozen as to future benefit accruals effective as of December 31, 2008; accordingly, no Employees are continuing to accrue any benefits under the ESPP and no Employees can defer compensation under the ESPP. However, the ESPP was amended in October of 2010 to allow Debtors to make discretionary contributions on behalf of participants, at such times and in such amounts as the Debtors may determine to make up for any negative adjustments that may be required to be made to a participant's account under the Pension Plan in order to comply with the applicable requirements of the Internal Revenue Code. Amounts credited to a participant's discretionary contribution account are paid from the Debtor's general assets.

27

64.     As of the Petition Date, approximately 40 current and former Employees have lump sum benefits accrued under the ESPP. Additionally, approximately 40 beneficiaries are in pay of the ESPP and receive monthly benefits totaling approximately $50,000.  For the plan year 2019, the Debtors do not have scheduled, and do not plan to make, any discretionary contributions to the ESPP. The total accrued but unpaid obligations, based on actuarial calculations, related to the ESPP are approximately $3,750,000.

65.     The Debtors maintain the Benefit Restoration Plan ("**BRP**"), which provides supplemental deferred compensation benefits to Employees which would have been available under the Pension Plan but for the limitations imposed by the Internal Revenue Code. The BRP is a non-qualified defined benefit plan that generally provides for payments to participants in the same form as participants may receive under the Pension Plan.  As of the Petition Date, approximately 4 Employees have benefits accrued under the BRP, of whom 3 are active Employees and 1 is a retired Employee receiving benefits.  For the plan year 2019, the Debtors have not made any contributions to the BRP.  The total accrued but unpaid obligations related to the BRP are approximately $160,000.

### 4.     Other Retirement Benefit Obligations

66.     *Legacy Retiree Life Insurance*.  The Debtors provide legacy life insurance benefits to certain retired Employees. Effective December 31, 2018, MetLife assumed responsibility for life insurance obligations with respect to 1,401 Hexion Inc. retirees. MetLife offered a single premium policy with a five-year buyout term. The average benefit across the 1,401 Hexion Inc. retirees is approximately $4,000 and the total aggregate benefit is approximately $5,100,000. The Debtors made the first payment to MetLife in late December 2018 and ongoing payments are made quarterly. A fixed payment of approximately $300,000 is scheduled to be made on each of April 14, 2019, June 26, 2019 and September 17, 2019. The last

28

payment will be made to MetLife on September 7, 2022. The quarterly payment amounts change each year and the total aggregate payments to MetLife over the buyout term is approximately $5,000,000. The outstanding balance as of March 31, 2018 is approximately $4,400,000. As of the Petition Date, the Debtors are current on their payments to MetLife for these legacy life insurance policies, with no arrearage.

67.    *Legacy Retiree Medical Plan*.  The Debtors offer legacy retiree medical insurance benefits to certain retired Employees through the American Association of Retired Persons ("**AARP**").  These plans are provided by and administered by AARP, with the Debtors paying AARP approximately $5,000 per month in premiums and administrative service fees.  As of the Petition Date, the Debtors are current on their payments to AARP for these medical plans, with no arrearage.

68.    *Other Contingent Claims*.  Over their long history as an operating business, the Debtors have historically made available certain retirement benefits to Employees. Due in part to multiple corporate reorganizations and in part to the large base of Employees and applicable benefits, along with the practical challenges with accounting for all such Employees and benefits, Debtors, in some circumstances, are presented with legitimate benefit claims from retired Employees for which the Debtors have not accounted for ("**Contingent Claims**").  Over the past 12 months, the Debtors have paid out approximately $10,000 in Contingent Claims, and the Debtors seek authority to honor Contingent Claims as they are presented in the ordinary course of business postpetition.

## E.    Workers' Compensation

69.    The Debtors maintain workers' compensation insurance that provides coverage for employee-related injuries, disability, or death, as prescribed by state and federal workers' compensation laws and other statutes.  In connection with these requirements, the

Debtors maintain both self-insured workers' compensation programs (the "**Self-Insured Programs**") and workers' compensation insurance policies (collectively, the "**Workers' Compensation Policies**"), depending upon the state in which the covered Employees work.  As described in further detail below, the Debtors' third party administrator, Zurich American Insurance Company ("**Zurich**"), manages all workers' compensation claims asserted by the Debtors' Employees.

70.    *Self-Insured Workers' Compensation Programs*.  The Debtors maintain or have maintained Self-Insured Programs in sixteen (16) states under which they pay workers' compensation and employer liability claims ("**Self-Insured Claims**") as they arise, up to a maximum of $500,000 per occurrence (the "**Self-Insurance Claim Cap**"), depending on the state in which the Self-Insured Claim arises.  For claims exceeding the Self-Insurance Claim Cap, the Debtors maintain an excess workers' compensation policy[7] with Zurich.[8]

71.    *Workers' Compensation Insurance Policies*.    The Debtors maintain workers' compensation insurance policies with Zurich for the states in which they are not self-insured.  Under these policies, Zurich provides insurance for workers' compensation claims in excess of the $500,000 deductible per accident.   The Debtors finance their premiums with Zurich, relief relating to which is requested in the Debtors' Insurance Motion which is filed contemporaneously herewith.

---

[7] The Debtors also maintain separate excess workers' compensation policies with respect to their legacy Self-Insured Programs.

[8] The Debtors maintain surety bonds and letters of credit in favor of certain of their workers' compensation and excess workers' compensation liability insurance carriers, as further described in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain and Renew Their Prepetition Insurance Programs and Pay All Obligations in Respect Thereof and (B) Maintain Their Premium Financing Program and Pay All Obligations in Respect Thereof and (II) Granting Related Relief*, filed contemporaneously herewith (the "**Insurance Motion**").

