## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------ x

In re:                    :      Chapter 11

                        :

HEXION HOLDINGS LLC, et al.,[1]    :      Case No. 19-10684 (KG)

                        :

          Debtors.         :      Jointly Administered

                        :

                        :      **Proposed Obj. Deadline: May 9, 2019 at 4:00 p.m. (ET)**

------------------------------------------------------------------ x   **Proposed Hr'g Date: May 15, 2019 at 3:00 p.m. (ET)**

## DEBTORS' MOTION FOR ENTRY OF ORDERS
## (A) APPROVING ASSUMPTION OF RESTRUCTURING SUPPORT
## AGREEMENT, (B) AUTHORIZING ENTRY INTO AND PERFORMANCE UNDER
## EQUITY BACKSTOP AGREEMENT, AND (C) AUTHORIZING ENTRY INTO AND
## PERFORMANCE UNDER DEBT BACKSTOP AGREEMENT

Hexion Holdings LLC ("**Hexion**") and its affiliated debtors and debtors in

possession (collectively, the "**Debtors**") respectfully submit this motion for the entry of orders,

substantially in the forms attached hereto as Exhibit A (the "**RSA Assumption Order**"), Exhibit B

(the "**Equity Backstop Approval Order**"), and Exhibit C (the "**Debt Backstop Approval**

**Order**"), pursuant to sections 105(a), 363(b), 365(a) and 503 of title 11 of the United States Code

(the "**Bankruptcy Code**"), and rule 6006 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**"), (a) authorizing the Debtors' (i) assumption of the restructuring support

agreement (as amended, modified or supplemented from time to time, the "**RSA**") among the

Debtors and the Consenting Parties (as defined below), a copy of which is attached to the RSA

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Hexion Holdings LLC (6842); Hexion LLC (8090); Hexion Inc. (1250); Lawter International Inc. (0818); Hexion CI Holding Company (China) LLC (7441); Hexion Nimbus Inc. (4409); Hexion Nimbus Asset Holdings LLC (4409); Hexion Deer Park LLC (8302); Hexion VAD LLC (6340); Hexion 2 U.S. Finance Corp. (2643); Hexion HSM Holdings LLC (7131); Hexion Investments Inc. (0359); Hexion International Inc. (3048); North American Sugar Industries Incorporated (9735); Cuban-American Mercantile Corporation (9734); The West India Company (2288); NL Coop Holdings LLC (0696); and Hexion Nova Scotia Finance, ULC (N/A). The address of the Debtors' corporate headquarters is 180 East Broad Street, Columbus, Ohio 43215.

Assumption Order as <u>Exhibit 1</u> and (ii) performance thereunder; (b) authorizing and approving the Debtors' (i) entry into and performance under a backstop agreement (the "**Equity Backstop Agreement**") among the Debtors and certain of the Consenting Noteholders (as defined below), a copy of which is attached to the Equity Backstop Approval Order as <u>Exhibit 1</u>, (ii) payment of the Equity Backstop Commitment Premium (as defined below) and Equity Expense Reimbursement (as defined below), and (iii) incurrence of the Equity Backstop Indemnity Obligations (as defined below); and (c) authorizing and approving the Debtors' (i) entry into and performance under a backstop agreement (the "**Debt Backstop Agreement**" and, together with the Equity Backstop Agreement, the "**Backstop Agreements**") among the Debtors and certain of the Consenting Noteholders, a copy of which is attached to the Debt Backstop Approval Order as <u>Exhibit 1</u>, (ii) payment of the Debt Commitment Premiums and the Debt Expense Reimbursement (each as defined below), and (iii) incurrence of the Debt Backstop Indemnity Obligations (as defined below).  In support of this motion, the Debtors respectfully represent:

## **PRELIMINARY STATEMENT**

1.    The Debtors' contemplated restructuring, as memorialized in the RSA and the Plan (as defined below) it contemplates, has overwhelming support at every level of the Debtors' capital structure, maximizes recoveries to all of the Debtors' creditors (including providing for the unimpairment of all of the Debtors' trade and other general unsecured creditors), substantially de-levers the Debtors' balance sheet, and is capable of being implemented expeditiously.  The RSA provides the framework for the Debtors to pursue confirmation and consummation of that Plan with the support of the holders of the vast majority of their funded indebtedness and resolves a variety of complex factual and legal disputes that would otherwise be the subject of expensive and protracted litigation resulting in significant uncertainty in these cases.

Accordingly, maximizing and preserving all the benefits of the RSA represents a critical step for the Debtors in their efforts to emerge from chapter 11 swiftly and positioned for success.

