IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | x | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| HEXION HOLDINGS LLC, et al.,[1] | : | Case No. 19-10684 (KG) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| | : | Proposed Obj. Deadline: June 6, 2019 at 1:00 p.m. (ET) |
| | : | Proposed Hr'g Date: June 7, 2019 at 2:00 p.m. (ET) |
| | x | |

**DEBTORS' MOTION FOR ORDER
AUTHORIZING DEBTORS TO (A) ENTER INTO
AND PERFORM UNDER COMMITMENT AND ENGAGEMENT LETTERS AND
FEE LETTERS RELATING TO THE NEW DEBT, (B) PAY FEES AND EXPENSES
IN CONNECTION THEREWITH, AND (C) PROVIDE RELATED INDEMNITIES**

Hexion Holdings LLC ("**Hexion**") and its affiliated debtors and debtors in possession (collectively, the "**Debtors**") respectfully submit this motion for the entry of an order, substantially in the form attached as Exhibit A (the "**Proposed Order**"), pursuant to sections 105(a), 363, 503(b) and 507(a)(2) of title 11 of the United States Code (the "**Bankruptcy Code**") and rules 6004(a) and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), (a) authorizing the Debtors to enter into and perform under (i) the Commitment Letter by and among JPMorgan Chase Bank, N.A. ("**JPMorgan**"), Credit Suisse AG (acting through such of its affiliates or branches as it deems appropriate, "**CS**") and Credit Suisse Loan Funding LLC ("**CSLF**" and, together with CS and their respective affiliates,

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Hexion Holdings LLC (6842); Hexion LLC (8090); Hexion Inc. (1250); Lawter International Inc. (0818); Hexion CI Holding Company (China) LLC (7441); Hexion Nimbus Inc. (4409); Hexion Nimbus Asset Holdings LLC (4409); Hexion Deer Park LLC (8302); Hexion VAD LLC (6340); Hexion 2 U.S. Finance Corp. (2643); Hexion HSM Holdings LLC (7131); Hexion Investments Inc. (0359); Hexion International Inc. (3048); North American Sugar Industries Incorporated (9735); Cuban-American Mercantile Corporation (9734); The West India Company (2288); NL Coop Holdings LLC (0696); and Hexion Nova Scotia Finance, ULC (N/A). The address of the Debtors' corporate headquarters is 180 East Broad Street, Columbus, Ohio 43215.

"**Credit Suisse**"), Wells Fargo Bank, National Association ("**Wells Fargo**"), Barclays Bank PLC ("**Barclays**"), Citigroup Global Markets Inc. ("**CGMI**" and, together with Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as Citi shall determine, "**Citi**"), on behalf of Citi, Deutsche Bank AG New York Branch ("**DBNY**"), Deutsche Bank Securities Inc. ("**DBSI**") and Goldman Sachs Bank USA ("**Goldman Sachs**" and, together with JPMorgan, Credit Suisse, Wells Fargo, Barclays, Citi, DBNY, DBSI and Goldman Sachs, "**ABL Commitment Parties**) and Hexion Inc. (the "**Company**") relating to a new asset-based credit facility (the "**ABL Commitment Letter**"), (ii) the Engagement Letter by and among JPMorgan, Credit Suisse, CGMI, on behalf of Citi, Goldman Sachs, Barclays, and DBSI (collectively, the "**Term Loan Engagement Parties**") and the Company relating to a new term loan facility (the "**Term Loan Engagement Letter**"), (iii) the Engagement Letter by and among Credit Suisse Securities (USA) LLC ("**CS Securities**"), J.P. Morgan Securities LLC ("**JPMorgan Securities**"), Goldman Sachs & Co. LLC ("**GS Co.**"), CGMI, Barclays Capital Inc. ("**Barclays Capital**"), DBSI, and Blackstone Advisory Partners L.P. ("**Blackstone**" and, together with CS Securities, JPMorgan Securities, GS Co., CGMI, Barclays Capital and DBSI, the "**Notes Engagement Parties**" and, together with the ABL Commitment Parties and the Term Loan Engagement Parties, the "**Arrangers**") and the Company relating to new senior unsecured notes (the "**Notes Engagement Letter**" and, together with the ABL Commitment Letter and Term Loan Engagement Letter, the "**Commitment and Engagement Letters**"), and (iv) certain fee letters relating to the New Debt (collectively, the "**Fee Letters**");[2] (b) pay certain fees and

