IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>MALLINCKRODT PLC, *et al.*<br><br>Debtors.[1] | ) Chapter 11<br>)<br>) Case No. 20-12522 (JTD)<br>)<br>) (Jointly Administered)<br>)<br>) **Re: D.I. 2433**<br>) |

**DECLARATION OF PETER A. CICALA IN SUPPORT OF DEBTORS'
MOTION FOR ENTRY OF ORDER (I) APPROVING SALE OF
VTS ASSETS TO MANDOS LLC FREE AND CLEAR OF ALL LIENS,
CLAIMS, INTERESTS AND ENCUMBRANCES; (II) AUTHORIZING
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS RELATED THERETO; AND (III) GRANTING RELATED RELIEF**

Pursuant to 28 U.S.C. § 1764, I, Peter A. Cicala, declare and state as follows:

1. I am the Chief Intellectual Property and Innovation Officer at Beren Therapeutics, P.B.C. ("Beren"), a Delaware public benefit corporation incorporated in 2019, with offices located in West Hollywood, California. I am authorized to make this Declaration on behalf of Beren and MANDOS LLC ("Buyer"), a Delaware limited liability company.

2. I submit this declaration ("Declaration") in connection with and in support of the Debtors' motion ("Sale Motion")[2] seeking entry of an order authorizing and approving, among other things, the sale by Vtesse LLC ("Vtesse" or "Seller") of assets ("VTS Assets") related to VTS-270, also known as adrabetadex ("Product" or "VTS-270"), to Buyer, as described in more

---

[1] A complete list of the debtors ("Debtors") in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

[2] D.I. 2433.

{00031053. }

detail in that certain Asset Purchase Agreement, by and among Seller, Buyer and Beren (solely for purposes of Section 9.12(b) thereof), dated May 14, 2021 ("VTS APA").

3. Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, information provided to me, my review of relevant documents, and/or my personal experience. If called to testify, I would testify competently to the facts set forth in this Declaration.

**BACKGROUND**

4. The Buyer is a wholly-owned subsidiary of Beren, formed to consummate the sale transaction under the VTS APA ("Sale Transaction"). Beren is a fast-growing, clinical stage, biotechnology company focused on developing highly innovative, efficacious therapies to improve the health of patients living with life-threatening diseases. Beren is well funded with approximately $29.2 million in predominately liquid assets, as of June 1, 2021. Beren has an executive team that has developed over 62 therapies approved by the Food and Drug Administration ("FDA").

5. The Product that is the subject of the VTS APA is used in the treatment of Niemann-Pick, Type C Disease ("NPC"), a lysosomal storage disorder also known as "childhood Alzheimer's disease." NPC is a rare, inherited, and progressive lysosomal disorder that impairs the body's ability to transport cholesterol and other fatty substances (lipids) within cells. This leads to the abnormal accumulation of these substances within various tissues of the body, including brain tissue. The disease is present at birth but symptoms can develop at any time and diagnosis is not always immediate. Age of diagnosis can range between early and late infantile, juvenile and adult ages, although many patients are diagnosed before or around five years of age. NPC can lead to loss of cognition, speech, the ability to swallow, mobility and eventually death.

This fatal neurodegenerative disease has no known cure and is increasingly debilitating to the affected children, as well as their families and caregivers as they watch their loved ones decline in a devastating way. There is an urgent public need for treatments for NPC, and the community of NPC patients and their parents, view VTS-270 as a key potential treatment.

6. Unfortunately, the pivotal clinical study conducted by Vtesse did not establish the efficacy of VTS-270, and participants experienced a significant reduction in hearing (ototoxicity), which is a known safety issue associated with this particular cyclodextrin (HPβCD). This led Vtesse to conclude that VTS-270 had an unfavorable risk/benefit profile, a determination that was supported by an external data monitoring and safety board, as well as by regulators. I understand that Vtesse determined—following receipt of a general advice letter from the FDA in April 2020 and after consultation with experts in the field—that regulators required additional evidence to demonstrate the benefit of VTS-270 in NPC patients in order to approve the drug for commercialization. Beren understands that following this determination of the negative risk/benefit profile in January 2021, Vtesse, with the support of the FDA, began planning to cease all active VTS-270 clinical studies. Vtesse agreed with the FDA to allow for a nine-month 'transition' period for patients to plan for other treatment options, or transition to an Investigator-Sponsored Expanded Access Program ("EAP"), by October 20, 2021.

**BUYER'S RESOURCES**

7. For several reasons discussed below, we believe that the Buyer and Beren are best-positioned to demonstrate the efficacy of VTS-270 in NPC patients and an acceptable benefit/risk profile, through the required clinical trials and development activities, that is necessary to seek FDA approval and continue the EAP until patients can potentially be transitioned to study drugs or commercial drugs. This would enable the children in clinical trials and the VTS-270 EAP to

continue critical treatment, and help to establish a viable treatment for the approximately 500-800 children in the United States and around the world suffering from NPC.