72.     Under the deductible for the Workers' Compensation Policies, the Debtors paid approximately $1,200,000 in fiscal year 2018 on account of covered claims (collectively, the "**Workers' Compensation Claims**").   As of the Petition Date, there are 28 current Workers' Compensation Claims open against the Debtors.  The Debtors estimate that, as of the Petition Date, the total accrued but unpaid obligations in connection with the Workers' Compensation Claims are approximately $3,400,000, all of which will become due and owing before the final hearing on this Motion.

## F.     Other Benefits

### 1.     Home Office Program

73.     Certain Employees who do not have access to an office at a Debtor site are provided with reimbursements of expenses incurred in connection with the Employee's set up and maintenance of a home office, such as a laptop, monitor and office furniture, up to $1,500 per Employee (the "**Home Office Program**").   The Debtors expend approximately $3,000 per month, in the aggregate on account of the Home Office Program.  The Debtors estimate that, as of the Petition Date, the total accrued but unpaid obligations in connection with the Home Office Program are approximately $6,000, all of which will become due and owing before the final hearing on this Motion.

### 2.     Adoption Assistance Program

74.     Full-time Non-Union Employees are provided with reimbursements of out-of-pocket expenses incurred in connection with the Employee's adoption of a dependent child under the age of 18, up to $5,000 per Employee (the "**Adoption Assistance Program**"). The Debtors estimate that, as of the Petition Date, there are no accrued but unpaid obligations in connection with the Adoption Assistance Program.

31

### 3.    Relocation Benefits

75.    Certain Employees who are moving residences in connection with employment with Debtors' business are provided with a lump-sum to be used in connection with the Employee moving, including home-finding trips, lease cancellations and other miscellaneous expenses (the "**Renter Assistance Program**").  The Debtors expend approximately $10,000 per month on account of the Renter Assistance Program.  The Debtors estimate that, as of the Petition Date, there are no accrued but unpaid obligations in connection with the Renter Assistance Program.

76.    Certain Employees who are moving residences in connection with employment with Debtors' business are provided with marketing services for the Employee to sell his or her residence plus a lump-sum to be used in connection with the Employee moving including movement of household goods, fees incurred with a new home purchase and reimbursement of seventy-five percent (75%) of the loss-on-sale of the Employee's residence (the "**Homeowner Buyout/Marketing Assistance Program**").   The Debtors spend approximately $55,000 per month, in the aggregate, on account of the Homeowner Buyout/Marketing Assistance Program.  The Debtors estimate that, as of the Petition Date, the total accrued but unpaid obligations in connection with the Homeowner Buyout/Marketing Assistance Program are approximately $275,000, substantially all of which will become due and owing before the final hearing on this Motion.

77.    In addition to relocation expenses, expatriate Employees are offered tax services through Deloitte. The Debtors spend approximately $50,000 per month in aggregate on account of these services. The Debtors estimate that, as of the Petition Date, the total accrued but unpaid obligations in connection with these tax services are approximately $100,000, substantially all of which will become due and owing before the final hearing on this Motion.

### 4. Education Reimbursement Program

78.    Certain associates who have worked for Debtors for over 18 months are provided with reimbursements of tuition and related expenses incurred in connection with the Employee completing continuing education, undergraduate or graduate coursework (the "**Education Reimbursement Program**").    The Debtors spend approximately $25,000 per month, in the aggregate on account of the Education Reimbursement Program.    The Debtors estimate that, as of the Petition Date, the total accrued but unpaid obligations in connection with the Education Reimbursement Program are approximately $25,000, all of which will become due and owing before the final hearing on this Motion.

### 5. Associate Referral Program

79.    The Debtors pay awards to Non-Union Associates who refer a candidate who is hired in a position at the Debtors' business, subject to certain exceptions (the "**Associate Referral Program**").    Such award is determined with reference to the market in which the candidate is hired.    The Debtors expend approximately $2,000 per month, in the aggregate on account of the Associate Referral Program.    The Debtors estimate that, as of the Petition Date, the total accrued but unpaid obligations in connection with the Associate Referral Program are approximately $4,000, all of which will become due and owing before the final hearing on this Motion.

### 6. United Way

80.    The Debtors support the United Way and allow for Employees to make contributions via payroll deductions to the organization.    Employees can elect either a percent of pay or a standard deduction.    The monthly amount is approximately $7,000.    The Debtors estimate that, as of the Petition Date, they owe United Way approximately $40,000 in accrued

but unpaid fees related to such services, all of which will become due and owing before the final hearing on this Motion.

### 7. Union Dues

81.     As part of the CBAs, union dues are withheld from participating Employees' paychecks.  This calculation is based both on the number of hours the Employee works and their earnings for the pay periods.  The monthly amount is approximately $5,500. The Debtors estimate that, as of the Petition Date, they owe approximately $65,000 in accrued but unpaid union dues, all of which will become due and owing before the final hearing on this Motion.

### G. Board of Managers Compensation

82.     Debtor Hexion Holdings LLC is the ultimate parent entity of all of the Debtors.   Its board of managers includes six (6) managers who are each compensated approximately $75,000 annually, paid in quarterly installments, in addition to up to $2,000 in expense reimbursements, paid in arrears, for each meeting attended in the performance of their duties as managers (the "**Manager Compensation**").

83.     As of the Petition Date, there are no accrued but unpaid obligations outstanding with respect to Manager Compensation.  The Debtors request the authority, solely pursuant to the proposed Final Order, to pay Manager Compensation as it comes due in the ordinary course of business.