2.      The Debtors require financing in order to emerge successfully and provide the negotiated recoveries agreed to by the Consenting Noteholders.  The Plan and the RSA allow the Debtors to achieve such goals on a swift timeline and with significant support across the Debtors' capital structure.  Among other things, the Plan contemplates debt and equity financing transactions that will generate nearly $2 billion of fresh capital to fund certain distributions contemplated by the Plan and agreed to with the Consenting Parties to resolve the factual and legal disputes among the parties.  This motion seeks approval of the Equity Backstop Agreement and the Debt Backstop Agreement ensuring those capital raises will be consummated.  More specifically, the Debtors' new capital will come in the form of (a) approximately $1.6 billion of new debt financing (the "**New Debt**") and (b) $300 million of equity financing to be generated in a rights offering open to all holders of the Debtors' prepetition notes (the "**Rights Offering**").  In connection with entering into the RSA, the Backstop Parties (as defined below) (comprised of certain of the Consenting Noteholders (as defined below)) agreed, pursuant to the Backstop Agreements, to backstop both of these transactions, committing almost $2 billion of capital to the Debtors' restructuring and ensuring that the Debtors will be able to consummate an expeditious restructuring on a consensual basis and emerge with (a) sufficient liquidity to fund go forward operations and (b) a sustainable capital structure.  Moreover, pursuant to the terms of the Plan as contemplated by the RSA, the Debtors' workforce ride through unimpaired.  Critically, the Backstop Parties have agreed to do so on fair and reasonable terms that were the product of good faith, vigorous negotiations, as reflected in the Backstop Agreements (and discussed in greater detail below).

3. Thus, approval of the Debtors' assumption of the RSA and entry into the Backstop Agreements is integral to the Debtors' ability to keep their promising restructuring efforts on track and maximize value for all stakeholders. Absent these approvals, these agreements may terminate on their terms or may relieve the applicable counterparties from their obligation to honor them, leaving the Debtors without a clear path forward in these cases, to the detriment of the Debtors, their estates, and creditors. Accordingly, the Debtors respectfully submit that the relief requested herein should be granted, so that the Debtors can continue to proceed toward a consensual, value-maximizing resolution of these cases with the support of a significant majority of creditors across the Debtors' entire capital structure.

## JURISDICTION AND VENUE

4. This Court has jurisdiction to consider this motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b), and, under rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue of these cases and this motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief requested herein are sections 105(a), 363(b), 365(a) and 503 of the Bankruptcy Code and Bankruptcy Rule 6006.

## BACKGROUND

5. On April 1, 2019 (the "**Petition Date**"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court

for the District of Delaware.  The Debtors are authorized to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On April 10, 2019, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed the Official Committee of Unsecured Creditors (the "**Creditors Committee**")

6.    Additional information about the Debtors' business, capital structure, and the events leading up to the Petition Date are set forth in the *Declaration of George F. Knight, Executive Vice President and Chief Financial Officer, in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "**Knight Declaration**") [Docket No. 3], filed on the Petition Date.[2]

## RELIEF REQUESTED

7.    By this motion, pursuant to sections 105(a), 363(b), and 365(a) of the Bankruptcy Code, the Debtors respectfully request entry of (a) the RSA Assumption Order, authorizing their assumption of the RSA and performance thereunder, (b) the Equity Backstop Approval Order, authorizing their entry into and performance under the Equity Backstop Agreement, and (c) the Debt Backstop Approval Order, authorizing their entry into and performance under the Debt Backstop Agreement.

## THE RESTRUCTURING SUPPORT AGREEMENT

8.    In early 2019, the Debtors, with the assistance of their advisors, initiated a process directly with their creditors to evaluate and consider various potential strategic and financial alternatives for the Debtors with a view to maximizing enterprise value, including, among other alternatives, a debt or equity financing, or a recapitalization, either in or out of court.  The

---

[2] Capitalized terms used but not defined in this motion have the meanings used in the Knight Declaration.

Debtors focused their restructuring efforts on discussions with certain holders of the First Lien Notes (the "**First Lien Group**"), certain holders of the 1.5 Lien Notes (the "**1.5 Lien Group**"), and a group with holdings across the capital structure (the "**Crossover Group**" and together with the First Lien Group and the 1.5 Lien Group, the "**Ad Hoc Groups**").  The primary goal of those discussions, and these chapter 11 cases, was and is to restructure the Debtors' balance sheet through a plan of reorganization that enjoys the maximum achievable creditor support, is fair to all creditors and other stakeholders, and positions the Debtors for success upon emergence.

9.    After the advisors to the Ad Hoc Groups commenced due diligence on the Debtors through information provided in an online data room, the Debtors commenced good-faith, arm's-length negotiations with the Ad Hoc Groups regarding a potential restructuring that would materially de-lever the Debtors' balance sheet and allow the Debtors to retain sufficient liquidity to continue to operate their businesses going forward.  In the course of these negotiations, the Debtors and the Ad Hoc Groups exchanged and considered, with the assistance of their respective advisors, numerous standalone and joint restructuring proposals.

10.    Ultimately, the Debtors reached a global agreement with all three of the Ad Hoc Groups and executed the RSA on April 1, 2019, with the members thereof (collectively, the "**Consenting Noteholders**") and certain equityholders that beneficially own more than a majority of the Company (the "**Consenting Sponsors**," and collectively with the Consenting Noteholders, the "**Consenting Parties**").  The RSA[3] enjoys support at every level of the Debtors' prepetition capital structure, and, as of the date of this motion, its signatories include holders of approximately 90 percent of the debt to be restructured.

---

[3] This description of the RSA is qualified in its entirety by reference to the RSA itself.