---

[2] Copies of the ABL Commitment Letter and the Term Loan Engagement Letter, and a redacted copy of the Notes Engagement Letter, are annexed hereto as Exhibits B, C, and D, respectively.  Simultaneously with the filing of this Motion, the Debtors are filing a motion seeking authority to file the Notes Engagement Letter in redacted form and the Administrative Agency Fee Letter (the "**ABL Administrative Fee Letter**"), the $350 million Senior Secured Exit Asset-Based Credit Facility Fee Letter (the "**ABL Facility Fee Letter**" and, together with the ABL Administrative Fee Letter, the "**ABL Fee Letters**"), the Exit Term Loan Facility Arrangement Fee Letter (the "**Term Arrangement Fee Letter**"), the Exit Term Loan Facility Administrative Agency Fee Letter (the "**Term**

expenses provided for in the Commitment and Engagement Letters and the Fee Letters; and (c) provide certain related indemnities. In support of this Motion, the Debtors respectfully represent:

**PRELIMINARY STATEMENT**

1. Solicitation of the Plan[3] is underway, and the Debtors are on the precipice of confirming a Plan that has overwhelming support at every level of the Debtors' capital structure, maximizes recoveries to all of the Debtors' creditors, and substantially de-levers the Debtors' balance sheet. Under the Plan, the Reorganized Debtors intend to enter into and borrow under a new asset-based credit facility contemplated by the ABL Commitment Letter (the "**New ABL Credit Facility**") and the term loan contemplated by the Term Loan Engagement Letter (the "**New Term Loan**") and issue senior unsecured notes as contemplated by the Notes Engagement Letter (the "**New Notes**"), which, in the aggregate, will give the Reorganized Debtors approximately $2 billion in debt financing upon emergence. These borrowings are necessary to fund distributions under the Plan, repay the Debtors' DIP Facilities, and allow the Debtors to successfully emerge from chapter 11 with sufficient post-emergence liquidity. More immediately, though, the Debtors need to take the critical step of entering into the Commitment and Engagement Letters and the Fee Letters with the Arrangers in order to facilitate the New

---

*(cont'd from previous page)*
**Administrative Fee Letter**" and, together with the Term Arrangement Fee Letter, the "**Term Loan Fee Letters**"), and the fee letter related to the New Notes (the "**Notes Fee Letter**") under seal (the "**Sealing Motion**"). Accordingly, the description of the fees set forth in the Notes Engagement Letter has been redacted in the publicly-filed version of this Motion. As more fully set forth in the Sealing Motion, the unredacted version of this Motion and the Fee Letters have been or will be shared only with the U.S. Trustee (as defined below), and the counsel and financial advisors to the Creditors' Committee on a confidential and "professionals' eyes only" basis, and certain other parties with whom the Debtors are permitted to share the Fee Letters pursuant to the terms of the Commitment and Engagement Letters, as applicable.

[3] Capitalized terms used but not defined in this motion have the meanings used in the *Second Amended Joint Chapter 11 Plan of Reorganization of Hexion Holdings LLC and Its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* [Docket No. 446] (as may be amended, modified, or supplemented from time to time, the "**Plan**").

3

ABL Credit Facility, the New Term Loan, and the New Notes being in place upon the Debtors' emergence from chapter 11.

2.  The Commitment and Engagement Letters contain the terms of (a) the ABL Commitment Parties' agreement to act as joint lead arrangers and joint bookrunners for the New ABL Credit Facility, (b) the Term Loan Engagement Parties' agreement to act as joint lead arrangers and joint bookrunners for the New Term Loan, and (c) the Notes Engagement Parties' agreement to act as underwriters, placement agents, or initial purchasers for the New Notes, as well as their respective agreements to initiate a syndication and private placement process for those financings. With the Debtors' Plan confirmation hearing less than one month away, it is imperative that syndication and private placement begin immediately to secure commitments for the exit facilities and ensure that the Debtors have sufficient time to obtain the most favorable exit financing terms possible without delaying their emergence from chapter 11. However, the Arrangers require assurance in the form of the Proposed Order that the Debtors will be authorized to pay certain fees and expenses, provide certain indemnities, and perform their obligations under the Commitment and Engagement Letters and the Fee Letters before proceeding with the syndication process.