8.  First, Beren has had the ability to study the results from the initial clinical trials as part of its diligence process for the VTS APA. This crucial time that Beren was able to spend reviewing the data and consulting with Vtesse's clinical team, prior to the departure of certain key Vtesse employees, enabled Beren to formulate a path forward for the development of VTS-270 and to develop plans for continuing the EAP.

9.  Second, Beren has invested significant resources in preparing for the acquisition of VTS-270 and planning for the continuity of the EAP for the benefit of NPC patients. Beren's willingness to invest its time and resources in creating a path forward for the NPC community in the face of this uncertainty demonstrates Beren's commitment and that Beren places compassion for the NPC community over profits. This is just one example of the values inherent in Beren's structure as a public benefit corporation ("PBC").

10. As a PBC, Beren has the ability to align the interests of its shareholders and the NPC patient community. As a result, Beren is committed to spending some of its corporate profits to produce a positive effect for society and individuals through the development and distribution of cost-effective, efficacious treatments for a broad range of diseases with unmet need, and in doing so, provide improvements to the quality of life for individuals suffering from rare diseases (including ultra-orphan diseases like NPC) and produce significant improvements in healthcare systems. Beren will be able to prioritize allocation of resources to the development of VTS-270 and other important NPC activities, such as initiatives for global NPC newborn screening, which will benefit both the patient community and our shareholders. Beren has already put significant

resources into creating a dedicated website for patients' caregivers regarding the EAP, and it is ready to make the website live following court approval and closing of the Sale Transaction.

11. Third, Beren possesses the scientific, medical and clinical expertise needed to complete the clinical trials required to demonstrate VTS-270's efficacy, obtain FDA approval and make VTS-270 accessible to NPC patients. Beren has a workforce of approximately 25 employees, at least twenty of whom possess medical and scientific degrees with extensive experience in the pharmaceutical industry. Beren's leadership team has comprehensive experience with respect to preclinical and clinical development and expanded access programs and has the entrepreneurial skills necessary to build enduring companies. Indeed, Beren's leadership team and advisory board members have played pivotal roles in shepherding numerous drugs and biologics throughout the development process, resulting in 62 FDA approvals across 17 therapeutic areas, 5 CNS (central nervous system) and 7 rare and ultra-orphan disease drug or biologic therapies. Collectively, Beren's executives have over 200 years of pharmaceutical industry experience.

12. Beren's executives will be dedicated to, and will oversee, the development of VTS-270. Beren's leadership team will be fully available to Buyer throughout the clinical development and commercialization of VTS-270. We believe that it is will be a unique opportunity for such a senior and accomplished leadership team to be devoted to the success of a program such as VTS-270 and demonstrates our dedication to moving the program forward.

13. Beren also has a full-service laboratory in Germany, and is in the process of opening a U.S. laboratory in Southern California where research, development and clinical trials can be conducted.

14. Finally, Beren and Buyer possess the requisite financial resources to develop, seek approval and make the Product available to NPC patients. Beren has $29.2 million in

predominately liquid assets that can be deployed today to begin the work necessary to continue supply of VTS-270 to patients in the EAP, and to conduct the clinical trials necessary to further develop this important drug. Beren will make needed financial resources available to Buyer. Beren's investors include some of the most successful investors and investment firms in the world, including Peter Thiel, Christian Angermayer, Founders Fund, Presight Capital, Falcon Edge and Moore Capital. These investors have invested in a number of industry-defining life science and technology companies, including PayPal, Facebook, Airbnb, Auris Health, Roivant Sciences, Compass Pathways, Adimab, AbCellera, Oscar Health, and SpaceX. Including their investment in Beren, our investors have collectively raised over $26.9 billion to date to support the development and manufacture of therapeutics. Indeed, Beren is backed by the co-founder of the company that became Alnylam, which developed the first RNAi therapy approved by the FDA and has a $15 billion market capitalization today.

15. To ensure continued access to the Product by patients in the NPC community, it is crucial that the Sale Transaction be approved and closed as soon as possible. Vtesse has a limited supply of VTS-270 on hand and has announced that it is shutting down the EAP by October 20, 2021. Beren also was advised by Vtesse that Janssen Pharmaceuticals, the subsidiary of Johnson & Johnson that is the current manufacturer of VTS-270, is no longer manufacturing VTS-270 for patients. There is a significant lag time between placing an order for the manufacture of VTS-270 and the delivery of finished product, which can be as long as one year. Given the foregoing, Beren will have to negotiate with Janssen Pharmaceuticals or another supplier as soon as possible after the Sale Transaction is approved to ensure continuity of supply, making timely consummation of the sale crucial. Any delay threatens the continuity of treatment for NPC patients. Given the urgency of insuring continued patient access to VTS-270, Beren and the Buyer stand ready to close

the Sale Transaction as soon as possible following entry of the Court's order approving the Sale Transaction.