## II. LEGAL BASIS FOR RELIEF REQUESTED

### A. Payment of the Prepetition Employee Obligations and the Prepetition Contracted Labor Obligations Is Appropriate Under Sections 363(b) and 105(a) of the Bankruptcy Code and the Doctrine of Necessity

84.     The relief requested in this Motion is appropriate under sections 363(b) and 105(a) of the Bankruptcy Code and the "doctrine of necessity."  Under section 363(b)(1) of

34

the Bankruptcy Code, a debtor may, in the exercise of its sound business judgment and after notice and a hearing, "use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Generally, the debtor is only required to "show that a sound business purpose" justifies the proposed use of property.  *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring "good business reason" for use under section 363(b) of the Bankruptcy Code).  This standard prohibits other parties from second-guessing the debtor's business judgment if the debtor has shown that the proposed use will benefit the debtor's estate. *See In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

85.     Likewise, section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  Courts have interpreted this provision to authorize payments on prepetition claims where the payments are essential to the success of the debtor's reorganization under what is known as the "necessity of payment doctrine."  *See In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581 (3d Cir. 1981) ("Thus, the 'necessity of payment' doctrine…teaches no more than, if a payment of a claim which arose prior to reorganization is essential to the continued operation of the [debtor's business] during reorganization, payment may be authorized…"); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) "provides a statutory basis for payment of pre-petition claims" under

necessity of payment doctrine); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) ("The appropriate standard…is commonly referred to as 'the necessity of payment doctrine.'").

86.    The relief requested in this Motion is appropriate under sections 363(b) and 105(a) of the Bankruptcy Code. Continued payment, without interruption, of the Prepetition Employee Obligations and the Prepetition Contracted Labor Obligations, and the continued funding, without interruption, of the compensation and benefits plans, policies, programs, and practices attendant to the Prepetition Employee Obligations as described in this Motion are vital to the Debtors' business and will ensure a smooth transition into chapter 11 and enhance the success of these cases.  If the relief requested in this Motion is not granted, the Debtors' business operations will suffer to the detriment of the Debtors' estates, creditors, and other stakeholders.

87.    Any delay or failure to pay wages, salaries, benefits, and other similar items would irreparably impair employee morale, dedication, confidence, and cooperation and would adversely impact the Debtors' relationships with their employees at a time when their employees' support is critical to the success of the Debtors' chapter 11 cases.  The Debtors simply cannot risk the substantial damage to their business that would result from any decline in employee morale.

88.    Without the relief requested in this Motion, the Employees and Contracted Labor could also suffer undue hardship and, in many instances, serious financial difficulties, as some Employees and Contracted Labor will likely need the amounts in question to meet their own personal financial obligations.  Failure to reimburse Business-Related Expenses will cause employees to worry about personal liability for business-related charges, a concern that would

discourage employees from devoting their full attention to the Debtors' business and restructuring efforts.

89.    Without the requested relief, the stability of the Debtors' workforce will be undermined, perhaps irreparably, by the likelihood that the Debtors will lose valued employees and Contracted Labor. Accordingly, for all the above reasons, the Debtors submit that the requested relief is reasonable and necessary.

## B.    The Debtors Should Be Authorized to Pay the Prepetition Employee Obligations and the Prepetition Contracted Labor Obligations Under Sections 1107(a) and 1108 of the Bankruptcy Code

90.    The Debtors are operating their business as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code, and are therefore fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) [their] equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).   A chapter 11 debtor in possession has the implicit duty "to protect and preserve the estate, including an operating business's going-concern value." *Id.*

91.    Courts have noted that a debtor in possession can in certain instances fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The *CoServ* court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id.* The court provided a three-prong test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim.

37

>Third, there is no practical or legal alternative by which the debtor
>can deal with the claimant other than by payment of the claim.

*Id.* at 498.

92.     Payment of the Prepetition Employee Obligations and the Prepetition Contracted Labor Obligations satisfies the *CoServ* test.   First, the Debtors' Employees and Contracted Labor—assets that are among the Debtors' most valuable—are central to the success of these chapter 11 cases, and thus, it is critical that the Debtors deal with their Employees and Contracted Labor.   Second, for the reasons already explained, if the Debtors do not pay the Prepetition Employee Obligations and the Prepetition Contracted Labor Obligations, the Debtors risk the "probability of harm, or, alternatively, loss of economic advantage to the estate or the debtors' going concern value, which is disproportionate to the amount of" the Prepetition Employee Obligations and the Prepetition Contracted Labor Obligations.   Finally, with respect to their Employees and Contracted Labor, the Debtors have examined other options short of payment of the Prepetition Employee Obligations and the Prepetition Contracted Labor Obligations and have determined that, to avoid significant disruption of the Debtors' business operations, there exists no practical or legal alternative to paying such obligations.   Therefore, payment of the Prepetition Employee Obligations and the Prepetition Contracted Labor Obligations is necessary for the Debtors to satisfy their fiduciary duties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

## C.     The Prepetition Employee Obligations Constitute Priority Claims Under Section 507(a) of the Bankruptcy Code

93.     The Debtors believe that the majority of the Prepetition Employee Obligations constitute priority claims under sections 507(a)(4), (a)(5), and (a)(8) of the Bankruptcy Code, which must be satisfied before any general unsecured claims against the Debtors' estates. 11 U.S.C. §§ 507(a)(4), 507(a)(5), 507(a)(8), 726. Specifically, under section

38

507(a)(4)(A) of the Bankruptcy Code, claims of employees for "wages, salaries, or commissions, including vacation, severance, and sick leave pay" earned within 180 days before the Petition Date are afforded priority unsecured status up to $13,650 per individual. 11 U.S.C. § 507(a)(4)(A).  As of the Petition Date, the Debtors believe that there are no employees with accrued unpaid wages exceeding the $13,650 cap.  Thus, virtually all the Prepetition Employee Obligations and Prepetition Contracted Labor Obligations are priority claims that, in any event, will have to be paid in full.  Accordingly, the Debtors request entry of the proposed Interim Order authorizing the Debtors to pay Prepetition Employee Obligations and Prepetition Contracted Labor Obligations in an aggregate amount not to exceed the Interim Amount subject to the $13,650 cap, followed by the final hearing on this Motion authorizing the Debtors to pay all other Prepetition Employee Obligations.