11.     As demonstrated by this broad support, the restructuring embodied in the RSA will decrease the Debtors' existing leverage by over 50% and give the Debtors a solid foundation for future success.  The chapter 11 plan contemplated thereunder (the "**Plan**") provides for the following:

- payment in full of all Administrative Claims;

- a recovery for Class 1 Other Secured Claims consisting of (a) payment in full in cash, (b) delivery of the collateral securing any such claim and payment of any interest required under section 506(b) of the Bankruptcy Code, (c) reinstatement of such claim, or (d) other treatment rendering such claim unimpaired;

- a recovery for Class 2 First Lien Notes Claims of each holder's pro rata share of (i) $1,450,000,000 (subject to certain adjustments), (ii) 72.5% of New Common Equity (as defined in the Plan) (subject to dilution for equity issued pursuant to the Rights Offering, the equity issued pursuant to the Management Incentive Plan (as defined in the Plan) and any equity issued pursuant to the Equity Backstop Commitment Premium and the Debt Backstop Commitment Premium), and (iii) 72.5% of the rights to be issued in the Rights Offering;

- a recovery for Class 3 Junior Notes Claims of each holder's pro rata share of (i) 27.5% of New Common Equity (subject to dilution for the equity issued pursuant to the Rights Offering, the equity issued pursuant to the Management Incentive Plan (as defined in the Plan) and any equity issued pursuant to the Equity Backstop Commitment Premium and the Debt Backstop Commitment Premium), and (ii) 27.5% of the rights to be issued in the Rights Offering;

- payment in full in cash of all Class 4 General Unsecured Claims;

- a new asset-backed revolving credit facility, the New Debt of approximately $1.6 billion, and the Rights Offering of New Common Equity sized to yield $300 million in cash proceeds; and

- releases by the Debtors and third parties, and exculpation and injunction provisions.

12.     The RSA contains certain covenants on the part of the Debtors and the Consenting Parties, including that the Debtors will pursue, and the Consenting Parties will support, the Plan and otherwise facilitate the restructuring transactions contemplated by the RSA, in each

case subject to certain terms and conditions in the RSA. In consideration of their significant commitments under the RSA, the Debtors have agreed to pay all fees and expenses of the advisors to the Ad Hoc Groups (including any back-end, transaction, success or similar fees provided for under the applicable fee or engagement letters with the Debtors), as further set forth in section 27 of the RSA.

13.    Importantly, the RSA also is terminable upon the occurrence of certain events, including some that may occur automatically unless and until the RSA Assumption Order is entered and certain events that may occur after notice to the Debtors from and after entry of the RSA Assumption Order. However, in general, if a Consenting Creditor Termination Event is triggered, the RSA is terminable only as to such Consenting Party and will otherwise remain in full force and effect. The termination events set forth in the RSA include, among other customary termination events and without limitation:

- a breach by the Debtors or any Consenting Party of any obligation or the making of any untrue representation or warranty under the RSA, subject to a ten (10) business day cure period;

- the Debtors or any Consenting Party filing any pleading that is materially inconsistent with the RSA, that challenges the amount, validity, or priority of any claims held by the Consenting Noteholders, or that asserts any claims or causes of action against the Consenting Noteholders;

- any Definitive Document (as defined in the RSA) is filed that is inconsistent with the RSA;

- the failure to meet any Milestone (as defined in the RSA);[4]

---

[4] The Milestones are set forth in Section 3 of the RSA and include, in relevant part, the following: (a) entry of the Final DIP Order by May 16, 2019; (b) entry of the orders granting the relief requested in this motion by May 31, 2019; (c) entry of the Disclosure Statement Order by June 30, 2019; (d) commencement of the confirmation hearing by August 4, 2019; and (e) the occurrence of the Effective Date of the Plan by August 29, 2019. The Debtors have previously agreed not to seek termination based on the original April 15, 2019 milestone dates (or the April 17, 2019 extended milestone dates) for execution of the Equity Backstop Agreement and the Debt Backstop Agreement.

- the termination or acceleration of the Debtors' DIP Facility (as defined in the RSA);

- any termination event in favor of the Required Consenting First Lien Noteholders, the Required Consenting 1.5L Noteholders, or the Required Consenting Crossholder Noteholders (each as defined in the RSA) or event of default by the Debtors under the Equity Backstop Agreement or the Debt Backstop Agreement;

- the Debtors withdrawing the Plan, announcing their intention not to support the Plan, agreeing to pursue or filing a motion seeking approval of an Alternative Transaction (as defined in the RSA), or announcing or seeking authority to sell any material assets without the prior written consent of the applicable Consenting Noteholders; or

- the failure of the Consenting Noteholders to hold, in the aggregate, at least (a) 66 2/3% of the aggregate principal amount outstanding of the 1L Notes; (b) 66 2/3% of the aggregate principal amount outstanding of the 1.5L Notes; and (c) 66 2/3% of the aggregate principal amount outstanding of the 2L Notes and the Unsecured Notes.