3.  The Debtors and their advisors conducted a robust marketing process through which they received proposals from several potential arrangers. After careful analysis and extensive negotiations, the Debtors, the ABL Commitment Parties, the Term Loan Engagement Parties, and the Notes Engagement Parties agreed upon the terms of the Commitment and Engagement Letters and the Fee Letters, which are fair and reasonable, and represent the best terms available to the Debtors. The Debtors, in their sound business judgement, believe that entering into and performing their obligations under the Commitment and Engagement Letters

and the Fee Letters is in the best interests of the Debtors, their estates, and their creditors, and therefore the relief requested in this motion should be granted.

## JURISDICTION AND VENUE

4. This Court has jurisdiction to consider this motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b), and, under Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue of these cases and this motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief requested herein are sections 105(a), 363(b), 503(b) and 507(a)(2) of the Bankruptcy Code and Rules 6004(a) and 6004(h) of the Bankruptcy Rules.

## BACKGROUND

5. On April 1, 2019 (the "**Petition Date**"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "**Court**"). The Debtors are authorized to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On April 10, 2019, the Office of the United States Trustee for the

District of Delaware (the "**U.S. Trustee**") appointed the Official Committee of Unsecured Creditors (the "**Creditors' Committee**").[4]

6. Additional information about the Debtors' business, capital structure, and the events leading up to the Petition Date are set forth in the *Declaration of George F. Knight, Executive Vice President and Chief Financial Officer, in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "**Knight Declaration**") [Docket No. 3], filed on the Petition Date.

## RELIEF REQUESTED

7. The Debtors respectfully request entry of the Order, which authorizes the Debtors to: (a) enter into and perform under each of the Commitment and Engagement Letters and the related Fee Letters; (b) pay certain fees and expenses associated with the Commitment and Engagement Letters and the related Fee Letters; and (c) provide certain related indemnities.

## PLAN AND EXIT FINANCING PROCESS

8. On May 22, 2019, the Court entered an order [Docket No. 441] approving the *Disclosure Statement for Second Amended Joint Chapter 11 Plan of Reorganization of Hexion Holdings LLC and Its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* (as amended, modified, and/or supplemented, the "**Disclosure Statement**"), authorizing the Debtors to solicit votes on the Plan, and granting related relief. On May 23, 2019, the Debtors filed solicitation versions of the Plan [Docket No. 446] and Disclosure Statement [Docket No. 447]. A hearing to consider confirmation of the Plan is scheduled for June 24, 2019. [*See* Docket No. 449].

---

[4] On April 24, 2019, the U.S. Trustee amended its appointment of the Creditors' Committee to add two additional members. *See* Docket No. 190. On April 29, 2019, the U.S. Trustee further amended its appointment of the Creditors' Committee to replace one member. *See* Docket No. 226.

6

9.  For the Plan to be effective, all conditions precedent to the incurrence of the New Debt must be satisfied or waived pursuant to the terms of the New Debt Documentation. *See* Plan, Art. VIII.A.4. The New Debt is expected to provide the Debtors with up to approximately $2,000,000,000 in debt financing, in the aggregate, which will permit the Debtors to repay the DIP Facilities, make other distributions contemplated under the Plan, and leave them with adequate liquidity for post-emergence operations.

10. To obtain the debt financing required under the Plan, the Debtors, with the assistance of their financial advisor, Moelis & Company LLC ("**Moelis**"), contacted twelve financial institutions regarding the possibility of providing or arranging an asset-based loan ("**ABL**"), term loan, and/or notes in connection with the Debtors' emergence from chapter 11. Eleven of the financial institutions submitted proposals to the Debtors, offering a range of terms and interest rates, including four unique structures for their exit financing. The Debtors and their advisors extensively evaluated each proposal received (including the cost and execution risk associated with each proposal) and determined that the proposals contemplated in the Commitment and Engagement Letters represented the best available proposals for arranging the New ABL Credit Facility, the New Term Loan, and the New Notes, respectively. Furthermore, the Debtors have negotiated the terms of the Commitment and Engagement Letters and the Fee Letters and will continue to negotiate the terms of the New ABL Credit Facility, the New Term Loan, and the New Notes leading up to and throughout the syndication process.