16. Additionally, from the Buyer's and Beren's perspective, a delayed closing entails additional risks that may make proceeding with the Sale Transaction unfeasible. Among other things, if supply to NPC patients is disrupted because of a protracted sale process, Beren could face significant reputational damage as a result. In addition, as mentioned above, Vtesse has experienced significant attrition of key employees working on this program as a result of its restructuring. Any further delay of the closing would likely risk additional losses of key personnel and jeopardize the smooth post-acquisition transition of the EAP and other clinical programs, threatening the continuity of access to this vital drug by NPC patients.

## GOOD FAITH

17. In mid-2020, Beren reached out to Vtesse with an initial offer to take over the VTS Assets and continue development of this promising treatment for NPC. The discussions ceased in 2020 because Vtesse was focused on analyzing all available data to determine a path forward for the program. Vtesse and Beren resumed talks in February 2021, subsequent to Vtesse's announcement of its discontinuation of the VTS-270 program after its analysis of clinical data resulted in the negative risk/benefit profile for the therapy. Following our initial discussions, Vtesse provided Beren with access to a data room for the purpose of conducting financial and operational due diligence with respect to the VTS Assets. In tandem with its due diligence review of materials provided by Vtesse, Beren (along with its advisors) engaged in extensive negotiations regarding the terms of the Purchase Agreement. Both parties were represented by separate legal advisors during the negotiations, which were conducted at arms-length and in good faith. At no time throughout the process did Beren or Buyer enter into any agreements with third parties

regarding the VTS Assets or otherwise engage in collusion with the Debtors or any third party, or act in any manner other than in good faith.

18. Although we were made aware that other parties expressed interest throughout the course of this year, I understand that Vtesse determined that Beren and Buyer had shown the most consistent interest in the development of VTS-270 and demonstrated that Beren and Buyer had the resources necessary to pursue development and approval of VTS-270 for patients in need.

19. Neither Buyer nor Beren (nor any of its members, officers, directors, principals or shareholders) is an "insider" or affiliate of any of the Debtors (as those terms are defined in section 101 of the Bankruptcy Code). Beren employed a former employee of Vtesse for a short term as Senior Director of Chemistry, Manufacturing and Controls Strategy, but that employee left Beren on April 16, 2021 (although the employee provided consulting services until May 14, 2021). At no time was Beren's former employee an "insider" or former "insider" of the Debtors. There is no common identity of incorporators, managers, directors, officers or controlling stockholders between Buyer and Beren, on the one hand, and the Debtors, on the other hand.

## ASSUMED CONTRACTS

20. As a part of the sale, the Debtors intend to assume and assign certain executory contracts ("Assumed Contracts") to the Buyer. The Buyer has agreed to pay any cure amounts associated with the assumption and assignment of the Assumed Contracts, subject to the Cure Cap (as defined in the VTS APA) of $400,000. The Buyer has the necessary financial capacity to pay any cure amounts due under the Assumed Contracts, and to continue performing under the Assumed Contracts following consummation of the Sale Transaction.

21. To ensure a seamless transition of the clinical trials and operations related to the Product, the Buyer has negotiated and will enter into a transition services agreement ("TSA") with

Vtesse upon consummation of the Sale Transaction. Under the TSA, Vtesse will provide interim services to Vtesse giving it access to the Debtors' capabilities and resources, including skilled employees and consultants, necessary to continue uninterrupted operations with clinical trial partners, service providers and counterparties to the Assumed Contracts.

22. The Buyer is capitalized through and has access to the financial and other resources and capabilities of Beren. Indeed, pursuant to Section 9.12(b) of the VTS APA, Beren has agreed to "unconditionally guarantee[]…the prompt payment and full performance and observation by the Buyer and any other Affiliate of Buyer of each and every covenant, obligation, agreement and undertaking required to be performed by the Buyer and any other Affiliate of the Buyer arising out of, connected with or related to" the VTS APA ("Buyer Guarantee"). *See* VTS APA, § 9.12(b). Additionally, as noted above, Beren currently has approximately $29.2 million in predominately liquid assets, a workforce of approximately 25 employees, and a strong management team possessing significant medical, scientific, clinical and regulatory experience in the pharmaceutical industry. Lastly, in addition to our strong financial position, Beren and Buyer have an extremely accomplished and motivated investor base.

23. It is my understanding that members of the NPC community are ready and willing to engage with Buyer and Beren as partners in the fight against NPC, and a number of them already have expressed support for Buyer's acquisition of the VTS Assets. Additionally, Beren has received a letter from Senators Kyrsten Sinema and Mark Kelly and Congressional Member Debbie Lesko in support of the Buyer's acquisition of the VTS Assets. *See* Exh. O to *Declaration of James F. Lathrop in Support of the Official Committee of Unsecured Creditors' Objection to the Debtors' Sale Motion* [D.I. 2695].

24.      In light of the foregoing, I believe that the Buyer has the financial wherewithal, management expertise, commitment and resources necessary to continue performing under the Assumed Contracts.

25.      Pursuant to 28 U.S.C. § 1764, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: Flemington, NJ
       June 25, 2021

                                          */s/ Peter A. Cicala*
                                            Peter A. Cicala