94.    Similarly, under section 507(a)(5) of the Bankruptcy Code, employees' claims for contributions to certain employee benefit plans are also afforded priority unsecured status up to $13,650 per employee covered by such plan, less any amount paid under section 507(a)(4). 11 U.S.C. § 507(a)(5)(A).  The same holds true for the payment of the Payroll Taxes, as the relevant taxing authorities generally would hold priority claims under section 507(a)(8) of the Bankruptcy Code for such obligations and their payment will therefore not prejudice other creditors of the Debtors. *See* 11 U.S.C. § 507(a)(8).[9]  Thus, payment of the Prepetition Employee Obligations merely expedites the treatment afforded to such claims and is consistent with the priority scheme of the Bankruptcy Code.

---

[9] Section 507(a)(8) of the Bankruptcy Code affords priority to, among other things, unsecured claims of governmental units for (i) taxes required to be collected or withheld and for which the debtor is liable in whatever capacity (§ 507(a)(8)(C)) and (ii) under certain circumstances, employment taxes on wages, salaries, or commissions (§ 507(a)(8)(D)).

**D.**    **Continuing to Make Severance Payments to Employees is Reasonable and a Sound Exercise of the Debtors' Business Judgment**

**1.**    **Severance Payments to Employees are Authorized under Section 363(c)(1) of the Bankruptcy Code.**

95.    The Debtors further request that they be allowed to continue to honor severance obligations and make severance payments to non-insider Employees in the ordinary course of business. The Debtors submit that the existing severance obligations should be reviewed under section 363(c)(1) of the Bankruptcy Code rather than section 503(c) of the Bankruptcy Code because the severance obligations are pre-existing obligations that the Debtors have maintained in the ordinary course and desire to continue on a postpetition basis, and no insiders (as that term is defined in the Bankruptcy Code) are owed severance payments. *See In re Blitz U.S.A. Inc.*, 475 B.R. 209, 215 (Bankr. D. Del. 2012) (holding that a prepetition employee incentive plan was an ordinary course transaction made with sound business judgment and in good faith under section 363 of the Bankruptcy Code).

**2.**    **Severance Payments to Employees are Authorized under Sections 363(b) and 503(c)(3) of the Bankruptcy Code.**

96.    Alternatively, to the extent that the Debtors are not authorized to continue to honor severance obligations and make severance payments to non-insider Employees, the Debtors submit that severance payments are authorized under sections 363(b) and 503(c) of the Bankruptcy Code. Importantly, because the Debtors do not propose to make any severance payments to any insiders, the pre-existing severance obligations are not subject to the heightened standards of sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code. *See* 11 U.S.C. § 503(c)(1) and (2) (applying only to insiders).

97.    Instead, pursuant to section 503(c)(3) of the Bankruptcy Code, continuing to honor severance obligations and make severance payments to non-insider Employees only

requires a showing that it is "justified by the facts and circumstances of" the Debtors' chapter 11 cases." *See* 11 U.S.C. § 503(c)(3). This standard, in turn, is essentially the same as the business judgment standard that is applied under section 363(b) of the Bankruptcy Code. *See In re Velo Holdings Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) ("Courts have held that the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)."); *In re Global Home Prods. LLC*, 369 B.R. 778, 783 (Bankr. D. Del. 2007) ("If [the] proposed plans are] intended to incentivize management, the analysis utilizes the more liberal business judgment review under § 363.").

98.     The Debtors submit that continuing to make severance payments to non-insiders is a sound exercise of their business judgment and in the best interests of the estates. Importantly, the severance obligations are intended to incentivize and protect the Employees in the ordinary operations of the Debtors' business operations. The Debtors therefore believe that it is necessary to continue honoring severance obligations to non-insiders on a postpetition basis, especially in light of the damage to morale that would result if any severance obligations to non-insiders are not honored on a postpetition basis. Accordingly, the Debtors request that the Court authorize the Debtors to continue making severance payments to non-insiders in the ordinary course of business, including payment of prepetition obligations related thereto, if any, *provided*, *however*, that the Debtors are not seeking authority to make payments to any Employees that, in the aggregate, exceed the $13,650 statutory cap provided for under section 507(a)(4) of the Bankruptcy Code.

**E.     Funds Related to the Payroll Taxes and Payroll Deduction Obligations May Be Held in Trust and Are Not Property of the Estate**

99.     Payroll Taxes withheld from an employee's wages and any other Payroll Deduction Obligations are collected or withheld by the Debtors and may be held in trust for the

benefit of the applicable taxing authority.  As a result, Payroll Taxes and other Payroll Deduction Obligations are not property of the Debtors' estates under section 541 of the Bankruptcy Code, and those funds, therefore, are not available for the satisfaction of creditors' claims.  *See, e.g.*, *Begier v. IRS*, 496 U.S. 53 (1990) (withheld taxes are property held by the debtor in trust for another and, as such, not property of the debtor's estate); *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95 (3d Cir. 1994) (withheld taxes were subject to a trust); *see generally In re Columbia Gas Sys. Inc.*, 997 F.2d 1039, 1060 (3d Cir. 1993) (indicating that even if a statute does not establish an express trust, a constructive trust may be found).  Instead, the Debtors may be obligated to remit these funds to the applicable taxing authority.

100.    Many federal, state, and local statutes also impose personal liability on officers and directors of companies for certain Payroll Taxes and other Payroll Deduction Obligations.  To the extent that the relevant Payroll Taxes and other Payroll Deduction Obligations remain unpaid by the Debtors, the Debtors' managers, directors, officers, and executives may be subject to lawsuits or criminal prosecution during the pendency of these chapter 11 cases.  Any such lawsuit or criminal prosecution (and the ensuing potential liability) would distract the Debtors and their managers, directors, officers, and executives from devoting their full attention to the Debtors' business and the orderly administration of these chapter 11 cases.  The Debtors believe that these distractions would materially and undermine their ability to operate in the ordinary course of business and to administer these chapter 11 cases, with resulting detriment to any parties in interest.