14.     Finally, and critically, the RSA allows the Debtors to fulfill their fiduciary duties to all of their stakeholders.  The Debtors are permitted to terminate the RSA (among other termination rights) if "the board of directors or managers or similar governing body, as applicable, of any Company Entity determines that continued performance under this Agreement (including taking any action or refraining from taking any action) would be inconsistent with the exercise of its fiduciary duties under applicable law (as reasonably determined by such board or body in good faith after consultation with legal counsel)."  Furthermore, the RSA is explicit that "[n]othing in this Agreement shall require any director or officer of any Company Entity to violate their fiduciary duties to such Company Entity."

15.     The RSA, without a doubt, was and is key to the Debtors' ability to efficiently effectuate a significant de-levering of their balance sheet.  With the RSA underpinning this restructuring, the Debtors stand poised to emerge from these chapter 11 cases expeditiously,

avoiding what otherwise likely would have been an expensive, litigious, and protracted stint in bankruptcy.

## THE EQUITY BACKSTOP AGREEMENT

16.     The Rights Offering and the agreement of certain of the Consenting Noteholders to backstop it are critical to the Debtors' Plan.[5]  Under the Plan, all holders of the Debtors' prepetition notes will have the opportunity to participate in the Rights Offering and purchase New Common Equity issued by the reorganized Debtors in an aggregate amount of $300 million at a price per share determined by using the pro forma capital structure and agreed plan equity value of $1.374 billion and applying a 35% discount to that equity value thereto on a per-share basis (after giving effect to the Rights Offering and the issuance of equity to creditors pursuant to the treatment prescribed in the Plan, but not equity issued in connection with the Equity Backstop Commitment Premium or the Debt Backstop Commitment Premium (each as defined below)).  The inclusion of the Rights Offering was material and necessary to achieve the negotiated compromises embodied in the RSA and the recoveries contemplated thereby.  Although the Debtors will offer all holders of their prepetition notes the opportunity to participate in the Rights Offering, the Debtors may be unable to obtain sufficient commitments from such holders to subscribe to shares for the full $300 million to be generated by the Rights Offering.  To ensure that the Rights Offering will remain fully-funded in that instance, the Equity Backstop Parties have agreed, pursuant to the Equity Backstop Agreement, to backstop, on a several and not joint basis, the Rights Offering and to purchase any of the equity offered in the Rights Offering that is not subscribed for by the Debtors' noteholders.

---

[5] In their capacity as backstop parties for the Rights Offering, the applicable Consenting Noteholders are referred to as the "**Equity Backstop Parties**."

17.    In consideration for the Equity Backstop Parties' commitments, they will receive a backstop premium equal to 8% of the Rights Offering Amount (or $24 million) payable in the Debtors' reorganized equity or, at the election of each Equity Backstop Party, in cash, subject to potential downward adjustment (in the aggregate) in the event that an Equity Backstop Party defaults on its backstop commitments and the Rights Offering proceeds are less than $300 million, provided that such downward adjustment shall not reduce the amount of the premium payable to non-defaulting Equity Backstop Parties (the "**Equity Backstop Commitment Premium**").  Under the proposed Equity Backstop Approval Order, the Equity Backstop Commitment Premium will be deemed an administrative expense of the Debtors' estates and will be payable (a) upon closing of the Rights Offering or (b) after termination of the Equity Backstop Agreement and within three business days of the consummation of an Alternative Transaction (as customarily defined in the Backstop Agreements and RSA, but excluding, for the avoidance of doubt, the pursuit and entry into exit financing arrangements with third parties contemplated by the Debt Backstop Agreement) if the Equity Backstop Agreement is terminated on account of the Debtors (i) exercising their "fiduciary out," (ii) pursuing an Alternative Transaction, (iii) attempting to unilaterally amend the Equity Backstop Agreement or other definitive transaction agreements in a manner inconsistent with the terms of the Equity Backstop Agreement, (iv) attempting to disavow, revoke or terminate the Equity Backstop Agreement or other transaction agreements, or (v) committing a Debtor Breach Termination Event (generally, a willful or intentional breach of the RSA or Backstop Agreements that, in the case of the Backstop Agreements, would cause a failure of certain conditions to close or a failure to close by the applicable outside date) and the Debtors subsequently enter into a definitive agreement with respect to an Alternative Transaction within twelve (12) months.  In addition to the Equity Backstop Commitment Premium, the Debtors agreed to pay all

reasonable and documented fees and expenses of the advisors to the Equity Backstop Parties under the Equity Backstop Agreement, including if the Equity Backstop Agreement is terminated, other than an automatic termination or a termination by the Equity Backstop Parties (the "**Equity Expense Reimbursement**").

18.     The Equity Backstop Agreement contains customary representations and warranties, including as to certain operational matters, and covenants concerning, among other things, the Debtors' interim operations between signing and closing, efforts to obtain necessary antitrust and other regulatory approvals, and information sharing.  In addition to providing for consensual termination rights, the Equity Backstop Agreement automatically terminates on the occurrence of certain events, including events related to timing and achievement of milestones and the DIP Facility and if the closing has not occurred by an outside date of August 29, 2019 (as such date may be extended by the Equity Backstop Parties), as well as provides for individual termination rights for each of the Debtors and the Equity Backstop Parties related to, among other things, breaches of the Equity Backstop Agreement and legal impossibility.  The Debtors are also able to terminate the Equity Backstop Agreement if they determine continued performance under the agreement would be inconsistent with the exercise of their fiduciary duties.  Pursuant to the Equity Backstop Agreement, the Debtors will indemnify and hold harmless the Equity Backstop Parties from claims by a third party arising out of or in connection with the Equity Backstop Agreement (the "**Equity Backstop Indemnity Obligations**").