## THE COMMITMENT, ENGAGEMENT, AND FEE LETTERS

11. The ABL Commitment Letter contemplates a $350,000,000 secured, asset-based revolving credit facility, including a $150,000,000 sub-facility in the form of letters of credit, subject to certain borrowing base requirements at an interest rate substantially

7

consistent with the Debtors' prepetition asset-based revolving credit agreement.[5] The following is a summary of the key terms of the ABL Commitment Letter and the related Fee Letters:

- Roles; Syndication. The Debtors will engage each of JPMorgan, CSLF, Wells Fargo, Barclays, Citi, DBSI and Goldman Sachs as joint bookrunners and joint lead arrangers (the "**ABL Lead Arrangers**" and, together with the initial lenders and their respective affiliates, the "**Financial Institutions**") for structuring, arranging and syndication of the New ABL Credit Facility. Each of the ABL Lead Arrangers will use commercially reasonable efforts to assemble a syndicate of financial institutions (which shall not include certain ineligible institutions specified by the Debtors) as lenders under the New ABL Credit Facility to provide the necessary asset-based revolving financing commitments of up to $350,000,000. *See* ABL Commitment Letter §§ 1-3. JPMorgan will act as sole administrative agent and collateral agent under the New ABL Credit Facility, except that the Debtors may appoint co-agents and co-managers reasonably acceptable to the Financial Institutions. The Debtors have agreed to assist the ABL Lead Arrangers in forming a syndicate, including, among other things, making the Debtors' management available for meetings with prospective lenders, assisting in the preparation of marketing materials, and providing certain information reasonably requested by JPMorgan and CSLF. *See id.* § 3.

- Expenses. In the event the closing date of the New ABL Credit Facility (the "**ABL Closing Date**") occurs, the Debtors will pay or reimburse all reasonable documented out-of-pocket fees, costs and expenses incurred by the Financial Institutions in connection with their due diligence, approval, documentation, syndication and closing of the New ABL Credit Facility, including but not limited to reasonable and documented attorneys' fees and legal expenses of counsel identified in the New ABL Credit Facility term sheet and one local counsel for the ABL Lead Arrangers. *See id.* § 7.

- Indemnity. The Debtors will indemnify and hold harmless each Financial Institution and its affiliates, and the respective officers, directors, employees, agents, controlling persons, members, advisors and representatives of each of the foregoing and their respective successors and assigns. *See id.* § 7. The Debtors' indemnification obligations are subject to customary carve-outs for losses arising from (a) willful misconduct, bad faith or gross negligence of an indemnified person, (b) a material breach of the ABL Commitment Letter by an indemnified person, (c) disputes solely among indemnified persons not involving any act or omission of the Debtors, or (d) any settlement entered into by an indemnified person without the Debtors' consent, among other exclusions. *See id.* § 7.

---

[5] Summaries of material terms of the New ABL Credit Facility, the New Term Loan, and the New Notes will be filed as part of the Plan Supplement.

8

US-DOCS\107933366.15RLF1 21324610v.1

- Fees. The Debtors will pay the fees described in the ABL Fee Letters on the ABL Closing Date. *See* ABL Administrative Fee Letter § 1; ABL Facility Fee Letter § 1.

- Confidentiality. The ABL Commitment Letter contains certain confidentiality restrictions prohibiting the Debtors and their affiliates from disclosing the ABL Commitment Letter, the related ABL Fee Letters, and their contents to third parties, subject to certain exceptions, including permitting the Debtors to disclose the ABL Commitment Letter and the ABL Fee Letters to (a) this Court, under seal or in redacted form, to the extent required to obtain Court approval of the ABL Commitment Letter and ABL Fee Letters, (b) the advisors to the Creditors' Committee, and (c) the U.S. Trustee. *See* ABL Commitment Letter § 12.