101.    In other chapter 11 cases, courts in this District and others have approved payment of prepetition claims for compensation, benefits, and expense reimbursements similar to

those described in this Motion.[10]  For these reasons, the Debtors submit that the relief requested is essential, appropriate, and in the best interests of their estates and creditors, and any parties in interest, and therefore, should be granted.

**F.     The Court Should Authorize Banks to Honor and Pay Checks Issued and Electronic Funds Transferred to Pay the Prepetition Employee Obligations and the Prepetition Contracted Labor Obligations**

102.     The Debtors further request that the Court authorize and direct their banking institutions and all other applicable banks and other financial institutions to receive, process, honor, and pay any and all checks drawn or electronic funds relating to the Prepetition Employee Obligations and the Prepetition Contracted Labor Obligations, whether such checks were presented before or after the Petition Date; *provided* that sufficient funds are on deposit in the applicable bank accounts to cover such payments. The Debtors have sufficient liquidity to pay such amounts as they become due in the ordinary course of business, and under the Debtors' existing cash management system, checks or wire transfer requests can be readily identified as relating to an authorized payment of the Prepetition Employee Obligations and the Prepetition Contracted Labor Obligations. For that reason, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. The Debtors also seek authority to issue new postpetition checks or effect new electronic fund transfers, on account of the Prepetition Employee Obligations and Prepetition Contracted Labor Obligations to replace any prepetition checks or electronic fund transfer requests that may be dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

---

[10] *See*, *e.g.*, *In re LBI Media, Inc.* Case No. 18-12655 (CSS) (Bankr. D. Del. Nov. 27, 2019) (D.I. 80); *In re The Rockport Co., LLC*, Case No. 18-11145 (LSS) (Bankr. D. Del. May 15, 2018) (D.I. 57); *In re Videology, Inc.*, Case No. 18-11120 (BLS) (Bankr. D. Del. May 11, 2018) (D.I. 29); *In re Claire's Stores, Inc.*, Case No. 18-10584 (MFW) (Bankr. D. Del. Mar. 20, 2018) (D.I. 94).

**G.      Interim Relief Is Necessary to Avoid Immediate and Irreparable Harm**

103.    Under Bankruptcy Rule 6003, the Court may grant a motion to "use . . . property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" within 21 days after the chapter 11 case's commencement to the extent "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. Here, the relief requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates, as set forth in the Knight Declaration, and relief on an interim basis is therefore appropriate under Bankruptcy Rule 6003, if applicable.[11]

104.    The urgency of the relief requested justifies immediate relief. To ensure the relief requested is implemented immediately, the Debtors request that the Court waive the notice requirements under Bankruptcy Rule 6004(a), if applicable, and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

<u>**RESERVATION OF RIGHTS**</u>

105.    Nothing contained in this Motion is an admission of the validity of any claim against the Debtors, a waiver of the Debtors' or any other party's rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code. If this Court grants the relief requested in this Motion, any Court-authorized payment is not an admission of the validity of any claim or a waiver of the Debtors' or any other party's rights to subsequently dispute such claim. In addition, authorization to pay the claims described in this Motion will not be deemed a direction to the Debtors to pay such claims; rather, the Debtors will make such payments in their discretion.

---

[11] *See* Knight Declaration filed concurrently with this Motion.

## NOTICE

106.    The Debtors will provide notice of this Motion by facsimile, e-mail, overnight delivery, or hand delivery to: (i) Linda J. Casey of the Office of the United States Trustee for the District of Delaware; (ii) the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis; (iii) the United States Attorney's Office for the District of Delaware; (iv) the attorneys general for the states in which the Debtors conduct business; (v) Akin Gump Strauss Hauer & Feld LLP as counsel to the ad hoc group of first lien noteholders; (vi) Milbank LLP as counsel to the ad hoc group of crossover noteholders; (vii) Jones Day as counsel to the ad hoc group of 1.5 lien noteholders; (viii) Simpson Thacher & Bartlett LLP as counsel to JPMorgan Chase Bank, N.A. as administrative agent and collateral agent under the Debtors' prepetition asset-based revolving credit facility; (ix) Wilmington Trust, National Association, as trustee under the First Lien Notes and the Second Lien Notes; (x) Arnold & Porter Kaye Scholer LLP as counsel to Wilmington Savings Fund Society, FSB, as trustee under the 1.5 Lien Notes; (xi) The Bank of New York Mellon, as trustee under the Borden Debentures; (xii) Simpson Thacher & Bartlett LLP and Landis Rath & Cobb LLP as counsel to the administrative agent and collateral agent under the Debtors' postpetition financing facility; (xiii) the Internal Revenue Service; (xiv) the Securities and Exchange Commission; (xv) the Pension Benefit Guaranty Corporation; and (xvi) the Environmental Protection Agency.  Following the hearing, a copy of this Motion and any order entered with respect to it will be served on the foregoing parties and all parties having filed requests for notice in these chapter 11 cases. A copy of this Motion is also available on the Debtors' case website at http://www.omnimgt.com/HexionHoldings.

US-DOCS\105687250.29 RLF1 21032675v.1

107.    As this Motion is seeking "first day" relief, notice of this Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m).  Due to the urgency of the relief requested, the Debtors submit that no other or further notice is necessary.

## NO PRIOR MOTION

108.    The Debtors have not made any prior motion for the relief sought in this Motion to this Court or any other.

The Debtors respectfully request entry of an interim and final order, substantially in the forms attached as <u>Exhibit A</u> and <u>Exhibit B</u>, granting the relief requested in its entirety and any other relief as is just and proper.