19.     The Debtors and the Equity Backstop Parties negotiated the Equity Backstop Agreement, which is integral to the restructuring transaction contemplated by the RSA and the Plan, in good faith and at arm's-length.  After such negotiations, the Debtors have determined, in the exercise of their business judgment, that the Equity Backstop Parties'

commitment to backstop the Rights Offering is vital to the Debtors' ability to consummate the Plan and emerge with appropriate levels of liquidity and leverage, and that the Debtors' entry into the Equity Backstop Agreement is therefore necessary and appropriate.

## THE DEBT BACKSTOP AGREEMENT

20.    The single largest source of capital for the reorganized Debtors will be the New Debt, totaling more than $1.6 billion.  With the proceeds of the New Debt, the Debtors will be able to fund cash payments to the First Lien Noteholders under the Plan and emerge from chapter 11 with adequate cash on their balance sheet.

21.    Since the Petition Date, the Debtors have been developing and executing a robust process to solicit and obtain the most favorable terms for the New Debt available in the market.  Despite doing so, however, there can be no assurance that debt financing will be obtained from third parties either in sufficient amounts or on acceptable terms.  The Debtors, recognizing this fact, obtained commitments from certain of the Consenting Noteholders to backstop the New Debt (in such capacity, the "**Debt Backstop Parties**" and, together with the Equity Backstop Parties, the "**Backstop Parties**") by locking in terms on which the Debt Backstop Parties will fund the New Debt, as set forth in the Debt Backstop Agreement.

22.    In consideration for the Debt Backstop Parties' commitments, they will receive a backstop premium equal to 3.375% of the New Debt (or $55,383,750) payable in cash or, at the election of each Debt Backstop Party, in the Debtors' reorganized equity (the "**Debt Backstop Commitment Premium**").  In addition, certain of the Debt Backstop Parties will share an additional premium equal to 1.5% of the New Debt (or $24,615,000), payable in cash (the "**Additional Premium**" and, together with the Debt Backstop Commitment Premium, the "**Debt Commitment Premiums**").  Under the proposed Debt Backstop Approval Order, and as with the premiums under the Equity Backstop Agreement, the Debt Commitment Premiums will be deemed

an administrative expense of the Debtors' estates and will be payable (a) upon closing of the New Debt or (b) after termination of the Debt Backstop Agreement and within three business days of the consummation of an Alternative Transaction if the Debt Backstop Agreement is terminated on account of substantially similar circumstances as the Equity Backstop Agreement, as described above.  In addition to the Debt Commitment Premiums, the Debtors agreed to pay all reasonable and documented fees and expenses of the advisors to the Debt Backstop Parties (including advisors' fees) under the Debt Backstop Agreement, including if the Debt Backstop Agreement is terminated (the "**Debt Expense Reimbursement**" and, together with the Equity Expense Reimbursement, the "**Expense Reimbursements**").

23.    The Debt Backstop Agreement contains substantially similar representations and warranties, covenants and conditions, and termination rights to the Equity Backstop Commitment Agreement.  Pursuant to the Debt Backstop Agreement, the Debtors will indemnify and hold harmless the Debt Backstop Parties from claims by a third party arising out of or in connection with the Debt Backstop Agreement (the "**Debt Backstop Indemnity Obligations**").

24.    The Backstop Facility (as defined in the Debt Backstop Commitment Agreement) will be structured as an offering of senior secured notes issued by Hexion Inc., guaranteed by its U.S. subsidiaries (and any other subsidiary that guarantees the Debtors' other exit financing), and secured by liens and security interests (the "**Liens**") in substantially all of the assets of the obligors thereunder, subject to certain exceptions.  Subject to certain "structure flex" provisions set forth in the term sheet governing the Backstop Facility (the "**Term Sheet**"),[6] the

---

[6] The "structure flex" provisions give Commitment Parties the right to subordinate the Liens to the liens securing the Syndicated Exit Facility (as defined below), in exchange for an increase in interest rate.

Liens will be *pari passu* with liens securing any Syndicated Exit Facility (as defined in the Debt Backstop Agreement) (i.e., the exit credit facility or notes being backstopped by the Backstop Parties), and, solely with respect to receivables, inventory and certain related assets, will be junior to the liens on such collateral securing the Debtors' new asset-backed revolving credit facility. The Backstop Facility will have a maturity of seven (7) years, or, if sooner, 6 months after maturity of any Syndicated Exit Facility that is incurred as one or more term loan facilities. Further, the Backstop Facility contains make whole/redemption premiums as specified in the Term Sheet, as well as covenants and events of default that will be consistent with market terms.

       25.    The Debtors and the Debt Backstop Parties negotiated the Debt Backstop Agreement in good faith and at arm's-length. In light of the benefits provided by the Debt Backstop Agreement, the Debtors have determined, in the exercise of their business judgment, that entry into the Debt Backstop Agreement is necessary and appropriate.