12.  The Debtors also seek authority to enter into and perform under the Term Loan Engagement Letter, pursuant to which the Term Loan Engagement Parties will undertake to syndicate a $1.2 billion secured term loan facility. The following is a summary of the key terms of the Term Loan Engagement Letter and the related Term Loan Fee Letters:

- Roles; Syndication. The Debtors will engage each of JPMorgan, CSLF, Citi, Goldman Sachs, Barclays and DBSI as joint bookrunners and joint lead arrangers (the "**Term Loan Lead Arrangers**") for structuring, arranging and syndication of the New Term Loan. Each of the Term Loan Lead Arrangers will use commercially reasonable efforts to assemble a syndicate of banks, financial institutions and other institutional lenders (which shall not include certain ineligible institutions specified by the Debtors) as lenders (the "**Lenders**") under the New Term Loan to provide the necessary term loan financing commitments of up to $1,200,000,000. *See* Term Loan Engagement Letter § 1. JPMorgan will act as sole administrative agent and sole collateral agent under the New Term Loan, except that the Debtors may appoint co-agents and co-managers reasonably acceptable to the Term Loan Engagement Parties. The Debtors have agreed to assist the Term Loan Lead Arrangers in forming a syndicate, including, among other things, making the Debtors' management available for meetings with prospective lenders, assisting in the preparation of marketing materials, and providing certain information reasonably requested by the Term Loan Lead Arrangers and Lenders. *See id.* § 3.

- Expenses. In the event the closing date of the New Term Loan (the "**Term Closing Date**") occurs, the Debtors will pay or reimburse all reasonable documented out-of-pocket fees, costs and expenses incurred by the Term Loan Lead Arrangers in connection with their due diligence, syndication, travel, disbursements and other charges of counsel and of a single firm of

9

local counsel to the Term Loan Lead Arrangers in each appropriate jurisdiction retained with your written consent. *See id.* § 6.

- Indemnity. The Debtors will indemnify and hold harmless each of the Term Loan Engagement Parties, each of their respective affiliates, and each of their officers, directors, employees, agents, advisors, representatives, controlling persons and members and their successors and assigns on the terms set forth in Section 6 of the Term Loan Engagement Letter. *See id.* § 6. The Debtors' indemnification obligations are subject to customary carve-outs for losses arising from (a) willful misconduct, bad faith or gross negligence of an indemnified person, (b) a material breach of the Term Loan Engagement Letter by an indemnified person, (c) disputes solely among indemnified persons not involving any act or omission of the Debtors, or (d) any settlement entered into by an indemnified person without the Debtors' consent, among other exclusions. *See id.* § 7.

- Fees. The Debtors will pay the fees described in the Term Loan Fee Letters on the Term Closing Date. *See* Term Administrative Fee Letter § 1; Term Arrangement Fee Letter § 1.

- Confidentiality. The Term Loan Engagement Letter contains certain confidentiality restrictions prohibiting the Debtors and their affiliates from disclosing the Term Loan Engagement Letter, the related Term Loan Fee Letters, and their contents to third parties, subject to certain exceptions, including requiring the Debtors to file the Term Loan Fee Letters with this Court under seal or in redacted form reasonably satisfactory to the Term Loan Lead Arrangers, and to provide an unredacted copy to the U.S. Trustee and to the advisors of the Creditors' Committee. *See* Term Loan Engagement Letter § 6.

13.  In addition to the ABL Commitment Letter and the Term Loan Engagement Letter, the Debtors seek authority to enter into and perform under the Notes Engagement Letter, pursuant to which the Notes Engagement Parties will undertake a Rule 144A or other private placement of senior unsecured notes in aggregate principal amount of $450 million. The following is a summary of the key terms of the Notes Engagement Letter and Notes Fee Letter:

- Roles. The Debtors will engage each of the Notes Engagement Parties as joint lead bookrunning managing underwriters, joint lead bookrunning managing placement agents, or joint lead bookrunning managing initial purchasers (the "**Notes Underwriters**") for the structuring, underwriting and placement of the New Notes. The Notes Underwriters services consist of (i) assistance in the

10

preparation of an offering document, (ii) assistance in structuring such offering and its terms, (iii) assistance in the preparation of any rating agency presentations and roadshows, and (iv) organizing the marketing effort to identify selected purchasers of the New Notes. *See* Notes Engagement Letter § 1.  The Debtors have agreed to assist the Notes Underwriters in the completion of the offerings, including, among other things, making the Debtors' senior officers and representatives available to the Notes Underwriters in connection with the offering (including by making them available to assist in the preparation of one or more offering documents, to participate in due diligence sessions, and to participate in one or more roadshows) and providing certain information reasonably requested by the Notes Underwriters. *See id.* § 2.