US-DOCS\105687250.29 RLF1 21032675v.1

Dated:  April 1, 2019
      Wilmington, Delaware

*/s/ Michael J. Merchant*
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:    302-651-7700
Fax:    302-651-7701
Email:    collins@rlf.com
    merchant@rlf.com
    steele@rlf.com
    schlauch@rlf.com

- and -

George A. Davis (*pro hac vice* pending)
Andrew M. Parlen (*pro hac vice* pending)
Hugh Murtagh (*pro hac vice* pending)
**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022
Telephone:    (212) 906-1200
Facsimile:    (212) 751-4864
Email:    george.davis@lw.com
    andrew.parlen@lw.com
    hugh.murtagh@lw.com

- and -

Caroline A. Reckler (*pro hac vice* pending)
Jason B. Gott (*pro hac vice* pending)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:    (312) 876-7700
Facsimile:    (312) 993-9767
Email:    caroline.reckler@lw.com
    jason.gott@lw.com

*Proposed Attorneys for the Debtors and Debtors in Possession*

**Exhibit A**

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | x | |
| In re: | : | Chapter 11 |
| | : | |
| HEXION HOLDINGS LLC, et al.,[1] | : | Case No. 19-10684 ( ) |
| | : | |
| Debtors. | : | Joint Administration Requested |
| | x | |

## INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) PAY CERTAIN EMPLOYEE COMPENSATION AND BENEFITS, (B) MAINTAIN AND CONTINUE SUCH BENEFITS AND OTHER EMPLOYEE-RELATED PROGRAMS, AND (C) PAY PREPETITION CLAIMS OF CONTRACTED LABOR AND (II) GRANTING RELATED RELIEF

Upon the Debtors' motion (the "**Motion**")[2] for entry of an interim order (this "**Interim Order**") (i) authorizing the Debtors, in their discretion, as deemed necessary to continue to operate and preserve value, to (a) pay all prepetition wages, salaries, commissions, and compensation, and related administrative and incidental costs (all as described in the Motion and collectively, the "**Employee Compensation Obligations**") and prepetition employee benefits (all as described in the Motion and collectively, the "**Employee Benefit Obligations**"), (b) pay all employment, unemployment, Social Security, and federal, state, and local taxes relating to the Employee Compensation Obligations and Employee Benefit Obligations, whether withheld from wages or paid directly by the Debtors to governmental authorities (collectively, "**Payroll Taxes**"), and make other payroll deductions, including, but not limited to, retirement

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Hexion Holdings LLC (6842); Hexion LLC (8090); Hexion Inc. (1250); Lawter International Inc. (0818); Hexion CI Holding Company (China) LLC (7441); Hexion Nimbus Inc. (4409); Hexion Nimbus Asset Holdings LLC (4409); Hexion Deer Park LLC (8302); Hexion VAD LLC (6340); Hexion 2 U.S. Finance Corp. (2643); Hexion HSM Holdings LLC (7131); Hexion Investments Inc. (0359); Hexion International Inc. (3048); North American Sugar Industries Incorporated (9735); Cuban-American Mercantile Corporation (9734); The West India Company (2288); NL Coop Holdings LLC (0696); and Hexion Nova Scotia Finance, ULC (N/A). The address of the Debtors' corporate headquarters is 180 East Broad Street, Columbus, Ohio 43215.

[2] Capitalized terms used but not defined in this Interim Order have the meanings used in the Motion.

and other employee benefit plan contributions, union dues, garnishments, and voluntary deductions (all as described in the Motion, and collectively with the Payroll Taxes, the "**Payroll Deduction Obligations**" and collectively with the Employee Compensation Obligations and Employee Benefit Obligations, the "**Prepetition Employee Obligations**"), (c) honor and continue the Debtors' prepetition programs, policies, and practices as described in the Motion with respect to the Prepetition Employee Obligations in the ordinary course of business, and (d) pay all prepetition claims of the Debtors' contracted labor (all as described in the Motion and collectively, the "**Prepetition Contracted Labor Obligations**") and (ii) granting certain related relief, all as more fully set forth in the Motion; and due and sufficient notice of the Motion having been provided under the particular circumstances, and it appearing that no other or further notice need be provided; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012; and consideration of the Motion and the relief requested therein being a core proceeding under 28 U.S.C. § 157(b)(2); and the Court having authority to enter a final order consistent with Article III of the United States Constitution; and venue being proper before this Court under 28 U.S.C. §§ 1408 and 1409; and a hearing having been held to consider the relief requested in the Motion (the "**Hearing**"); and upon the Knight Declaration and the record of the Hearing and all the proceedings before the Court; and the Court having found and determined the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates, as contemplated by Bankruptcy Rule 6003, and such relief to be in the best interests of the Debtors, their estates and creditors, and any parties in interest; and the legal and factual bases set forth in the Motion and at the Hearing having established just cause for the

2

relief granted herein; and after due deliberation thereon and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.    The Motion is granted on an interim basis as set forth herein.

2.    The Debtors are authorized but not directed, in their discretion and business judgment, to (i) pay or otherwise honor all Prepetition Employee Obligations, including prepetition severance obligations, in an amount not to exceed $16,150,000 on an interim basis; *provided* that the Debtors are not authorized to pay any severance obligations to any Senior Employee absent further order of the Court; (ii) honor and continue their programs, policies, and practices with respect to the Prepetition Employee Obligations that were in effect as of the Petition Date, in the ordinary course of business, and in the same manner and on the same basis as the Debtors honored and continued such programs, policies, and practices before the Petition Date, *provided* that the Debtors shall honor only the 2018 ICP Corrections, the Recognition Program and the Service Award Program, and no other Bonus and Incentive Plans under this Interim Order; *provided further* that the Debtors are not authorized to pay any amounts under any Bonus and Incentive Plan (including any paid time off in respect of accrued vacation days unless required by applicable non-bankruptcy law) to any Senior Employee absent further order of the Court; (iii) withhold all federal, state, and local taxes relating to the Employee Compensation Obligations and Employee Benefit Obligations as required by applicable law; and (iv) pay or otherwise honor the Prepetition Contracted Labor Obligations in an amount not to exceed $3,750,000 on an interim basis.