## **BASIS FOR RELIEF REQUESTED**

I.      **ASSUMING THE RSA AND PERFORMANCE THEREUNDER IS A SOUND EXERCISE OF THE DEBTORS' BUSINESS JUDGMENT AND SHOULD BE APPROVED.**

       26.    Section 365(a) of the Bankruptcy Code authorizes a debtor-in-possession to assume an executory contract or unexpired lease, subject to the bankruptcy court's approval. *See* 11 U.S.C. § 365(a). Courts apply the business judgment rule to determine whether a debtor's decision to assume an executory contract or an unexpired lease should be approved. *See, e.g.*, *Sharon Steel Corp. v. National Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.)*, 872 F.2d 36, 40 (3d Cir. 1989); *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (describing the business judgment test as the "traditional" test); *In re III Enterprises, Inc. V*, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) (citations omitted) ("Generally, a court will give great deference to a debtor's decision to assume or reject the contract. A debtor need only show that its decision to assume or

reject the contract is an exercise of sound business judgment – a standard which we have concluded many times is not difficult to meet."). So long as assumption of the contract or lease is an exercise of the debtor's sound business judgment and the debtor otherwise satisfies the requirements of section 365(b), the assumption should be approved. *See In re Sharon Steel Corp.*, 872 F.2d at 40.

27. The Debtors' decision to assume the RSA here satisfies the sound business judgment standard. The RSA is the product of arm's length, hard-fought negotiations among the Debtors and the Consenting Parties. The Plan contemplated by the RSA comprehensively resolves a variety of disputes that, in the absence of this resolution, would have required expensive and protracted litigation that would have undoubtedly sidetracked the Debtors' reorganization efforts, extended the duration of the Debtors' bankruptcy cases and imposed a level of uncertainty onto the Debtors' ability to emerge successfully. These disputes relate to, among other things, (a) the Debtors' total enterprise value, (b) the scope of the "Principal Properties" exclusion in the prepetition collateral agreements relating to the Debtors' prepetition funded indebtedness and (c) the value of those properties. Importantly, in reaching the agreements embodied in the RSA, the Consenting Noteholders agreed to the unimpairment of trade creditors and agreed to the terms of the Debtors' DIP Financing. Absent the RSA and the Backstop Agreements, it is doubtful that the Consenting Noteholders would have supported a plan that unimpairs the Debtors' general unsecured creditors or the DIP financing. Indeed, the Debtors believe one or more of the Ad Hoc Groups would have opposed the foregoing.

28. In stark contrast, the RSA provides the Debtors with an expeditious path forward to a balance sheet restructuring that enjoys broad-based support among the Debtors' creditor constituencies and maximizes recoveries across the capital structure. The RSA provides a framework for the Debtors to pursue confirmation of a consensual Plan providing for a multi-

billion dollar deleveraging of the Debtors, the unimpairment of all trade and other general unsecured claims, and significant recoveries to holders of the Debtors' funded indebtedness (along with upside in the Debtors' business going forward through the issuance of equity on account of their claims and the opportunity to participate in the Rights Offering).  At the same time, the RSA preserves the Debtors' ability to fulfill their fiduciary duties through the "fiduciary out" provisions described above, should the Debtors' fiduciary duty to maximize the value of their estates require the Debtors to pursue a different transaction.  Absent assumption of the RSA, these benefits would be lost, as the RSA is subject to termination in the event that an order authorizing assumption of the RSA is not entered within sixty (60) days of the Petition Date.  (RSA, § 3(d)).

29.     Finally, in assuming the RSA, the Debtors' obligations to pay or reimburse the fees and expenses of the advisors to the Ad Hoc Groups will appropriately be provided administrative expense status as "actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A).  These obligations were key aspects of the consideration that brought the Consenting Noteholders to the table to negotiate the Debtors' restructuring and to their agreements underlying the RSA, the Plan, and all the transactions comprising this reorganization.

30.     Courts in this and other districts have approved debtors' assumption of restructuring support agreements.  *See, e.g. In re New Mach Gen, LLC*, Case No. 18-11368 (MFW) (Bankr. D. Del. July 2, 2018) [D.I. 92] (authorizing debtors to assume restructuring support agreement); *In re FirstRain, Inc.*, Case No. 17-11249 (LSS) (Bankr. D. Del. Jun. 21, 2017) [D.I. 80] (authorizing debtors to enter restructuring support agreement); *In re Aspect Software Parent, Inc.*, Case No. 16-10597 (MFW) (Bankr. D. Del. Apr. 21, 2016) [D.I. 219] (authorizing debtors to assume and perform under a plan support agreement); *In re Altegrity, Inc.*, Case No. 15-10226 (LSS) (Bankr. D. Del. Mar. 16, 2015) [D.I. 208] (authorizing debtors to assume a restructuring

support agreement); *In re Exide Technologies*, Case No. 13-11482 (KJC) (Bankr. D. Del. Feb. 4, 2015) [D.I. 3087] (authorizing debtors to enter into a plan support agreement).