- Expenses. In connection with any offering, the Debtors shall cause the applicable issuer to pay for all printing costs, filing fees, customary "blue sky" fees and expenses relating to filings and clearances with the Financial Industry Regulatory Authority, Inc. and any rating agencies and the Debtors' share of road-show costs. *See id.* § 6.

- Indemnity. The Debtors will indemnify and hold harmless each of the Notes Engagement Parties, each of their respective affiliates, and each of their members, directors, officers, partners, agents, advisors, employees, and any other controlling persons on the terms set forth in Annex A of the Notes Engagement Letter. *See id.* § 5. The Debtors' indemnification obligations are subject to customary carve-outs for losses arising from (a) willful misconduct or gross negligence of an indemnified person, or (b) certain settlements entered into by an indemnified person without the Debtors' consent, among other exclusions, in each case as set forth in Annex A. *See id.* Annex A.

- Fees.  The Debtors will pay the fees described in the Notes Engagement Letter and Notes Fee Letter on the closing of the offering of the New Notes. *See id.* § 6.

- Confidentiality.  The Notes Engagement Letter contains certain confidentiality restrictions prohibiting the Debtors and their affiliates from disclosing the Notes Engagement Letter and its contents to third parties, subject to certain exceptions, including allowing the Debtors to file the Notes Engagement Letter with this Court under seal and to provide unredacted copies to the U.S. Trustee and to the counsel and financial advisors to the Creditors' Committee on a confidential and "professionals' eyes only" basis. *See id.* § 9.

11

## BASIS FOR RELIEF REQUESTED

**I.   Entry Into and Performance Under the Commitment and Engagement Letters and the Fee Letters is a Sound Exercise of the Debtors' Business Judgment and Should be Approved.**

14.   The Debtors are seeking authority under sections 105(a) and 363(b) of the Bankruptcy Code to enter into and perform under the Commitment and Engagement Letters and the Fee Letters, including paying certain fees and reimbursing expenses provided thereunder, and providing certain related indemnities.  Section 105(a) of the Bankruptcy Code provides, in pertinent part, that the "[c]ourt may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a). Under section 363(b)(1) of the Bankruptcy Code, a debtor may, in the exercise of its sound business judgment and after notice and a hearing, "use, sell or lease, other than in the ordinary course of business, property of the estate." *Id*. § 363(b)(1).

15.   Generally, the debtor is only required to "show that a sound business purpose" justifies the proposed use of property. *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring "good business reason" for use under section 363(b) of the Bankruptcy Code).  This standard prohibits other parties from second-guessing the debtor's business judgment if the debtor has shown that the proposed use will benefit the debtor's estate. *See In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

16. Substantial business justifications support the Debtors' decision to enter into the Commitment and Engagement Letters and the Fee Letters, pay the required fees and expenses, and provide the required indemnities. First, the Debtors have an urgent need to solidify lending commitments for the New ABL Credit Facility and the New Term Loan, and the placement of the New Notes, as, without committed exit financing contemplated by the Plan, the Debtors will be unable to fund distributions under the Plan, repay the DIP Facilities, or successfully emerge from chapter 11 with sufficient post-emergence liquidity. The ABL Commitment Parties' and the Term Loan Engagement Parties' syndication efforts, and the Notes Engagement Parties' placement efforts, are integral to the Debtors' ability to promptly obtain those commitments.

17. Second, the Debtors undertook a thorough marketing process followed by careful analysis of each proposal and extensive negotiations with the ABL Commitment Parties, the Term Loan Engagement Parties, and the Notes Engagement Parties to reach the terms of the Commitment and Engagement Letters and the Fee Letters, which are fair and reasonable under the circumstances.

18. Third, commencing the syndication process, as well as obtaining commitments for the New ABL Facility, sends a strong, positive signal to the Debtors' creditors, many of whom will either continue to do business with the Reorganized Debtors or be the Reorganized Debtors' new shareholders, that (a) capital markets are confident in the Reorganized Debtors' prospects and (b) the Reorganized Debtors will emerge with the liquidity they need for successful post-emergence operations.