3.    Notwithstanding any other provision of this Interim Order and absent further order of the Court, (i) payments on account of prepetition obligations in the interim period shall be limited by sections 507(a)(4) and (a)(5) of the Bankruptcy Code and capped at the

amount afforded priority by those statutory subsections; and (ii) the Debtors are not authorized to "cash out" unpaid vacation days upon termination/resignation of an employee in excess of the caps provided by sections 507(a)(4) or (a)(5) of the Bankruptcy Code unless applicable state law requires such payment.

4.      The Debtors' banks and financial institutions are authorized to receive, process, honor, and pay all checks, drafts, electronic fund transfers, or other forms of payment drawn or issued on the Debtors' bank accounts before the Petition Date for Prepetition Employee Obligations and Prepetition Contracted Labor Obligations that have not been honored and paid as of the Petition Date (or to reissue checks, drafts, electronic fund transfers, or other forms of payment drawn or issued on the Debtors' bank accounts, as may be necessary), and are authorized to rely on the Debtors' representations as to which checks, drafts, transfers, or other forms of payment drawn or issued on the Debtors' bank accounts are subject to this Interim Order; *provided* that sufficient funds are on deposit in the applicable bank accounts to cover such payments.  Further, the Debtors' banks and financial institutions are prohibited from placing any holds on, or attempting to reverse, any automatic transfers to any account of an Employee or other party for Prepetition Employee Obligations or Prepetition Contracted Labor Obligations; *provided* that sufficient funds are on deposit in the applicable bank accounts to cover such transfers.

5.      The Debtors are authorized to reissue payment for the Prepetition Employee Obligations and Prepetition Contracted Labor Obligations and to replace any inadvertently dishonored or rejected payments. Further, the Debtors are authorized to reimburse any expenses that Employees or Contracted Labor may incur as a result of any bank's failure to honor a prepetition check.

4

6.     Notwithstanding anything in the Motion or this Interim Order to the contrary, any payment made or action taken by any of the Debtors pursuant to the authority granted herein, as well as the exercise of any and all other rights and authorizations granted or approved hereunder, shall be subject in all respects to, as applicable, the orders approving the Debtors' use of cash collateral and/or post-petition debtor-in-possession financing facilities (collectively, the "**DIP Orders**").

7.     Nothing in the Motion or this Interim Order or the relief granted herein (including any actions taken or payments made by the Debtors) is to be construed as (i) an admission of the validity of any claim against the Debtors; (ii) an admission with respect to the validity, extent, or perfection of any lien; (iii) a waiver of the Debtors' rights or those of any party in interest to dispute, contest, setoff, or recoup any claim, or assert any related rights, claims, or defenses; (iv) a waiver of the Debtors' rights or those of any party in interest over the validity, extent, perfection, or possible avoidance of any lien; or (v) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.

8.     The final hearing (the "**Final Hearing**") on the Motion will be held on _____, 2019, at____:_____.m. (Eastern Time). Any objections or responses to entry of a final order on the Motion must be filed on or before 4:00 p.m. (Eastern Time) on _____, 2019, and served on the following parties: (i) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 North King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: Linda J. Casey, Esq. (Linda.Casey@usdoj.gov)); (ii) Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022 (Attn: George Davis (George.Davis@lw.com), Andrew Parlen (Andrew.Parlen@lw.com), and Hugh Murtagh (Hugh.Murtagh@lw.com)) and 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611

(Attn: Caroline Reckler (Caroline.Reckler@lw.com) and Jason Gott (Jason.Gott@lw.com)), proposed co-counsel for the Debtors; and (iii) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Mark D. Collins (Collins@RLF.com), Michael J. Merchant (Merchant@RLF.com), Amanda R. Steele (Steele@RLF.com), and Brendan J. Schlauch (Schlauch@RLF.com)), proposed co-counsel for the Debtors.  In the event no objections to entry of a final order on the Motion are timely received, this Court may enter such final order without need for the Final Hearing.

9.      The requirements set forth in Bankruptcy Rule 6004(a) are hereby waived.

10.     Notwithstanding the applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

11.     The Debtors are authorized and empowered to take all actions necessary or appropriate to implement the relief granted in this Interim Order.

12.     This Court retains jurisdiction over all matters arising from or related to the implementation or interpretation of this Interim Order.

Dated: _____, 2019
        Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

**Exhibit B**

**Proposed Final Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | x | |
| In re: | : | Chapter 11 |
| | : | |
| HEXION HOLDINGS LLC, et al.,[1] | : | Case No. 19-10684 (  ) |
| | : | |
| Debtors. | : | Joint Administration Requested |
| | x | |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS
TO (A) PAY CERTAIN EMPLOYEE COMPENSATION AND BENEFITS,
(B) MAINTAIN AND CONTINUE SUCH BENEFITS AND OTHER EMPLOYEE-
RELATED PROGRAMS, AND (C) PAY PREPETITION CLAIMS OF CONTRACTED
LABOR AND (II) GRANTING RELATED RELIEF**

Upon the Debtors' motion (the "**Motion**")[2] for entry of a final order (this "**Final Order**") (i) authorizing the Debtors, in their discretion, as deemed necessary to continue to operate and preserve value, to (a) pay all prepetition wages, salaries, commissions, and compensation, and related administrative and incidental costs (all as described in the Motion and collectively, the "**Employee Compensation Obligations**") and prepetition employee benefits all as described in the Motion and collectively, the "**Employee Benefit Obligations**"), (b) pay all employment, unemployment, Social Security, and federal, state, and local taxes relating to the Employee Compensation Obligations and Employee Benefit Obligations, whether withheld from wages or paid directly by the Debtors to governmental authorities (collectively, "**Payroll Taxes**"), and make other payroll deductions, including, but not limited to, retirement and other

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Hexion Holdings LLC (6842); Hexion LLC (8090); Hexion Inc. (1250); Lawter International Inc. (0818); Hexion CI Holding Company (China) LLC (7441); Hexion Nimbus Inc. (4409); Hexion Nimbus Asset Holdings LLC (4409); Hexion Deer Park LLC (8302); Hexion VAD LLC (6340); Hexion 2 U.S. Finance Corp. (2643); Hexion HSM Holdings LLC (7131); Hexion Investments Inc. (0359); Hexion International Inc. (3048); North American Sugar Industries Incorporated (9735); Cuban-American Mercantile Corporation (9734); The West India Company (2288); NL Coop Holdings LLC (0696); and Hexion Nova Scotia Finance, ULC (N/A). The address of the Debtors' corporate headquarters is 180 East Broad Street, Columbus, Ohio 43215.