## II.   THE DEBTORS' ENTRY INTO AND PERFORMANCE UNDER THE EQUITY BACKSTOP AGREEMENT AND DEBT BACKSTOP AGREEMENT REFLECTS A SOUND EXERCISE OF BUSINESS JUDGMENT AND SHOULD BE APPROVED, AND THE DEBTORS' OBLIGATIONS THEREUNDER ARE ENTITLED TO ADMINISTRATIVE EXPENSE STATUS.

31.     Under section 363(b)(1) of the Bankruptcy Code, a debtor may, in the exercise of its sound business judgment and after notice and a hearing, "use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Generally, the debtor is only required to "show that a sound business purpose" justifies the proposed use of property.  *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring "good business reason" for use under section 363(b) of the Bankruptcy Code).  This standard prohibits other parties from second-guessing the debtor's business judgment if the debtor has shown that the proposed use will benefit the debtor's estate.  *See In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

32.     The Debtors have exercised sound business judgment in determining to enter into the Equity Backstop Agreement and Debt Backstop Agreement.  These two Backstop Agreements, pursuant to which the relevant Backstop Parties are committing to provide up to nearly $2 billion of debt and equity financing (in the aggregate) to fund Plan distributions and provide currency to resolve myriad intercreditor disputes, are highly integrated with the RSA and represent the financial "backbone" of the Plan.  Together, they ensure that the Debtors' rights

18

offering and exit financing will be fully-funded, and that the Debtors will have adequate liquidity upon emergence to (a) make the cash distributions contemplated by the Plan and (b) fund their post-emergence operations. Both the Equity Backstop Agreement and Debt Backstop Agreement were negotiated at arm's length, and in good faith, by the Debtors and the Backstop Parties, who, as the Debtors' potential future equityholders, share the Debtors' goal of an expeditious, value-maximizing restructuring.  All parties recognize that the commitments provided under the Equity Backstop Agreement and Debt Backstop Agreement are integral to achievement of those goals.

33.     The commitment premiums (i.e., the Debt Commitment Premiums and Equity Backstop Commitment Premium) and Expense Reimbursements are reasonable and appropriate under the circumstances.  These amounts represent compensation for the capital commitments that the Equity Backstop Parties and Debt Backstop Parties are providing under the applicable Backstop Agreements, are reflective of the certainty and other benefits that those commitments provide to the Debtors and their estates, and were necessary inducements for the applicable Backstop Parties to enter into the Backstop Agreements.  Notably, the Debtors anticipate that a substantial portion of the Debt Commitment Premiums and Equity Backstop Commitment Premium will be payable in equity of the reorganized Debtors, rather than cash.  In addition, payment of the Expense Reimbursements is also warranted in light of the Backstop Parties' good faith negotiation of the RSA and Backstop Agreements and other agreements and documents necessary to implement the restructuring contemplated thereby, including the Plan.

34.     These provisions, and in particular, the circumstances under which the Debt Commitment Premiums and Equity Backstop Commitment Premium are payable in cash in the event that the applicable financings are *not* consummated, were the subject of vigorous negotiations among the parties.  As set forth in the applicable agreements, in the event the Backstop

Agreements are terminated, these fees will *only* be payable under the limited circumstances identified for each of the Backstop Agreements above.    Accordingly, the scope of the circumstances in which the commitment premiums will be payable is appropriately narrow, and the Debtors have eliminated the risk of a "hair trigger" default requiring payment of those premiums.

35.    Courts in this and other districts have approved payment of commitment premiums and expense reimbursements in other chapter 11 cases. *See, e.g.*, *In re Aspect Software Parent, Inc.*, Case No. 16-10597 (Bankr. D. Del. Mar. 9, 2016) [D.I. 238] (approving commitment fee and expense reimbursement); *In re Exide Tech.*, Case No. 13-11482 (KJC) (Bankr. D. Del. Feb. 4, 2015) [D.I. 3087] (same); *In re William Lyon Homes*, Case No. 11-14019 (CSS) (Bankr. D. Del. Dec. 29, 2011) [D.I. 104]; (same); *In re Lee Enters., Inc.*, Case No. 11-13918 (KG) (Bankr. D. Del. Jan. 11, 2012) [D.I. 149] (same).

36.    The Debtors' agreement to the indemnification provisions set forth in the Backstop Agreements was also necessary to obtain the commitments being provided thereunder. The Backstop Parties, understandably, expect to be protected from claims and litigation arising from those commitments and the Backstop Agreements more generally.    In addition, the indemnification provisions are subject to customary carve-outs for fraud, bad faith, willful misconduct and gross negligence, and are generally of a reasonable and appropriate scope.  Courts in this district and elsewhere have approved debtors' incurrence of similar indemnification obligations in similar contexts. *See, e.g.*, *In re Aspect Software Parent, Inc.*, Case No. 16-10597 (Bankr. D. Del. Mar. 9, 2016) [D.I. 238]; *In re Exide Tech.*, Case No. 13-11482 (KJC) (Bankr. D. Del. Feb. 4, 2015) [D.I. 3087]; *In re William Lyon Homes*, Case No. 11-14019 (CSS) (Bankr. D. Del. Dec. 29, 2011) [D.I. 104].