19. Courts in this and other districts have approved debtors' entry into commitment and/or engagement letters in connection with exit financing, and the incurrence of

13

obligations under such letters, based on such debtors' reasonable business judgement, in other chapter 11 cases.  *See, e.g., In re Panda Temple Power, LLC*, Case No. 17-10839 (LSS) (Bankr. D. Del. Dec. 18, 2017) [Docket No. 468] (authorizing debtors to enter into exit financing fee letter); *In re Optima Specialty Steel, Inc.*, Case No. 16-12789 (KJC) (Bankr. D. Del. Sept. 27, 2017) [Docket No. 1062] (authorizing debtors to enter into exit financing commitment letter and related fee letter); *In re Triangle USA Petroleum Corp.*, Case No. 16-11566 (MFW) (Bankr. D. Del. Jan. 23, 2017) [Docket No. 632] (authorizing debtors to enter into exit financing engagement letter); *In re Chaparral Energy, Inc.*, No. 16-11144 (LSS) (Bankr. D. Del. Dec. 14, 2016) [Docket No. 647] (authorizing debtors to enter into exit financing mandate letter); *In re Verso Corp.*, Case No. 16-10163 (KG) (Bankr. D. Del. May 25, 2016) [Docket No. 963] (authorizing debtors to enter into exit financing engagement letters and related fee letter).

II. **The Debtors' Fee, Expense, and Indemnity Obligations are Entitled to Allowed Administrative Expense Status under Sections 503(b) and 507(a)(2) of the Bankruptcy Code.**

20. The Debtors' obligations under the Commitment and Engagement Letters and the Fee Letters are entitled to allowed administrative expense status in respect of each of the Debtors as "actual, necessary costs and expenses of preserving the estate."  11 U.S.C. § 503(b)(1)(A), 507(a)(2).  As discussed above, each such obligation was necessary to secure the ABL Commitment Parties' and the Term Loan Engagement Parties' arrangement and syndication services, and the Notes Engagement Parties' placement and underwriting services, which the Debtors and their advisors determined were the best terms under which the Debtors could obtain the exit financing that is essential to the Debtors' ability to consummate the Plan on the timeframe contemplated by the Restructuring Support Agreement.  Under similar circumstances, courts have recognized that obligations undertaken in connection with a debtor's exit financing commitment agreements are entitled to administrative expense status.  *See In re*

14

*Optima Specialty Steel, Inc.*, Case No. 16-12789 (KJC) (Bankr. D. Del. Sept. 27, 2017) [Docket No. 1062] (approving fees and expenses incurred pursuant to the exit financing commitment and fee letters as allowed administrative expense claims); *In re Triangle USA Petroleum Corp.*, Case No. 16-11566 (MFW) (Bankr. D. Del. Jan. 23, 2017) [Docket No. 632] (approving fees and expenses incurred pursuant to the exit financing engagement letter as allowed administrative expense claims); *In re Chaparral Energy, Inc.*, No. 16-11144 (LSS) (Bankr. D. Del. Dec. 14, 2016) [Docket No. 647] (approving fees and expenses incurred pursuant to the exit financing mandate letter as allowed administrative expense claims); *In re Verso Corp.*, Case No. 16-10163 (KG) (Bankr. D. Del. May 25, 2016) [Docket No. 963] (approving fees and expenses incurred pursuant to the exit financing engagement and fee letters as allowed administrative expense claims).

21. The Arrangers' services are critical to the Debtors' ability to consummate a Plan that maximizes creditor recoveries and leaves the Debtors with a sustainable capital structure and liquidity upon emergence, and the fees, expenses, and indemnities provided in the Commitment and Engagement Letters and the Fee Letters were necessary to induce the Arrangers to enter into such agreements. Accordingly, the Debtors respectfully submit that all fees, expenses, and indemnities in the Commitment and Engagement Letters and the Fee Letters are entitled to allowed administrative expense status under sections 503(b) and 507(a)(2) of the Bankruptcy Code.