[2] Capitalized terms used but not defined in this Final Order have the meanings used in the Motion.

employee benefit plan contributions, union dues, garnishments, and voluntary deductions (all as described in the Motion, and collectively with the Payroll Taxes, the "**Payroll Deduction Obligations**" and collectively with the Employee Compensation Obligations and Employee Benefit Obligations, the "**Prepetition Employee Obligations**"), (c) honor and continue the Debtors' prepetition programs, policies, and practices as described in the Motion with respect to the Prepetition Employee Obligations in the ordinary course of business, and (d) pay all prepetition claims of the Debtors' contracted labor (all as described in the Motion and collectively, the "**Prepetition Contracted Labor Obligations**") and (ii) granting certain related relief, all as more fully set forth in the Motion; and due and sufficient notice of the Motion having been provided under the particular circumstances, and it appearing that no other or further notice need be provided; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012; and consideration of the Motion and the relief requested therein being a core proceeding under 28 U.S.C. § 157(b)(2); and the Court having authority to enter a final order consistent with Article III of the United States Constitution; and venue being proper before this Court under 28 U.S.C. §§ 1408 and 1409; and a hearing having been held to consider the relief requested in the Motion (the "**Hearing**"); and upon the Knight Declaration and the record of the Hearing and all the proceedings before the Court; and the Court having found and determined such relief to be in the best interests of the Debtors, their estates and creditors, and any parties in interest; and the legal and factual bases set forth in the Motion and at the Hearing having established just cause for the relief granted herein; and after due deliberation thereon and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

US-DOCS\105687250.29 RLF1 21032675v.1

1.      The Motion is granted on a final basis as set forth herein.

2.      The Debtors are authorized but not directed, in their discretion and business judgment, to (i) pay or otherwise honor all Prepetition Employee Obligations, including prepetition severance obligations; *provided* that the Debtors are not authorized to pay any prepetition or postpetition severance obligations to any Insider absent further order of the Court; (ii) honor and continue their programs, policies, and practices with respect to the Prepetition Employee Obligations that were in effect as of the Petition Date, in the ordinary course of business, and in the same manner and on the same basis as the Debtors honored and continued such programs, policies, and practices before the Petition Date, including all Bonus and Incentive Plans; *provided* that the Debtors are not authorized to pay any amounts under the 2016 LTI to any Insider absent further order of the Court; (iii) withhold all federal, state, and local taxes relating to the Employee Compensation Obligations and Employee Benefit Obligations as required by applicable law; and (iv) pay or otherwise honor the Prepetition Contracted Labor Obligations.

3.      The Debtors' banks and financial institutions are authorized to receive, process, honor, and pay all checks, drafts, electronic fund transfers, or other forms of payment drawn or issued on the Debtors' bank accounts before the Petition Date for Prepetition Employee Obligations and Prepetition Contracted Labor Obligations that have not been honored and paid as of the Petition Date (or to reissue checks, drafts, electronic fund transfers, or other forms of payment drawn or issued on the Debtors' bank accounts, as may be necessary), and are authorized to rely on the Debtors' representations as to which checks, drafts, transfers, or other forms of payment drawn or issued on the Debtors' bank accounts are subject to this Final Order; *provided* that sufficient funds are on deposit in the applicable bank accounts to cover such

US-DOCS\105687250.29 RLF1 21032675v.1

payments.  Further, the Debtors' banks and financial institutions are prohibited from placing any holds on, or attempting to reverse, any automatic transfers to any account of an Employee or other party for Prepetition Employee Obligations or Prepetition Contracted Labor Obligations; *provided* that sufficient funds are on deposit in the applicable bank accounts to cover such transfers.

4.      Notwithstanding anything in the Motion or this Final Order to the contrary, any payment made or action taken by any of the Debtors pursuant to the authority granted herein, as well as the exercise of any and all other rights and authorizations granted or approved hereunder, shall be subject in all respects to, as applicable, the orders approving the Debtors' use of cash collateral and/or post-petition debtor-in-possession financing facilities (collectively, the "**DIP Orders**").

5.      The Debtors are authorized to reissue payment for the Prepetition Employee Obligations and Prepetition Contracted Labor Obligations and to replace any inadvertently dishonored or rejected payments.  Further, the Debtors are authorized to reimburse any expenses that Employees or Contracted Labor may incur as a result of any bank's failure to honor a prepetition check.

6.      Nothing in the Motion or this Final Order or the relief granted herein (including any actions taken or payments made by the Debtors) is to be construed as (i) an admission of the validity of any claim against the Debtors; (ii) an admission with respect to the validity, extent, or perfection of any lien; (iii) a waiver of the Debtors' rights or those of any party in interest to dispute, contest, setoff, or recoup any claim, or assert any related rights, claims, or defenses; (iv) a waiver of the Debtors' rights or those of any party in interest over the

4

validity, extent, perfection, or possible avoidance of any lien; or (v) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.

7.      The requirements set forth in Bankruptcy Rule 6004(a) are hereby waived.

8.      Notwithstanding the applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

9.      The Debtors are authorized and empowered to take all actions necessary or appropriate to implement the relief granted in this Final Order.

10.     This Court retains jurisdiction over all matters arising from or related to the implementation or interpretation of this Final Order.

Dated: _____, 2019
         Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

US-DOCS\105687250.29 RLF1 21032675v.1