37.     The Debtors' obligations to pay the commitment premiums, Expense Reimbursements, and indemnities under the Backstop Agreements are entitled to administrative expense status as "actual, necessary costs and expenses of preserving the estate."  11 U.S.C. § 503(b)(1)(A).  As discussed above, each such obligation was a condition precedent to the Backstop Parties' agreement to enter into the Backstop Agreements, without which the Debtors could not be certain that they would have access to debt and equity financing that is essential to the Debtors' ability to consummate the Plan on the timeframe contemplated by the RSA.  Under similar circumstances, courts have recognized that obligations undertaken by debtors in backstop and other financing commitment agreements are entitled to administrative expense status.  *See See, e.g.*, *In re Aspect Software Parent, Inc.*, Case No. 16-10597 (Bankr. D. Del. Mar. 9, 2016) [D.I. 238]; *In re Exide Tech.*, Case No. 13-11482 (KJC) (Bankr. D. Del. Feb. 4, 2015) [D.I. 3087]; *In re Lee Enters., Inc.*, Case No. 11-13918 (KG) (Bankr. D. Del. Jan. 11, 2012) [D.I. 149].

38.     Together, the RSA and Backstop Agreements are critical to the Debtors' ability to consummate, in the near term, a Plan that maximizes creditor recoveries and leaves the Debtors with a sustainable capital structure and liquidity upon emergence.  The relief requested in this Motion is, in turn, essential to the Debtors' ability to keep those agreements in place. Accordingly, the Debtors' entry into the RSA and Backstop Agreements represents an exercise of sound business judgment and should be approved.

## NOTICE

39.     The Debtors will provide notice of this motion by first class mail to: (i) Linda J. Casey of the Office of the United States Trustee for the District of Delaware; (ii) Kramer Levin Naftalis & Frankel LLP as counsel to the Creditors Committee; (iii) the United States Attorney's Office for the District of Delaware; (iv) the attorneys general for the states in which the Debtors conduct business; (v) Akin Gump Strauss Hauer & Feld LLP as counsel to the

ad hoc group of first lien noteholders; (vi) Ashby & Geddes, P.A. as co-counsel to the ad hoc group of first lien noteholders; (vii) Milbank LLP as counsel to the ad hoc group of crossover noteholders; (viii) Jones Day as counsel to the ad hoc group of 1.5 lien noteholders; (ix) Simpson Thacher & Bartlett LLP as counsel to JPMorgan Chase Bank, N.A. as administrative agent and collateral agent under the Debtors' prepetition asset-based revolving credit facility; (x) Wilmington Trust, National Association, as trustee under the First Lien Notes and the Second Lien Notes; (xi) Arnold & Porter Kaye Scholer LLP as counsel to Wilmington Savings Fund Society, FSB, as trustee under the 1.5 Lien Notes; (xii) The Bank of New York Mellon, as trustee under the Borden Debentures; (xiii) Simpson Thacher & Bartlett LLP and Landis Rath & Cobb LLP as counsel to the administrative agent and collateral agent under the Debtors' postpetition financing facility; (xiv) the Internal Revenue Service; (xv) the Securities and Exchange Commission; (xvi) the Pension Benefit Guaranty Corporation; (xvii) the Environmental Protection Agency; and (xviii) all parties that have requested notice pursuant to Bankruptcy Rule 2002.  A copy of the motion is available on the Debtors' case website at http://www.omnimgt.com/HexionRestructuring.

## NO PRIOR MOTION

40.     The Debtors have not made any prior motion for the relief sought in this motion to this Court or any other.

The Debtors respectfully request entry of orders, substantially in the forms attached as <u>Exhibit A</u>, <u>Exhibit B</u>, and <u>Exhibit C</u>, granting the relief requested in its entirety and any other relief as is just and proper.

Dated:    April 25, 2019
   Wilmington, Delaware     <u> /s/ Brendan J. Schlauch    </u>
             Mark D. Collins (No. 2981)
             Michael J. Merchant (No. 3854)
             Amanda R. Steele (No. 5530)
             Brendan J. Schlauch (No. 6115)
             **RICHARDS, LAYTON & FINGER, P.A.**
             One Rodney Square
             920 North King Street
             Wilmington, Delaware 19801
             Telephone: 302-651-7700
             Fax: 302-651-7701
             Email: collins@rlf.com
                merchant@rlf.com
                steele@rlf.com
                schlauch@rlf.com

             - and -
             George A. Davis (admitted *pro hace vice*)
             Andrew M. Parlen (admitted *pro hace vice*)
             Hugh Murtagh (admitted *pro hace vice*)
             **LATHAM & WATKINS LLP**
             885 Third Avenue
             New York, New York 10022
             Telephone: (212) 906-1200
             Facsimile: (212) 751-4864
             Email: george.davis@lw.com
                andrew.parlen@lw.com
                hugh.murtagh@lw.com

             - and -
             Caroline A. Reckler (admitted *pro hace vice*)
             Jason B. Gott (admitted *pro hace vice*)
             **LATHAM & WATKINS LLP**
             330 North Wabash Avenue, Suite 2800
             Chicago, Illinois 60611
             Telephone: (312) 876-7700
             Facsimile: (312) 993-9767
             Email: caroline.reckler@lw.com
                jason.gott@lw.com

             *Proposed Attorneys for the Debtors and Debtors in Possession*