### III. Waiver of Bankruptcy Rule 6004(a) Notice Requirements and 6004(h) Stay.

22. Bankruptcy Rule 6004(a) requires notice of a proposed use, sale or lease of property outside the ordinary course of business to be given in accordance with Rule 2002 of the Bankruptcy Code, including the requirement that 21 days' notice be provided to all creditors and other parties in interest. Fed. R. Bankr. P. 6004(h). Bankruptcy Rule 6004(h) provides that

an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." *Id*.

23.  Waivers of the notice requirements of Bankruptcy Rule 6004(a) and the stay provided by Bankruptcy Rule 6004(h) are warranted here. The Arrangers, working in good faith with the Debtors, have already spent time and incurred expenses negotiating term sheets and other documentation and will incur additional expenses in the coming weeks as they, as applicable, syndicate the facilities, structure, underwrite, and place the New Notes, and finalize documentation, and prepare for the Effective Date of the Plan. Therefore, it is important that the Commitment and Engagement Letters and the Fee Letters become effective and enforceable against the Debtors immediately to give the ABL Commitment Parties, the Term Loan Engagement Parties, and the Notes Engagement Parties the certainty they need to move forward with their processes and facilitate confirmation and consummation of the Plan and the Debtors' successful emergence from chapter 11. For these reasons, the Bankruptcy Rule 6004(h) stay should be waived.

## NOTICE

24.  The Debtors will provide notice of this motion by overnight mail to: (i) Linda J. Casey of the Office of the United States Trustee for the District of Delaware; (ii) Kramer Levin Naftalis & Frankel LLP and Bayard, P.A. as co-counsel to the Creditors' Committee; (iii) the United States Attorney's Office for the District of Delaware; (iv) the attorneys general for the states in which the Debtors conduct business; (v) Akin Gump Strauss Hauer & Feld LLP as counsel to the ad hoc group of first lien noteholders; (vi) Milbank LLP as counsel to the ad hoc group of crossover noteholders; (vii) Jones Day as counsel to the ad hoc group of 1.5 lien noteholders; (viii) Simpson Thacher & Bartlett LLP as counsel to JPMorgan Chase Bank, N.A. as administrative agent and collateral agent under the Debtors' prepetition

asset-based revolving credit facility; (ix) Wilmington Trust, National Association, as trustee under the First Lien Notes and the Second Lien Notes; (x) Arnold & Porter Kaye Scholer LLP as counsel to Wilmington Savings Fund Society, FSB, as trustee under the 1.5 Lien Notes; (xi) The Bank of New York Mellon, as trustee under the Borden Debentures; (xii) Simpson Thacher & Bartlett LLP and Landis Rath & Cobb LLP as counsel to the administrative agent and collateral agent under the Debtors' postpetition financing facilities; (xiii) the Internal Revenue Service; (xiv) the Securities and Exchange Commission; (xv) the Pension Benefit Guaranty Corporation; (xvi) the Environmental Protection Agency; and (xvii) all parties that have requested notice pursuant to Bankruptcy Rule 2002. A copy of the motion is available on the Debtors' case website at http://www.omnimgt.com/HexionRestructuring.

## NO PRIOR MOTION

25. The Debtors have not made any prior motion for the relief sought in this motion to this Court or any other.

US-DOCS\107933366.15RLF1 21324610v.1

The Debtors respectfully request that the Court enter the Proposed Order, granting the relief requested in its entirety and any other relief as is just and proper.

Dated: May 29, 2019
Wilmington, Delaware

*/s/ Brendan J. Schlauch*
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:    302-651-7700
Fax:          302-651-7701
Email:        collins@rlf.com
              merchant@rlf.com
              steele@rlf.com
              schlauch@rlf.com

- and -

George A. Davis (admitted *pro hac vice*)
Andrew M. Parlen (admitted *pro hac vice*)
Hugh Murtagh (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022
Telephone:    (212) 906-1200
Facsimile:    (212) 751-4864
Email:        george.davis@lw.com
              andrew.parlen@lw.com
              hugh.murtagh@lw.com

- and -

Caroline A. Reckler (admitted *pro hac vice*)
Jason B. Gott (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:    (312) 876-7700
Facsimile:    (312) 993-9767
Email:        caroline.reckler@lw.com
              jason.gott@lw.com

*Attorneys for the Debtors and Debtors in Possession*